IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ERG TRANSIT SYSTEMS (USA), INC.,** | } | |
| | } | |
| *Plaintiff,* | } | |
| | } | **Judge Rosemary M. Collyer** |
| **v.** | } | **Case No. 1:07-cv-01924** |
| | } | |
| **WASHINGTON METROPOLITAN** | } | |
| **AREA TRANSIT AUTHORITY,** | } | |
| | } | |
| **Defendant.** | } | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Comes now the Plaintiff, ERG Transit Systems Inc., ("ERG"), by and through its undersigned counsel, pursuant to Federal Rules of Civil Procedure 7 and 56, Local Rules of Civil Procedure 7.1 and 56.1, and the Court's January 17, 2008 Order, hereby move this Court to grant summary judgment against Defendant Washington Metropolitan Area Transit Authority ("WMATA") and in favor of Plaintiff.

WMATA violated its Public Access to Records Policy ("PARP") by deciding to release Plaintiff's confidential and proprietary commercial and financial information and trade secrets to a direct competitor. As set forth more fully in the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment and the Statement of Material Facts in Support of Plaintiff's Motion for Summary Judgment, WMATA violated the PARP because WMATA's decision to release that information is (1) in excess of its authority under the PARP and (2) prohibited by the Trade Secrets Act.

**WHEREFORE**, ERG respectfully requests that this Court:

Permanently enjoin Defendant WMATA from releasing Plaintiff's confidential and proprietary commercial and financial information and trade secrets to a direct competitor.

Respectfully submitted,

**ERG TRANSIT SYSTEMS (USA), INC.**

By its attorneys:  /s/ Benjamin J. Lambiotte

Benjamin J. Lambiotte, Esq.
D.C. Bar No. 421288
blambiotte@gsblaw.com

Matthew C. Hoyer, Esq.
D.C. Bar. No. 975544
Robert A.W. Boraks, Esq.
D.C. Bar No.      72132

**GARVEY SCHUBERT BARER**
1000 Potomac Street, Fifth Floor
Washington, D.C. 20007
(202) 965-7880

Dated:  May 30, 2008

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ERG TRANSIT SYSTEMS (USA), INC., } | |
| } | |
| *Plaintiff,* } | |
| } | Judge Rosemary M. Collyer |
| v. } | Case No. 1:07-cv-01924 |
| } | |
| WASHINGTON METROPOLITAN } | |
| AREA TRANSIT AUTHORITY, } | |
| } | |
| *Defendant.* } | |
| } | |

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to LCvR 7(h) and LCvR 56, Plaintiff ERG Transit Systems (USA) Inc. ("ERG"), hereby respectfully submits the following Statement of Material Facts Not in Dispute in Support of its Motion for Partial Summary Judgment, along with Exhibits 1 through 5, hereto, and the documents attached to Exhibit 1.

**A.    Parties**

1.    Plaintiff ERG Transit Systems (USA), Inc., is a corporation organized and existing under the laws of California, having its principal place of business in Concord, California. Winyard Dec. Ex. 1 ¶ 2[1]; Def. Ans.[2] ¶ 1. Its parent company, ERG Ltd., is located in Perth, Western Australia. *Id.*

2.    The ERG Group is one of the world's leading developers and suppliers of integrated fare management software systems, and smart card systems and services for the transit industry, with transit customers throughout the world. *Id.*

3.    WMATA is an interstate instrumentality created under an interstate Compact

---

[1] "Winyard Dec. Ex. 1" refers to the Declaration of John Winyard, which is Exhibit 1, hereto. Documents attached to Mr. Winyard's Declaration are referred to herein as Attachments A – E ("Att.").
[2] "Def. Ans." refers to the Defendant's Answer to the First Amended Complaint.

among the District of Columbia, the State of Maryland, and the Commonwealth of Virginia to create, operate and administer a mass transit system for the Washington, D.C., metropolitan area. Def. Ans. ¶ 3; Int. Ans. ¶ 3.

4. Cubic Transportation Systems, Inc. ("Cubic") is a corporation, organized and existing under the laws of Delaware, having its principal place of business in San Diego, California.   By letter dated May 2, 2007, invoking WMATA's Public Access to Records Policy ("PARP")[3], Cubic requested WMATA to release ERG's "Requests for Equitable Adjustments," "all Contract Modifications," "[a]ll ERG claim documents," and "[d]ispositions on all claims."  Ex. 5  (Cubic Request).  On January 17, 2008, this Court granted Cubic's motion for leave to intervene in this matter, on the terms and conditions set forth in the Court's Order of the same date.

**B.    The Contract, Contract Administration Issues, and ERG's Efforts to Resolve Them With WMATA Through Negotiations**

5.    In 1999, WMATA introduced the "SmarTrip®" card, a memory logic "smart card," enabling payment of Metrorail fares, utilizing chip technology developed by Cubic and Ramtron International Corporation.   Def. Ans. ¶ 11; Int. Ans.[4] ¶ 11.

6.    Cubic is a direct competitor of ERG's, offering similar products and services. Def. Ans. ¶ 12; Int. Ans. ¶ 13.  Each company regularly bids in major procurements for smart card systems and related services for transit systems in the United States and other countries. ERG and Cubic have competed in the United States for approximately 10 years, and longer internationally.  Int. Ans. ¶ 13.  Over the past decade, contracts awarded for most of such systems in connection with major public transit projects in the U.S. and U.K. have gone to either ERG or Cubic, or in some cases, including the WMATA procurement from which this case arises, both companies were awarded contracts and directed to integrate systems.  Int. Ans. ¶ 12; Winyard Dec. Ex. 1 ¶ 6.

7.    A "smart card," as employed by WMATA, is a layered plastic card in which is

---

[3] The PARP is included as Exhibit 4.
[4] "Int. Ans." refers to the Intervenor's Answer to the First Amended Complaint. .

embedded a microprocessor, and a radio frequency receiver. Def. Ans. ¶ 13; Int. Ans. ¶ 13.

Upon being contacted by a radio transmission device, the card can communicate with the

transmission source, and perform data storage and mathematical manipulation, including

retrieval and modification of the data stored on the memory of the card. *Id.* Cubic is the sole

source of SmarTrip® cards to WMATA. Winyard Dec. Ex. 1 ¶ 6.

8.    In 2001, WMATA issued a Request for Proposals for the procurement of a state

of the art automatic fare collection system ("RFP") entitled "Contract C05034, SmarTrip®

Regional Customer Service Center." Int. Ans. ¶ 14; *See* Def. Ans. ¶ 14.

9.    As of 2002, WMATA was using its SmarTrip® cards for rail travel and Metro

station parking. Def. Ans. ¶ 15; Int. Ans. ¶ 15. In the RFP, WMATA sought to expand

SmarTrip® to become a seamless, integrated regional smart card-enabled fare payment system to

be used on WMATA's and other regional bus operators' non-rail transit systems as well as to

update the functionality of the card to include such capabilities as "auto-load" when funds on the

card reached a certain level. *Id.*; Winyard Dec. Ex. 1 ¶5.

10.    In January 2002, ERG submitted a final proposal, which was required to be

revised numerous times as a result of changes to the RFP. Winyard Dec. Ex. 1 ¶ 11. By then,

the RFP had been modified by WMATA not less than eight times. *See* Def. Ans. ¶ 16; Int. Ans.

¶ 16.

11.    Cubic also submitted proposals in response to the RFP and amendments thereto.

Def. Ans. ¶ 17; Int. Ans. ¶ 17. WMATA's series of modifications to the RFP embodied changes

in the technical approach that ultimately resulted in contract awards to both Cubic and ERG.

Def. Ans. ¶ 17; *see* Int. Ans. ¶ 17. Instead of awarding the entire scope of work to one

contractor, WMATA split the scope of work in the RFP, giving part to Cubic and part to ERG,

and directed both contractors to integrate their performance and respective contracts. *See* Int.

Ans. ¶ 12; Winyard Dec. Ex. 1 ¶ 6.

12.    ERG's contract has an initial term of five years (one year startup "design/build"

phase and four year "operation and maintenance" phase), with options for WMATA to renew for

two successive two year periods. Def. Ans. ¶ 18. The initial term is set to expire in July 2008, unless ERG's period of performance is extended. *Id.* Upon expiration, the work to be performed by ERG will likely be subject to a competitive procurement. Winyard Dec. Ex. 1 ¶ 23. Cubic intends to bid in any such procurement, as does ERG. Int. Ans. ¶ 19; Winyard Dec. Ex. 1 ¶ 23.

14.     Despite ERG's repeated warnings to WMATA that administering the SmarTrip® program through two contracts—one with ERG and the other with Cubic—created interdependency and potential for interference with ERG's performance due to delays or problems with Cubic's performance, WMATA proceeded in that manner nonetheless. Winyard Dec. Ex. 1 ¶¶ 6 - 8. As predicted, these same contract administration issues delayed ERG's ability to meet the tight timelines for the startup "design and build" phase, and caused ERG to incur additional costs. *Id.* They also resulted in numerous changes to the contract work. *Id.* WMATA admits that "there have been delays to the work associated with Contract C05034." Def. Ans. ¶ 20.

15.     Part of the delay was the result of WMATA changing database management systems. Winyard Dec. Ex. 1 ¶ 8. But the overriding source of the delay arises from the difficulties in integrating Cubic's and ERG's systems. *Id.* In rudimentary terms, Cubic was responsible for the process involving direct interaction with the cards and ERG was responsible for the process involving the point of sale network, clearing and settlement function and customer service . Winyard Dec. Ex. 1 ¶ 7. In this process, data flows from Cubic to ERG, yet both companies use different data formats and proprietary software, so Cubic had the responsibility of developing a Data Network Concentrator ("DNC"), enabling the two companies to share the data necessary to make the system work. *Id.* This has proved to be an exceptionally challenging task and has taken much longer than anticipated. *See* Winyard Dec. Ex. 1 ¶ 8.

16.     Since November 2007, WMATA has taken at least three distinct positions on how to overcome the difficulties presented in integrating the two companies' systems, with each successive decision deleting ever greater work from ERG, though no position was ever formally adopted by the WMATA Board of Directors. *See* Winyard Dec. Ex. 1 ¶¶ 21 -23. Based on

4

WMATA's latest statement of intention, it intends to take most of the work that ERG is responsible for and transfer that to Cubic. Winyard Dec. Ex. 1 ¶ 23. As of this date, WMATA has halted all work on the contract, but has not issued ERG a stop work order or any formal direction. *Id.*

17.    From the inception of the contract, through and including the present date, ERG has attempted to resolve these administration issues through cooperative negotiations with WMATA. Winyard Dec. Ex. 1 ¶ 9 -12; *see* Def. Ans. ¶ 21.   These efforts consisted of a number of requests for change orders ("RFCOs") and culminated in a Request for an Equitable Adjustment ("REA"), together, the "Contract Negotiation Submissions" or "CNS." These documents and the information in them are the subject of Cubic's PARP request, and thus, this lawsuit. Winyard Dec. Ex. 1 ¶ 10; Ex. 5 (Cubic Request).  The RFCOs either originated as a suggestion from ERG to change certain contract requirements or were submitted in an effort to document and memorialize the impact on ERG of changed contract requirements, which were frequently constructive changes rather than ones ordered by the contracting officer.  Winyard Dec. Ex. 1 ¶ 11.  The purpose of the CNS was to negotiate contract administration issues such as changes to the scope of work, period of performance and compensation for increased costs. Winyard Dec. Ex. 1 ¶  9.  The RFCOs and REA were submitted to ERG throughout the course of contract performance.  *Id.*  These efforts culminated in ERG's submission in February 26, 2006, of a request for equitable adjustment ("REA"), which addressed unresolved RFCOs, new issues, and costs associated with the delays.  Winyard Dec. Ex. 1 ¶ 11.

18.    ERG deliberately structured the CNS to facilitate resolution through confidential negotiations, which ERG stated was its preferred mode of dealing with the issues it previously raised and tried to resolve with WMATA.  Winyard Dec. Ex. 1 ¶ 10.  In consequence, each page of the REA was marked "confidential."  *Id.*; Def. Ans. ¶ 22.  The RFCOs were typically marked as "confidential" on the cover page or document footer.  Winyard Dec. Ex. 1 ¶ 11.  Regardless of whatever markings were on the documents, ERG intended and expected that they remain confidential.  *Id.*  The REA provides WMATA with ERG's confidential perspective on the

reasons why those efforts had not succeeded and why the project had been delayed as a result of WMATA's failure to administer the contract properly, and chronicling ERG's attempts to resolve the issues with WMATA cooperatively. *See* Winyard Dec. Ex. 1 ¶¶ 10, 11. During the course of negotiations, ERG updated the cost data supporting the REA. Winyard Dec. Ex. 1 ¶ 11.

19.    Pursuant to negotiations between WMATA and ERG, bilateral modification 10 to contract C05034, "Settlement of a Variety of Claims," bilateral modification 11 to contract C05034 "Payment Schedule" were issued in March 2006, and bilateral modification 12 to Contract C05034, "Piece 1 Delay, Incremental Costs, Etc.," was issued in December 2006. Def. Ans. ¶ 23; Winyard Dec. Ex. 1 ¶ 12 & Attchs. A through C (Contract Modifications). The negotiations took months to complete. Winyard Dec. Ex. 1 ¶ 11.

20.    Other elements of the REA, by agreement of the parties, were not resolved by the modification, but expressly reserved, and those elements continue to be the subject of continuing settlement negotiations between WMATA and ERG. Def. Ans. ¶ 24; Winyard Dec. Ex. 1 ¶ 13 & Attchs. A, B and C, indicating partial settlement.

**B.    PARP Procedures for Protection of Submitter's Business Information That May be Exempt From Disclosure Under Section 6.14**

21.    WMATA's PARP Statement of Purpose recognizes that "[s]ome of the records, if released, could benefit selectively or could cause personal or economic harm to members of the public [or] other organizations." PARP § 2.0; *See* Def. Ans. ¶ 25.

22.    Accordingly, Section 6.1.4 of the PARP exempts from disclosure "trade secrets and commercial or financial information obtained from a person and is privileged or confidential." *See* Def. Ans. ¶ 26. This PARP exemption mirrors Exemption 4 under the federal FOIA. *See* 5 U.S.C. § 552(b)(4); *Id.*

23.    The PARP Section 7.11 governs WMATA's handling of requests for records that are potentially exempt under PARP Section 6.1.4, and provides that "[b]usiness information obtained by WMATA from a Submitter will be disclosed only pursuant to this Section." PARP

§ 7.11.1. The PARP defines "business information" as "information that may be protected from disclosure under subsection 6.1.4 of this Policy," and "Submitter" as "any person or entity from whom WMATA obtains business information, directly or indirectly." *Id.* § 7.11.2; Def. Ans. ¶ 27.

24.    The PARP further provides that a "Submitter of business information will use good faith efforts to designate, by appropriate markings, either at the time of submission or at a reasonable time thereafter, any portions of its submission that it considers to be protected from disclosure under section 6.4.1 of this Policy." *Id.* § 7.11.3; *See* Def. Ans. ¶ 28.

25.    When WMATA's PARP Administrator receives a PARP request that seeks a Submitter's business information, and the information has been designated by Submitter in good faith as information considered to be protected from disclosure under subsection 6.1.4, or when WMATA has reason to believe that the information may be protected from disclosure under subsection 6.1.4, then WMATA is generally required to provide the Submitter with prompt written notice of such a request, to give the Submitter an opportunity to object to disclosure of any specified portion or that information under subsection 7.11.6 of the Policy. *Id.* § 7.11.4 & 7.11.5; Def. Ans. ¶ 29. The requester, too, is entitled to notice that WMATA has provided a submitter with notice and an opportunity to object to disclosure. § 7.11.10.

26.    WMATA is obliged to consider a Submitter's objections and the specific grounds for nondisclosure in deciding whether to disclose business information. When WMATA decides to disclose such information over the objection of the Submitter, the PARP Administrator shall give the Submitter written notice, return receipt requested, stating its reasons why each of the Submitter's disclosure objections were not sustained, and description of the business information to be disclosed, and a specified disclosure date. *Id.* § 7.11.7; *See* Def. Ans. ¶ 30.

27.    Section 7.11 of the PARP expressly contemplates the filing of a lawsuit by Submitter to prevent disclosure of business information, and requires, in such a case, that WMATA notify the requester of the filing of such a suit. *Id.* § 7.11.10.

C.    **Cubic's Records Request, WMATA's Notice, ERG'S Response and WMATA's Disclosure Decision**

28.    By letter dated May 2, 2007, invoking the PARP, Cubic requested WMATA to release "records relating to specific change proposals and modifications to contract C05034 as well as any 'any and all other claims submitted by ERG any contract adjustments/contract modification made by WMATA' to contract C05034." Exhibit 5, Cubic Request; Def. Ans. ¶ 33.

29.    On August 15, 2007, ERG received a letter from WMATA giving notice that WMATA had determined that certain business records (the CNS) submitted by ERG to WMATA were responsive to a request for release of records pursuant to the PARP made on May 2, 2007 by Cubic. *See* Def. Ans. ¶ 34. The letter stated that, if ERG considered any of the information in the records identified by WMATA to be proprietary or confidential, ERG was to identify such information, and explain why, by August 30, 2007. *See* Def. Ans. ¶ 34.

30.    ERG responded to WMATA's notice in writing, on August 28, 2007, as supplemented by an additional submission on August 30, 2007. Def. Ans. ¶ 35. In its responses, ERG requested that certain documents in their entirety not be disclosed and that others be redacted, to prevent disclosure of confidential commercial and financial information submitted to WMATA by ERG, disclosure of which would either cause ERG competitive harm or which was information not disclosed publicly. Winyard Dec. Ex. 1 ¶ 15.

31.    On October 11, 2007, WMATA sent ERG a further notice declaring its intention to release to the requester certain documents and information, disclosure of which ERG had objected in its response, on August 28 and 30, 2007. Winyard Dec. Ex. 1 ¶ 16 & Att. 1 (First Decision Letter); *See* Def. Ans. ¶ 36. ERG objected to disclosure arguing that the documents were voluntarily submitted, not routinely disclosed to the public, disclosure of which would lead to the substantial likelihood of competitive harm given the nature of the contents of the documents. Winyard Dec. Ex. 1 ¶ 17.

32.    In the October 11, 2007 decision, WMATA took the positions that all the records it had identified initially "were either developed by the parties or required by WMATA, in either

case an involuntary submission in FOIA parlance." Def. Ans. ¶ 37; Winyard Dec. Ex. 1 ¶ 16 &
Att. D (First Decision Letter).  Also, WMATA notified ERG that it had identified additional
documents it deemed responsive to Cubic's request, and requested that ERG notify WMATA, by
the same date, October 26, 2007, of any objections ERG had to disclosure of the "second wave"
of documents, the same day it proposed to release the "first wave" of documents.  *Id.*

33.     Despite WMATA's characterization of its October 11, 2007, letter as a "final
determination" regarding Cubic's request for records, WMATA stated expressly that it would
issue yet another determination as to the "second wave" of documents, after it considered ERG's
objections to disclosure.  Winyard Dec. Ex. 1  ¶ 17.  ERG had objections to disclosure of certain
of the records and information identified in the "second wave," and responded accordingly.  *Id.*;
*See* Def. Ans. ¶ 38.

34.     After receipt of the notice, ERG, by counsel, contacted WMATA, noted that ERG
did not agree with WMATA's determinations, and requested that WMATA defer disclosure of
the "first wave" of documents until ERG could be heard on its objections to disclosure of the
"second wave."  Def. Ans. ¶ 39.  WMATA declined to do so.  Winyard Dec. Ex. 1 ¶ 17.

35.     On October 26, 2007, ERG submitted its objections to the "second wave" in
writing, requesting that certain documents in their entirety not be disclosed and that others be
redacted, to prevent disclosure of confidential commercial and financial information submitted to
WMATA by ERG.  Def Ans. ¶ 41.  Disclosure of this information would either cause ERG
competitive harm or was information not generally disclosed publicly by ERG.  Winyard Dec.
Ex. 1 ¶¶ 24 - 29.  On January 10, 2008, WMATA, via letter, informed ERG of its final decision
and identified what of the "second wave" materials it intended to release to Cubic on January 28,
2008.  Def. Ans. ¶ 41; Winyard Dec. Ex. 1 ¶ 16 & Att. E (Second Decision Letter).  WMATA
intended to release a portion of material over ERG's objection.  *Id.*

36.     WMATA issued a blanket pronouncement, again opining that all records it
identified in its October 11, 2007 and January 10, 2008 letters were "involuntarily" submitted by
ERG as part of the contract requirements, and therefore that ERG must show likelihood of

substantial competitive harm as to all such records. Winyard Dec. Ex. 1 ¶ 19 & Att. E (Second Second Decision Letter)[5].

37.     WMATA agreed to withhold the bulk of the REA on the grounds that premature disclosure of the document would compromise WMATA's negotiating position. Def. Ans. ¶ 44; Winyard Dec. Ex. 1 ¶ 16 & Att. D (First Decision Letter). However, WMATA refused to withhold or redact in the manner proposed by ERG, overruling ERG's objections that the information was confidential commercial and financial information that would not generally be disclosed to the public. *See Id.*; Winyard Dec. Ex. 1 ¶¶ 16, 18 & Attchs. D & E (First and Second Decision Letters). The CNS were generally marked "confidential," and in all cases were submitted to WMATA to facilitate an ongoing business negotiation concerning contract administration issues, portions of which are the subject of continuing settlement negotiations between WMATA and ERG and were intended to be kept confidential. Winyard Dec. Ex. 1 ¶ 11. ERG does not release the type of information to the public contained in the CNS. Winyard Dec. Ex. 1 ¶ 11, 24.

38.     More immediately, access to the CNS documents would give Cubic valuable information to coordinate its own contract negotiation efforts with WMATA, and to support WMATA's positions in negotiations against ERG concerning the remaining portion of the REA, as well as any additional claims or termination settlements that may arise from future contract actions adverse to ERG that WMATA may take. Winyard Dec. Ex. 1 ¶ 25. This is a real possibility, considering that the main issue in claims of this nature is attribution of responsibility for delays that occurred. If Cubic has documents ERG submitted in the course of confidential negotiations to settle contract administration issues with WMATA, Cubic could use those to formulate positions attacking ERG's theories and in favor of its own theories, which likely differ as to whom to blame for delays should be attributed. *Id.* In addition, Cubic could use the information to assist it gain greater scope of work under the contract and put it in a better

---

[5] In the Second Decision Letter, WMATA took the position that certain contract provisions required ERG to submit the CNS. Winyard Dec. Ex. 1 ¶ 19 & Att. E (Second Decision Letter). Those contract provisions are included as exhibits "2" (General Provision 2) and "3" (General Provision 9).

position than ERG in terms of option year award or future competitive procurements. *Id.*

39.     Furthermore, the CNS documents contain proprietary information that will lead to immediate competitive harm if released to Cubic.  Winyard Dec. Ex. 1 ¶ 26.  Release of these submissions jeopardize the culmination of 15 years of experience ERG has in developing the world's leading clearing and settlement technology and supporting processes for transit systems. While Cubic is a leader in fare card technology, ERG has an advantage in clearing and settlement. *Id.*  This advantage arises from ERG's system architecture combined with the integration of its proprietary business and technical processes, which enables ERG to process millions of transactions a day efficiently and accurately as a result of how ERG organizes and shares settlement data with financial institutions. *Id.*

40.     Some of the documents at issue include diagrams and descriptions of ERG workflows and technical processes.  Winyard Dec. Ex. 1 ¶ 27.  If Cubic had access to the materials containing this type of information, it would gain insight as to how to either replicate ERG's business model, or to gain information that may assist it in reverse engineering and reaching the same result, thus eroding ERG's advantage in this aspect of the worldwide fare capture business. *Id.*

41.     In addition, competitive harm would result from disclosure of certain financial and cost and pricing data contained in the CNS documents.  Winyard Dec. Ex. 1 ¶ 28.  While WMATA redacted some of this data, there remains unredacted certain labor rates, subcontract rates, and other cost information, that standing alone or combined with other data which WMATA refused to redact, would allow Cubic to derive or obtain "breakdown pricing" related to the contract. *Id.*  If Cubic were to know ERG's "breakdown" pricing, it would give Cubic allow Cubic to scrutinize ERG's unit costs and use this information to refine its proposal to undercut ERG's, negotiate better rates with a subcontractor, or for other customers to "ratchet down" prices. *Id.*

42.     If ERG knew that the CNS submissions would be released to Cubic, ERG would not have included the level of detail reflect in the CNS.  Winyard Dec. Ex. 1 ¶ 29.  ERG would

have avoided discussing in detail its confidential system architecture, workflows, processes and cost and financial information. *Id.* ERG would have proceeded in a more general fashion. *Id.* Certainly, in the future, ERG will avoid submitting CNS with a similar level of detail if such information can be disclosed. *Id.* This will perhaps make settlement of contract issues more difficult, however, this is preferable to a competitor receiving detailed confidential information. *Id.*

    43.    ERG will suffer immediate and irreparable harm if WMATA discloses ERG's confidential and proprietary commercial and financial information and trade secrets as proposed in WMATA's October 11, 2007 and January 10, 2008 letters, to ERG's commercial competitor, Cubic. Winyard Dec. Ex. 1 ¶ 30.

Respectfully submitted,

**ERG TRANSIT SYSTEMS (USA), INC.**

By its attorneys:    /s/ Benjamin J. Lambiotte
Benjamin J. Lambiotte, Esq.
D.C. Bar No. 421288
blambiotte@gsblaw.com
Matthew C. Hoyer, Esq.
D.C. Bar. No. 975544
Robert A.W. Boraks, Esq.
D.C. Bar No. 72132
**GARVEY SCHUBERT BARER**
1000 Potomac Street, Fifth Floor
Washington, D.C. 20007
(202) 965-7880

Dated: May 30, 2008

# EXHIBIT 1
# (with attachments A-E)

## DECLARATION OF JOHN WINYARD

The undersigned, John Winyard, hereby declares as follows:

1. I am an employee of Plaintiff ERG Transit Systems (USA), Inc. ("ERG"). I am the Project Manager for ERG on the Washington Metropolitan Area Transit Authority ("WMATA") Contract C05034, SmarTrip® Regional Customer Service Center. I have held this position since October 2006. From October 2004 until October 2006, I was the Engineering Manager on the project. I have been employed by ERG since 1999, and am therefore familiar with events related to the above-referenced contract that predate my tenure as Project Manager. I have personal knowledge of the following.

2. ERG is a corporation organized and existing under the laws of California, having its principal place of business in Concord, California. ERG is the U.S. operating company within the ERG Group. Its parent company, ERG Ltd., is located in Perth, Western Australia. ERG is one of the world's leading developers and suppliers of integrated fare management software systems, smart card systems and services for the transit industry, with transit customers throughout the world.

3. The documents at issue in this lawsuit were requested under WMATA's Public Access to Records Policy ("PARP") by Cubic Transportation Systems, Inc. ("Cubic"). Cubic is a direct competitor of ERG for the work awarded to ERG under the WMATA contract, which is the subject of this action, and other contracts in the United States and abroad for fare collection systems. Over the past decade, many contracts awarded by transit systems world-wide for fare collection systems have gone to either Cubic or ERG.

4. ERG submitted all of the documents at issue in this case to WMATA in the course of ERG's confidential negotiations with WMATA, seeking a settlement of issues concerning WMATA's administration of and ERG's performance under its contract with WMATA. It was ERG's hope and desire that these negotiations would result in a consensual resolution, which would avert the necessity of formal prosecution of its claims. Fundamentally, ERG objects to WMATA's public release of materials submitted by ERG to WMATA to ERG's competitor, in which ERG sets forth and supports the positions ERG took in those settlement negotiations.

5. In January 2002, ERG submitted a contract proposal, after several revisions, to WMATA in response to "Contract C05034, SmarTrip® Regional Customer Service Center" for a state of the art automatic fare collection system. The project involved application of WMATA's SmarTrip® card already used on Metrorail for the supply, delivery, installation and maintenance of electronic validating bus fare collection systems, revenue collection equipment, ancillary equipment, spare parts, software, and services for use in the Washington, D.C. metropolitan area by WMATA and other regional bus operators. In addition to expanding the SmarTrip® card to the regional bus systems, the contract called for the expansion of the capabilities of the card to perform functions such as "auto-load," whereby funds would automatically be loaded on to a card when the value on it dropped below a certain level.

6. Instead of awarding the entire scope of work to a single contractor, WMATA awarded portions of the work to both ERG and Cubic and directed them to integrate their systems.

Despite the reasonably foreseeable difficulties in administering the SmarTrip® program through two contractors – one with ERG and the other with Cubic – and the attendant problems of interdependency and potential for interference with ERG's performance due to delays or problems with Cubic's performance, WMATA proceeded in this manner nonetheless. Cubic is the sole source of SmarTrip® cards to WMATA. These contract administration issues delayed ERG's ability to meet the tight timelines for the startup "design and build" phase, caused ERG to incur additional costs, and also resulted in numerous changes and delays to the contract work.

7. Initially, the contract was intended to be a single delivery of all necessary elements of the SmarTrip® program. ERG was responsible for developing the point of sale network, running the customer service center, and designing and building the "back office" system to facilitate the clearing and settlement of funds and accounts. Cubic's tasks included developing a system that would have direct interaction with the cards Cubic supplied, such as, recharging fare amounts encoded on the card itself. Cubic was also responsible for developing a system that would enable effective data transfer from the card to the clearing and settlement system. Because the card reader used Cubic's proprietary software, and the clearing and settlement system used ERG's proprietary software, Cubic had to develop a converter, called a Data Network Concentrator ("DNC"), that would transform the data into a common format. Difficulties with the DNC led to long delays.

8. ERG started performance on the contract in 2003. Almost immediately delays occurred. First, WMATA changed the clearing and settlement requirements from the original contract and ERG had to stop development work and wait six months for WMATA to issue the official contract modification. ERG restarted in 2004. In May 2005, it came time to test the integration of the Cubic and ERG portions of the contract. Today the contract still stands at this point due to difficulties in integrating the two systems. This should have only taken one round of testing to reach a result; instead, at present, the parties have conducted many rounds of testing, without a final product. WMATA caused additional delay when it transitioned its SmarTrip® to a new Database Management System. Obviously, unanticipated delays occurred as a result that were not the fault of ERG. WMATA directed ERG to demobilize it development work in October 2005 and remobilize in August 2006. Delays associated with integrating the Cubic and ERG portions of the work effectively prevented ERG from proceeding on a significant portion of its scope of work. Testing restarted in January 2007.

9. From the inception of the contract, through and including the present date, ERG has attempted to resolve the administration issues and delays through cooperative and confidential negotiations with WMATA. These efforts consisted of a number of requests for change orders ("RFCOs") and culminated in a Request for an Equitable Adjustment ("REA"), the purpose of all of which was to negotiate contract administration issues such as changes to the scope of work and compensation for increased costs. The RFCOs and REA were submitted by ERG throughout the course of contract performance.

10. Together, I will refer to ERG's RFCOs and REA as "Contract Negotiation Submissions" ("CNS"). These documents are the subject of Cubic's PARP request at issue in this lawsuit. ERG deliberately structured the CNS to facilitate resolution through confidential settlement negotiations, which ERG stated was its preferred mode of dealing with the issues it raised and tried to resolve with WMATA. ERG expected and understood that these settlement

2

negotiations and associated submissions would be held in confidence. No part of any of the CNS were requested by WMATA or otherwise required, aside from perhaps the amount of any claim for delay. They were submitted in the sole discretion of ERG as part of a reasoned contract administration and dispute resolution process. Seeking a consensual resolution in the midst of contract performance was only one of a number of strategies ERG could have pursued. For example, ERG could have proceeded forward with negotiations but refraining from relying on confidential information, filed and prosecuted a formal claim against WMATA at the conclusion of the contract, approached the WMATA Board directly, or done nothing at all.

11. The RFCOs either originated as a suggestion from ERG to change certain contract requirements or were submitted in an effort to document and memorialize the impact on ERG of changed contract requirements, frequently based on constructive changes, rather than changes formally directed by WMATA. The RFCOs also addressed ERG's costs. The RFCOs were typically marked as "confidential" on the cover page or on the document footer. Regardless of whatever markings were on the documents, ERG intended and expected that they remain confidential. As indicated by the confidential markings, we would not have customarily released the CNS to the public. This kind of sensitive information concerning contract administration negotiations that also contain proprietary information would only be released on a "need to know basis" and precautions would be taken if we released such information outside of ERG. To address unresolved RFCOs as well as additional issues not associated with a particular RFCO concerning WMATA's mismanagement and continuing delays experienced on the contract, on February 26, 2006, ERG submitted the REA. Each page of the REA was marked "confidential." Because ERG's costs associated with the delays continued to accrue during the course of several months of REA negotiations, ERG submitted revised cost information during the course of the negotiations process. The REA negotiations took months, and led to a settlement of a portion of ERG's claims in the REA, but are not yet complete.

12. These partial settlements resulted in three settlement agreements executed by ERG and WMATA, and formal contract bilateral modifications approved by WMATA's Board of Directors: Modification No. 10, issued in March 2006, Modification No. 11, also issued in March 2006 and Modification No. 12, issued in December 2006. True and correct copies of these modifications are attached hereto as Attachments A, B and C. Although these documents were among the records WMATA proposed to release in response to Cubic's PARP request, ERG has agreed with WMATA that they may be released, with certain confidential information redacted. As the end product of the settlement negotiations, whose terms and conditions were approved in public meetings of WMATA's Board of Directors, and are as such available publicly on WMATA's website, these bilateral modifications and settlement agreements do not stand on the same footing as ERG's CNS records, submitted as part of a confidential settlement negotiation process.

13. However, there are still significant portions of the REA that have not been settled. In the settlement WMATA and ERG tabled a number of items included in the REA and/or addressed in previous RFCOs. These remain unresolved to this day.

14. By letter dated May 2, 2007, invoking the PARP, Cubic requested WMATA to release "records relating to specific change proposals and modifications to contract C05034 as

3

well as any 'any and all other claims submitted by ERG any contract adjustments/contract modification made by WMATA' to contract C05034."

15. In response to a request from WMATA, ERG, as the submitter, objected to release of certain materials that WMATA determined to be responsive to a Public Access to Records Request ("PARP") by Cubic (the "First Wave"). ERG properly designated records and information as submissions that it considers to be protected from disclosure under Section 6.1.4, as required by Section 7.11.3 of the PARP.

16. After receiving ERG's objections, on October 11, 2007, WMATA sent ERG notice declaring its intention to release to Cubic significant portions of the "First Wave" documents, disclosure of which ERG had objected in its response. A true and correct copy of this Notice with redactions made to protect confidential information is attached hereto as Attachment D. As discussed below, disclosure of this information would either cause ERG competitive harm or is information not generally disclosed publicly by ERG.

17. WMATA later sent additional documents that it determined to be responsive to Cubic's request (the "Second Wave"). ERG objected to disclosure of a significant portion of the records and information identified in the Second Wave on the basis that the materials were voluntarily submitted, were not routinely disclosed to the public, and disclosure of which would lead to a substantial likelihood of competitive harm. ERG properly designated records and information as submissions that it considers to be protected from disclosure under Section 6.1.4, as required by Section 7.11.3 of the PARP. WMATA denied ERG's request to withhold release of the First Wave documents until it made a decision on the Second Wave documents.

18. After receiving ERG's objections, on January 10, 2008, WMATA sent ERG notice declaring its intention to release significant portions of the Second Wave documents, disclosure of which ERG had objected in its response. A true and correct copy of this Notice with redactions made to protect confidential information is attached hereto as Attachment E. Disclosure of this information would either cause ERG competitive harm or was information not generally disclosed publicly by ERG.

19. WMATA issued a blanket pronouncement that *all* records in the First Wave and Second Wave were "involuntarily" submitted by ERG as part of the contract requirements, and therefore that ERG must show substantial competitive harm as to all such records to prevent disclosure. WMATA rejected all arguments in favor of substantial competitive harm.

20. While ERG has waited for WMATA to resolve the remaining issues raised in the REA, WMATA is contemplating further actions that will overtake and make it even more difficult to conclude that process. These recent events at once illustrate and enhance the potential harm to ERG that would flow from release of the CNS records at issue.

21. In November 2007, a consultant hired by WMATA recommended that WMATA address the operational difficulties with SmarTrip® by reducing ERG's scope of work. ERG strongly disagreed with this recommendation for reasons of fundamental fairness and operational efficiency. WMATA officials indicated their approval of this recommendation, but it was never

4

officially adopted by the Board of Directors, which we understand must approve such important contract-related decisions.

22. Instead of forwarding the recommendation to the Board for a decision, on or about April 2008, WMATA hired another consultant to review the SmarTrip® program. This consultant recommended removing both the clearing and settlement function and the card base management from ERG. Of the original contract, this would have left ERG with only the customer service function and the point of sale network remaining from its original scope of work.

23. In April 2008, WMATA summoned ERG officials to the usual monthly tri-party meeting. Cubic representatives also attended this meeting. ERG personnel traveled from Australia for the meeting because we expected that WMATA was going to announce how they wished to proceed on the contract. Instead, WMATA officials told ERG that WMATA was switching direction on the contract and shifting work from ERG to Cubic. However, WMATA has to date not issued ERG a stop work order. The parties still await a decision by WMATA on the unsettled parts of ERG's 2006 REA, and as to how WMATA wants to proceed with the remaining work on the contract while, without a stop work order, ERG must stand ready to perform the contract. After expiration of the five year contract period in July 2008, ERG anticipates the work may be subject to another competitive procurement, which it intends to bid on, and expects Cubic to bid as well. However, the contract period allows for the non-competitive award of two, one-year option periods, if WMATA so chooses.

24. Due to the uncertainties created by the manner in which WMATA has administered the ERG and Cubic contracts, and the now very real prospect that work formerly allocated to ERG may be re-allocated to Cubic through further contract modifications, or other means, WMATA's proposed disclosures of ERG's confidential and proprietary commercial and financial information submitted to WMATA in connection with ERG's negotiations would give Cubic an unfair insight into the details of the competitive and financial impact on ERG of Cubic's behavior in performance of its own contract, the way WMATA has administered the contract, and how ERG proposes to redress those harms. Further, such disclosures would give Cubic an unfair advantage in Cubic's attempts to influence WMATA's decisions concerning how to allocate work currently awarded to ERG and to position itself in regard to potential option year awards or follow on contracts. This would inure to ERG's competitive disadvantage in connection with this contract, and also in connection with future procurements before WMATA and other agencies' contracts for which ERG and Cubic may compete. As confidential submissions regarding sensitive settlement negotiations, ERG would never have disclosed the CNS to the public, much less to its primary competitor, Cubic.

25. More immediately, access to the CNS documents give Cubic valuable information to coordinate its own contract negotiation efforts with WMATA, and to support WMATA's positions in negotiations against ERG concerning the remaining portion of the REA, as well as any additional claims or termination settlements that may arise from future contract actions adverse to ERG that WMATA may take. This is a real possibility, considering that the main issue in claims of this nature is attribution of responsibility for delays that occurred. If Cubic has documents ERG submitted in the course of confidential negotiations to settle contract administration issues with WMATA, Cubic could use those to formulate positions attacking

ERG's theories and in favor of its own theories, which likely differ as to the to whom blame for delays should be attributed.

26. Furthermore, the CNS documents contain proprietary information that will lead to immediate competitive harm if released to Cubic. Release of these submissions jeopardize the culmination of 15 years of experience ERG has in developing the world's leading clearing and settlement technology and supporting processes for transit systems. While Cubic is a leader in fare card technology, ERG has an advantage in clearing and settlement. ERG's clearing and settlement processes are proprietary to ERG and not used by any other company because ERG protects this information. This advantage arises from ERG's system architecture combined with the integration of its proprietary business and technical processes, which enables ERG to process millions of transactions a day efficiently and accurately as a result of how we organize and share settlement data with financial institutions.

27. Some of the documents at issue include diagrams and descriptions of ERG workflows and technical processes. If Cubic had access to the materials containing this type of information, it would gain insight as to how to either replicate ERG's business model, or to gain information that may assist it in reverse engineering and reaching the same result, thus eroding ERG's advantage in this aspect of the worldwide fare capture business.

28. In addition, competitive harm would result from disclosure of certain financial and cost and pricing data contained in the CNS documents. While WMATA redacted some of this data, there remains unredacted certain labor rates, subcontract rates, and other cost information, that standing alone or combined with other data which WMATA refused to redact, would allow Cubic to derive or obtain "breakdown pricing" related to the contract. If Cubic were to know ERG's "breakdown" pricing, it would give Cubic an undeniable advantage in efforts to convince WMATA to direct the remaining scope of work on this project and allow Cubic to both scrutinize ERG's unit costs and use this information to refine its proposal to undercut ERG's or indicate to WMATA where Cubic may have a pricing advantage.

29. If ERG knew that the CNS submissions would be released to Cubic, ERG would not have included the level of detail reflect in the CNS. ERG would have avoided discussing in detail its confidential architecture, processes and cost and financial information. ERG would have proceeded in a more general fashion. Certainly, in the future, ERG will avoid submitting CNS with a similar level of detail if such information can be disclosed. This will perhaps make settlement of contract issues more difficult, however, this is preferable to a competitor receiving detailed confidential information.

6

30.  For these reasons, ERG will suffer immediate and irreparable competitive harm if WMATA discloses ERG's confidential settlement submissions to WMATA, as proposed in WMATA's October 11, 2007 and January 10, 2008 letters, to ERG's commercial competitor, Cubic.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed on May 29, 2008.

John Winyard

**Attachment A**

B-E-5 page 2

**M** metro

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
600 Fifth Street, NW, Washington, DC 20001-2651

## AMENDMENT OF SOLICITATION / MODIFICATION OF CONTRACT

| 1. AMENDMENT/MODIFICATION CO5034 - 010 | 2. EFFECTIVE DATE March 28, 2006 | |
|---|---|---|
| 3. ISSUED BY PURCHASING SECTION **Office of Procurement** | 4. ADMINISTERED BY (if other than block 3) | |

| 6. CONTRACTOR NAME AND ADDRESS | 8. FORM TYPE (Check only one) |
|---|---|
| **ERG Transit Systems (USA) Inc.** (Street, city, county, state, and Zip Code) **1800 Sutter Street - Suite 900 Concord, CA 94520** | ☐ AMENDMENT OF SOLICITATION NO. ____ DATE ____ (See block 7) ☒ MODIFICATION OF CONTRACT/ORDER NO. __ **C05034** |

7. ☐ THIS BLOCK APPLIES ONLY TO AMENDMENTS OF SOLICITATIONS
The above numbered solicitation is amended as set forth in block 10. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended. Offerors must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation, or as amended, by one of the following methods: (a) By signing and returning _____ copies of this amendment; (b) by acknowledging receipt of this amendment on each copy of the offer submitted; or (c) by separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE ISSUING OFFICE PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If, by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided such telegram makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

8. ACCOUNTING AND APPROPRIATION DATA (if required)

9. THIS BLOCK APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS
   (a) ☒ This Change Order is issued pursuant to **GENERAL PROVISIONS Article 2, Changes, of the Contract**
        The Changes set forth in block 10 are made to the above numbered contract/order.
   (b) ☐ The above numbered contract/order is modified to reflect the administrative changes (such as changes in paying office, appropriation data, etc.) set forth in block 10.
   (c) ☐ This Supplemental Agreement is entered into pursuant to authority of _____
        It modifies the above numbered contract as set forth in block 10.

10. DESCRIPTION OF AMENDMENT/MODIFICATION

**\*\*\* See Page Two for a detailed description of this modification.   \*\*\***

Except as provided herein, all terms and conditions of the document referenced in block 6, as heretofore changed, _____

| 11. ☒ CONTRACTOR/OFFEROR IS REQUIRED TO SIGN THIS MODIFICATION AND RETURN _____ COPIES TO | ☐ CONTRACTOR/ OFFEROR IS NOT REQUIRED TO SIGN THIS DOCUMENT |
|---|---|
| 12. NAME OF CONTRACTOR/OFFICE BY ▓▓▓▓▓▓▓ (Signature of person authorized to sign) | 15. WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY BY _Ashok K. Rajpal_ (Signature of Contracting Officer) |
| 13. NAME AND TITLE OF SIGNER (Type or print) ▓▓▓▓▓  VP | 14. DATE SIGNED 4/3/06 | 16. NAME OF CONTRACTING OFFICER (Type or print) **Ashok K. Rajpal** | 17. DATE SIGNED **March 28, 2006** |

B-E-5 page 3

### Contract C05034
### SmarTrip® Regional Customer Service Center

### Modification No. 10

\* \* \*

1. The Contract is hereby increased in the amount of $975,000, from $20,590,258.30 to $21,565,258.30 for 'the settlement of a variety of claims' as defined in the Agreement of Settlement dated December 15, 2005 - attached hereto and incorporated herein.

2. All other terms and conditions of Contract C05034 remain unchanged.

3. This modification constitutes a full accord and satisfaction for the work above described.

4. The amount of this modification is subject to audit of costs and pricing data in accordance with the General Provisions, Article 26, Audit and Inspection of Records - Negotiations, with respect to CP#6, Paper Products, and CP#18, Connectivity to Carmen Turner Facility for Disaster Recovery.

5. The 'Operational Funding' portion of this modification is subject to the availability of funding for that specific fiscal year.

6. All other terms and conditions of Contract C05034 remain unchanged by this modification.

Contract C05034 - Modification No. 10 - Payment Schedule

| ITEM NO. | DESCRIPTION | PERIOD COVERED | ESTIMATED QUANTITY | UNIT PRICE | TOTAL PRICE | COMMENTS NOTES |
|---|---|---|---|---|---|---|
| M010-1 | Capital Funding Portion of Settlement | Various Claims | NA | NA | ▉ | Payment subsequent to execution of Modification 10 |
| M010-2 | Paper Products - CP6 (Operational Funding) | ▉ | ▉ | ▉ | ▉ | Payment subsequent to execution of Modification 10 |
| M010-3 | Paper Products - CP6 (Operational Funding - FY 07 - Note 1) | ▉ | ▉ | ▉ | ▉ | With RCSC Monthly Invoices |
| M010-4 | Paper Products - FY 07 - Note 1 | ▉ | ▉ | ▉ | ▉ | With RCSC Monthly Invoices |
| M010-4 | Paper Products - FY 08 - Note 2 | ▉ | ▉ | ▉ | ▉ | With RCSC Monthly Invoices |
| M010-5 | Operational Funding - FY 09 - Note 3 | ▉ | ▉ | ▉ | ▉ | With RCSC Monthly Invoices |
| M010-6 | CTF Connectivity - CP18 (Operational Funding - Fv 05 - Note 4) | ▉ | ▉ | ▉ | ▉ | With RCSC Monthly Invoices |
| M010-7 | CTF Connectivity - CP18 (Operational Funding - FY 07 - Note 5) | ▉ | ▉ | ▉ | ▉ | With RCSC Monthly Invoices |
| M010-8 | CTF Connectivity - CP18 (Operational Funding - FY 08 - Note 6) | ▉ | ▉ | ▉ | ▉ | With RCSC Monthly Invoices |
| | TOTAL | | | | ▉ | |

NOTES:

1. Monthly payments as designated are subject to the availability of funding in the FY07 Budget.

2. Monthly payments as designated are subject to the availability of funding in the FY08 Budget.

3. Monthly payments as designated are subject to the availability of funding in the FY09 Budget.

4. Monthly payments are predicated on the availability of connectivity to a functional redundant DNC at CTF such that all necessary connections with Verizon are completed and operational, monthly payments as designated are subject to the availability of funding in the FY07 Budget.

5. Monthly payments are predicated on the availability of connectivity to a functional redundant DNC at CTF such that all necessary connections with Verizon are completed and operational, monthly payments as designated are subject to the availability of funding in the FY08 Budget.

6. Monthly payments are predicated on the availability of connectivity to a functional redundant DNC at CTF such that all necessary connections with Verizon are completed and operational, monthly payments as designated are subject to the availability of funding in the FY09 Budget.

B-E-5 page 4

00 21 05 06:44p    Cynthia Viramontez    1-928-886-8274    p.2

B-E-5 page 6

## CONTRACT C05034
## AGREEMENT OF OPEN ISSUES

Agreed to at a total price of $975,000 for the following claims and change orders. Payment of this amount constitutes a full accord and satisfaction for any and all issues related to the following CP's, including but not limited, to the Operations for the Paper Products as well as Operations of the DNC Networking through the end of the base contract period of performance and delays associated with the delivery of POS Devices through 12/15/2005

     CP6 - Paper Products
     CP8 - Data Sync.
     CP 7 - Delay Claim for the new settlement requirement
     CP17 - Pre-bill Auto-load.
     CP18 - CTF Connectivity
     CP20 - Multiple Language
     CP19 - Website Functionality
     CP15- SIRS Development 01/04 to 01/05



All other terms and conditions of Contract C05034 are unchanged by this agreement.

This settlement is without prejudice to any claim by ERG relating to any of the above CP's to the extent the claim relates to an act or omission by WMATA after December 16, 2005.

The above agreement is subject to the understanding that the contract modification(s) will only be issued after approval of the agreement by the WMATA Board of Directors.

Ashok K. Rajpal     12.22.05
Contracting Officer
Washington Metropolitan Area
Transit Authority

Head of Operating Companies
ERG Transit Systems (USA) Inc.

**Attachment B**

B-E-5 page 6

# [M metro]

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
600 Fifth Street, NW, Washington, DC 20001-2651

## AMENDMENT OF SOLICITATION / MODIFICATION OF CONTRACT

| 1. AMENDMENT/MODIFICATION | 2. EFFECTIVE DATE |
|---|---|
| C05034 - 011 | **March 28, 2006** |

| 3. ISSUED BY PURCHASING SECTION | 4. ADMINISTERED BY (if other than block 3) |
|---|---|
| **Office of Procurement** | |

| 5. CONTRACTOR NAME AND ADDRESS | 6. FORM TYPE (Check only one) |
|---|---|
| (Street, city, county, state, and Zip Code)  **ERG Transit Systems (USA) Inc.** **1800 Sutter Street - Suite 900** **Concord, CA 94520** | AMENDMENT OF SOLICITATION NO. _____ <br> DATE _____ (See block 7) <br> [X] MODIFICATION OF CONTRACT/ORDER NO. _____ **C05034** |

**7.** ___ **THIS BLOCK APPLIES ONLY TO AMENDMENTS OF SOLICITATIONS**
The above numbered solicitation is amended as set forth in block 10. The hour and date specified for receipt of Offers ___ is extended, ___ is not extended. Offerors must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation, or as amended, by one of the following methods: (a) by signing and returning _____ copies of this amendment; (b) by acknowledging receipt of this amendment on each copy of the offer submitted; or (c) by separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE ISSUING OFFICE PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If, by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided such telegram makes reference to the solicitation and this amendment and is received prior to the opening hour and date specified.

**8.** ACCOUNTING AND APPROPRIATION DATA (if required)

**9.** THIS BLOCK APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS
(a)  [X] This Change Order is issued pursuant to __GENERAL PROVISIONS Article 2, Changes, of the Contract__
The Changes set forth in block 10 are made to the above numbered contract/order.
(b) ___ The above numbered contract/order is modified to reflect the administrative changes (such as changes in paying office, appropriation data, etc.) set forth in block 10.
(c) ___ This Supplemental Agreement is entered into pursuant to authority of _____
It modifies the above numbered contract as set forth in block 10.

**10.** DESCRIPTION OF AMENDMENT/MODIFICATION

*** See Page Two for a detailed description of this modification: ***

Except as provided herein, all terms and conditions of the document referenced in block 8, as heretofore changed, remain unchanged.

| 11. [X] CONTRACTOR/OFFEROR IS REQUIRED TO SIGN THIS MODIFICATION AND RETURN _____ COPIES TO | [ ] CONTRACTOR/OFFEROR IS NOT REQUIRED TO SIGN THIS DOCUMENT |
|---|---|

| 12. NAME OF CONTRACTOR/OFFICE | 13. WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY |
|---|---|
| BY ▌(Signature of person authorized to sign) | BY _Ashok L. Rajpal_ (Signature of Contracting Officer) |

| 13. NAME AND TITLE OF SIGNER (Type or print) | 14. DATE SIGNED | 16. NAME OF CONTRACTING OFFICER (Type or print) | 17. DATE SIGNED |
|---|---|---|---|
| ▌ VP | 4/3/06 | **Ashok K. Rajpal** | **March 28, 2006** |

PROC/JMN Rev. 1046 — EVOD-FIN-GM 2-7-05C05034 SmarTrip RCBC [ERG]/ModificationsWod-11-RCBC Labor InMod 11 Final.wpd

B-E-5 page 7

## Contract C05034
## SmarTrip® Regional Customer Service Center

### Modification No. 11

\* \* \*

1.  ERG has certified to the Washington Metropolitan Area Transit Authority (WMATA) that staffing for the SmarTrip® Regional Customer Service Center (RCSC) of ten individuals (three supervisory and seven customer service representatives) would have been sufficient to handle customer service call volumes and card management responsibilities reasonably anticipated by the contract documents. However, due to a substantial increase in the sales of SmarTrip® cards and associated call activity at the SmarTrip® Regional Customer Service Center, ERG increased and will continue to increase the Customer Service Staff by the addition of 'not-to-exceed' ▓▓▓▓▓ Customer Service Agents for the period June 1, 2005 through June 30, 2006. Those agents are needed on a temporary basis to enhance efficiency of the RCSC while reducing customer telephone wait times. (See also, Modifications No. 4 and 7 for reference.)

2.  Pursuant to audit verification (AUD 05-026) ERG will be reimbursed at the total rate of ▓▓▓▓▓ for ▓▓▓▓ agents (Northrop Grumman Temporaries)) ▓▓▓▓▓ for ▓▓▓▓ agents (identified as Other Temporaries), and ▓▓▓▓ for ▓▓▓▓ agent (identified as Other Temporary)) for each hour worked by each of the Customer Service Agents during normal operating hours of the Customer Service Center for the previously stated period. Detailed cost accounting records, and time sheets must be maintained for each of the 'up-to' ▓▓▓ agents by name, date, and activity. Such time sheets must be completed daily and submitted to the COTR on a weekly basis. The COTR shall have the authority to change the number of agents from ▓▓▓ to a lessor number predicated on the workload. All such records shall be subject to audit verification by the Authority's Office of Auditor General.

4.  The Contract amount is hereby increased by the not-to-exceed amount of $787,969 from $21,565,258.30 to not-to-exceed $22,353,227.30. There is no change in the Contract period-of-performance.

5.  All other terms and conditions of Contract C05034 remain unchanged by this modification.

**Attachment C**

01-33-07P01:44 RCVD

December 21, 2006



Project Manager
ERG Transit Systems (USA) Inc.
1800 Sutter Street, Suite 900
Concord, CA 94520

RE:    Contract C05034, SmarTrip® Regional Customer Service Center
          Modifications No. 12 – Piece 1 Delay Claim, Incremental Costs, Etc.

Gentlemen:

Attached please find Modification No. 12 to Contract CO5034, SmarTrip Regional
Customer Service Center. Modification No. 12, Piece 1 Delay Claim, Incremental
Costs, Etc. Modification No. 12 is being issued in the lump-sum, fixed-price
amount of $820,000. This modification increases the contract amount from not-to-
exceed $22,353,227.30 to not-to-exceed $23,173,227.30. All other terms and
conditions of Contract C05034 remain unchanged by this modification.

On September 14, 2006, a Settlement Agreement was executed between ERG
Transit Systems (USA) Inc. (ERG) and WMATA relative to a series of claims.
That Settlement Agreement is expressly incorporated into Modification No. 12. As
stated in that Agreement, WMATA and ERG agree that:

    i.    WMATA will make every reasonable effort to pay to ERG the
          sum of $420,000 within fifteen (15) days subsequent to the
          WMATA Board of Director approval of this settlement; and

    ii.    WMATA will pay to ERG the sum of $200,000 upon
          completion, testing, certification, and approval by WMATA of
          Piece 1 IIIT. The start of the Piece 1 IIIT test phase is contingent
          upon the date that ERG has officially informed WMATA the
          project team is in place and ready for IIIT. The WMATA COTR
          may release to ERG some or all of the $200,000, in his sole
          discretion, based upon reasonable efforts and progress by ERG in
          furtherance of Piece 1, IIIT;

    iii.    WMATA will pay to ERG the sum of $200,000 upon actual and
          complete implementation of ERG's Remobilization Plan,
          including Training, as detailed in its staffing plan submitted
          September 13, 2006. Specific details of remobilization efforts,

Washington
Metropolitan Area
Transit Authority

600 Fifth Street, NW
Washington, DC 20001
202/962-1234

Metrorail:
    Judiciary Square—
    Red Line
    Gallery Place-Chinatown—
    Red, Green &
    Yellow Lines
Metrobus:
    D6, P6, 80, X2

A District of Columbia,
Maryland and Virginia
Transit Partnership

2

including categories of labor and training, shall be presented to the WMATA COTR on a monthly basis as part of the Monthly Project Report until all remobilization is complete; and

iv.    ERG hereby withdraws the claims referenced as (a) <u>Piece 1 Test Delay</u>, (b) <u>Piece 1 Incremental Costs</u>, ( c) <u>Piece 1 Remobilization Costs</u>, and (d) <u>Request for Equitable Adjustment Preparation Costs thru the Date of This Settlement Agreement</u>

Please sign this letter at the space designated below, and execute all originals of Modification No. 12, and return a copy of this letter with an original signature, as well as two originals of Modification No. 12 to Ashok K. Rajpal, Contracting Officer, for WMATA records. One original is for the records of ERG.

Sincerely,

Ashok K. Rajpal
Contracting Officer

Attachment: Modification No. 12

Agreed to and Accepted on behalf of ERG Transit Systems (USA) Inc.

_____          12/27/2006
Signature                                              Date

_____
Print or Type Name

Vice President
Title

_____

Title
_____

REVIEWED AND APPROVED:


_____  11/3/06        _____  11/01/06
Craig Maxey            Date               Douglas D. Deckert        Date
SMRT                                      SMRT


_____  10/30/06
Richard W. Beebe        Date
PRMT



WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
600 Fifth Street, NW, Washington, DC 20001-2651

# AMENDMENT OF SOLICITATION / MODIFICATION OF CONTRACT

| 1. AMENDMENT/MODIFICATION | 2. EFFECTIVE DATE |
|---|---|
| CO5034 - 012 | December 21, 2006 |
| ISSUED BY PURCHASING SECTION | 4. ADMINISTERED BY (if other than block 3) |
| Office of Procurement | |

| CONTRACTOR NAME AND ADDRESS | 6. FORM TYPE (Check only one) |
|---|---|
| **ERG Transit Systems (USA) Inc.** (Street, city, county, state, and zip Code) **1800 Sutter Street - Suite 900 Concord, CA 94520** | ☐ AMENDMENT OF SOLICITATION NO. ___ DATE ___ (See block 7) ☒ MODIFICATION OF CONTRACT/ORDER NO. (See block 7) **CO5034** |

**7.** ☐ **THIS BLOCK APPLIES ONLY TO AMENDMENTS OF SOLICITATIONS**
The above numbered solicitation is amended as set forth in block 10. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended. Offerors must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation, or as amended, by one of the following methods: (a) By signing and returning _____ copies of this amendment; (b) by acknowledging receipt of this amendment on each copy of the offer submitted; or (c) by separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE ISSUING OFFICE PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If, by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided such telegram makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

**8.** ACCOUNTING AND APPROPRIATION DATA (if required)

**9.** THIS BLOCK APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS

  (a) ☒ This Change Order is issued pursuant to **GENERAL PROVISIONS Article 2, Changes, of the Contract.**
     The Changes set forth in block 10 are made to the above numbered contract/order.

  (b) ☐ The above numbered contract/order is modified to reflect the administrative changes (such as changes in paying office, appropriation data, etc.) set forth in block 10.

  (c) ☐ This Supplemental Agreement is entered into pursuant to authority of _____
     It modifies the above numbered contract as set forth in block 10.

**10.** DESCRIPTION OF AMENDMENT/MODIFICATION

(a)  The Contract is hereby increased in the amount of $820,000, from $22,353,227.30 to $23,173,227.30 for 'Piece 1 Delay Claim, Incremental Costs, Etc.,'as defined in the Settlement Agreement dated September 14, 2006 - attached hereto and incorporated herein.

(b)  All other terms and conditions of Contract CO5034 remain unchanged.

(c)  This modification constitutes a full accord and satisfaction for the work above described.

Except as provided herein, all terms and conditions of the document referenced in block 6, as heretofore changed, remain unchanged and in full force and effect.

| 11. ☒ CONTRACTOR /OFFEROR IS REQUIRED TO SIGN THIS MODIFICATION AND RETURN _____ COPIES TO | ☐ CONTRACTOR/ OFFEROR IS NOT REQUIRED TO SIGN THIS DOCUMENT |
|---|---|
| 12. NAME OF CONTRACTOR/OFFICE | 13. WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY |
| BY _____ (Signature of person authorized to sign) | BY ~~Ashok K. Rajpal~~ (Signature of Contracting Officer) |
| NAME AND TITLE OF SIGNER (Type or print) Vice President | 14. DATE SIGNED 6/27/2006 | 16. NAME OF CONTRACTING OFFICER (Type or print) 5 Ashok K. Rajpal | 17. DATE SIGNED December 21, 2006 |

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (hereinafter referred to as "Agreement"), effective this 14th day of September 2006, is made by and between the following entities: (a) The Washington Metropolitan Area Transit Authority (WMATA) and (b) ERG Transit Systems, Inc. (ERG).

WHEREFORE, WMATA and ERG are parties to Contract CO5034, SmarTrip Regional Customer Service Center, executed July 21, 2003 for a base period of five (5) years; and

WHEREFORE, claims have arisen concerning issues termed by ERG as (a) Piece 1 Test Delay, (b) Piece 1 Incremental Costs, ( c) Piece 1 Remobilization Costs, and (d) Request for Equitable Adjustment Preparation Costs; and

WHEREFORE, WMATA and ERG desire to settle and resolve the referenced claims by entering into this Agreement; and

WHEREFORE, this Agreement is conditioned on the approval of it by the WMATA Board of Directors.

## I.    HISTORY OF CLAIMS

ERG by Letter ERCSC-000198, dated February 24, 2006 submitted a Request for Equitable Adjustment in the amount of ████████ for Piece 1 Delay Claim, Piece 1 Incremental Costs, Piece 2 Incremental Costs, Project Remobilization Cost, Impact on Operations Contract, and REA Preparation Costs. Thereafter, by Letter ERCSC-000198, dated February 24, 2006, Version 2, received April 18, 2006 revised the claimed amount to ████████

The four items, identified in the Revised Letter ERCSC-000198, agreed-to for discussion during the period September 11, 2006 to September 13, 2006 were (1) the Piece 1 Delay Claim (████████), (2) Piece 1 Incremental Costs (████████), (3) Impact – Local Remobilization (████████), and (4) Preparation Costs for the Request for Equitable Adjustment as of the date of this Settlement Agreement (Stated in Letter ERCSC-000198 as ████████ revised thereafter on September 11, 2006 to $████████. The total amount claimed for these four referenced items was ████████ WMATA and ERG agreed to address only these initial four items in an attempt to resolve them.

21/2006 16:15 FAX  2029822035          WMATA PROCUREMENT DEPT                           ☎005/004

## II.  SETTLEMENT DETAILS

FOR GOOD AND VALUABLE CONSIDERATION, the Parties agree as follows:

A.  The four claims submitted to WMATA by ERG, above referenced as Piece 1 Test Delay, Piece 1 Incremental Costs, Piece 1 Remobilization Costs, and Request for Equitable Adjustment Preparation Costs are hereby settled, in their entirety to the date of this agreement, for the total lump sum amount of $820,000 which is agreed-to as a Full Accord and Satisfaction for all aspects and costs including, labor costs, direct, indirect, or costs of whatever nature for these claims, including time-related costs for the referenced four items; and

B.  Subject to approval by the WMATA Board of Directors of this settlement in the amount of $820,000, payments shall be made by WMATA to ERG as follows:

    i.  WMATA shall make every reasonable effort to pay to ERG the sum of $420,000 within fifteen (15) days subsequent to the WMATA Board of Director approval of this settlement; and

    ii.  WMATA shall pay to ERG the sum of $200,000 upon completion, testing, certification, and approval by WMATA of Piece 1 IIIT. The start of the Piece 1 IIIT test phase is contingent upon the date that ERG has officially informed WMATA the project team is in place and ready for IIIT. The WMATA COTR may release to ERG some or all of the $200,000, in his sole discretion, based upon reasonable efforts and progress by ERG in furtherance of Piece 1, IIIT]; and

    iii.  WMATA shall pay to ERG the sum of $200,000 upon actual and complete implementation of ERG's Remobilization Plan, including Training, as detailed in its staffing plan submitted September 13, 2006. Specific details of remobilization efforts, including categories of labor and training, shall be presented to the WMATA COTR on a monthly basis as part of the Monthly Project Report until all remobilization is complete.

C.  Upon approval by the WMATA Board of Directors of this Settlement Agreement anticipated to be presented at the November 2006 Board of Directors Meeting, ERG hereby withdrawals the claims referenced as (a) Piece 1 Test Delay, (b) Piece 1 Incremental Costs, ( c) Piece 1 Remobilization Costs, and (d) Request for Equitable Adjustment Preparation Costs thru the Date of This Settlement Agreement; and

D.  ██████████████████████████████████████████

**Attachment D**



October 11, 2007

**VIA FACSIMILE AND**
**FEDERAL EXPRESS**
<u>**TRACKING NO.: 859457502802**</u>

ERG Transit Systems
1800 Sutter Street, Suite #900
Concord, CA 94520

Re:   Contract #C05034
      SmarTrip Regional Customer Service Center

Dear Mr. Teske:

This presents our final determination regarding a request that we received pursuant to the Public Access to Records Policy (PARP) for copies of records relating to claims submitted by ERG Transit Systems. This determination was made under PARP § 7.11 and in consideration of ERG's position as stated in its letter of August 30, 2007. We intend to release the records with the redactions described below on October 26, 2007.

WMATA located some additional records that were not provided to ERG on August 15, 2007, these are separately identified and enclosed. We ask that you provide any objections to those records by October 26, 2007.

Our PARP exemptions are based on the federal Freedom of Information Act (FOIA), and we look to federal regulations, DOJ guidance and FOIA exemption case law for guidance in determining what is exempt. The records were either developed by the parties or required by WMATA, in either case an involuntary submission in FOIA parlance, See <u>McDonnell Douglas Corp v. NASA</u>, 895 F.Supp 316, 318 (D.D.C. 1995) (information submitted under contract requirement is involuntary). We therefore look primarily to whether disclosure is likely to cause substantial competitive harm to ERG Transit Systems. See <u>National Parks and Conservative Ass'n v. Morton</u>, 498 F.2d 765 (D.C. Cir 1974) and <u>Critical Mass Energy Project v. Nuclear Regulatory Com'n</u>, 975 F.2d 871 (D.C. Cir. 1992). Further, conclusory claims of harm are insufficient to establish substantial competitive harm. <u>Public Citizen</u>

**Washington**
**Metropolitan Area**
**Transit Authority**

500 Fifth Street, NW
shington, DC 20001
202/962-1234

By Metrorail:
idary Square—Red Line
lery Place-Chinatown—
Red, Green and
Yellow Lines
By Metrobus:
routes D1, D3, D6, P6,
70, 71, 80, X2

District of Columbia,
Maryland and Virginia
Transit Partnership



Page 2

Health Research Group v. Food & Drug Admin., 704 F.2d 1280 (D.C. Cir. 1983). Case law requires us to consider the following factors in determining whether disclosure will cause substantial competitive harm: (1) whether the contractor faces competition for the good or service; (2) whether the information is otherwise publicly available; and (3) whether the information, if released, is likely to hasten and reduce the cost of producing a competitive product or service. Frazee v. United States Forest Serv., 97 F.3d 367 (9th Cir. 1996); Worthington Compressors, Inc. v. Costle, 662 F.2d 45 (D.C. Cir. 1981).

The following presents WMATA's final determination:

Letter dated December 21, 2006, regarding Modification No. 12 - Piece 1 Delay Claim, Amendment of the Solicitation/Modification #12, dated December 21, 2006, and Settlement Agreement:

ERG requests that WMATA withhold employee names and job titles from the above-referenced records because disclosure may cause harm to ERG's competitive position by allowing a competitor to attempt to recruit ERG's key personnel. WMATA disagrees with ERG's basis for redaction of employee names. We based our decision, in part, on Hecht v. United States Agency for Int'l Dev., 1996 U.S. Dist. LEXIS 22894 *25-26 (D. Del. 1996). In Hecht, the Court ruled that disclosure of "biographical information" about a contractor's employees would not cause competitive harm because the "possibility of another company recruiting away one's employees is present in nearly every industry, regardless of whether the public is furnished with a list of each company's employees." As such, we do not find that this information is likely to place ERG at risk of substantial competitive harm if employee names are released. However, WMATA has redacted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ names from the above-referenced records because it would be a clearly unwarranted invasion of personal privacy to release employee names that are not already in the public domain. Further, WMATA disagrees that the job titles should be redacted, as they do not reveal any confidential or proprietary information that is likely to cause ERG substantial competitive harm if released. Therefore, we did not redact the job titles.

Finally, ERG requests that WMATA redact costs, rates, prices and durations from the above-referenced documents because they may allow a competitor to gauge how much it costs for ERG to do specific work. WMATA disagrees with ERG's redactions of the lump sum dollar amounts contained in the December 21, 2006 letter and page 2 of the Settlement Agreement because aggregate figures consist of too many variables to reveal proprietary information. Acumenics Research and Technology v. United States Dep't of Justice, 843 F.2d 800, 807 - 8 (4th Cir. 1988). Therefore, we did not redact



Page 3

the lump sum dollar amounts in the December 21, 2006 letter or the Settlement Agreement.

However, WMATA agrees that the cost amounts contained on pages 1 and 3 of the Settlement Agreement should be redacted.   The cost amounts can be used by a competitor to determine ERG's pricing strategy for settlement of claims that were not addressed in the Settlement Agreement.

Letter dated April 18, 2006 regarding ERCSC-000198 v2 and letter dated February 24, 2006 regarding the Request for Equitable Adjustment (REA) and the attached REA:

ERG requests that WMATA redact the above-referenced documents because they would not generally be disclosed to the public;  the REA is not closed out and can harm ERG's final negotiations with WMATA; they contain employee names and job titles that may cause harm to ERG's competitive position because a competitor can attempt to recruit ERG's key personnel; they contain  costs, rates, prices and durations that may allow a competitor to gauge how much it costs for ERG to do specific work; and they contain process descriptions that may reveal ERG's confidential methodology and may harm ERG's competitive position.  WMATA disagrees that the above-referenced letters should be redacted in their entirety. The letters do not contain information that reveals any proprietary process, system or confidential commercial information.  Therefore the letters have not been redacted in their entirety.

As stated earlier, WMATA does not agree with ERG's basis for redacting employee names.  However, we have redacted employee names where release would be a clearly unwarranted invasion of personal privacy for employees whose names are not already in the public domain.  Therefore, WMATA has redacted███████████████████names.  WMATA disagrees that job titles should be redacted, as they do not reveal any confidential or proprietary information that is likely to cause ERG substantial competitive harm if released.  Thus, we did not redact the job titles.

WMATA disagrees in part with ERG's redactions of the REA.   WMATA did not redact pages 1 through the top of page 10 because those pages contain general information that is already in the public domain.  However, WMATA has redacted page 10 beginning with the paragraph about the briefing on August 13, 2003 through page 36, the REA Costing Rationale, and Financial Exhibits.  WMATA  believes that the information contained in the above-referenced sections, if released prematurely, would jeopardize WMATA's bargaining position, and therefore, is exempt from release pursuant to PARP



Page 4

section 6.1.5. See, Fed. Open Market Comm. of Fed. Reserve Sys. v. Merrill, 443 U.S. 340 (U.S. 1979).

Letter dated April 30, 2004 regarding the Delay Claim - 238 days:

ERG does not provide any objections to disclosure of the above-referenced letter. Thus, WMATA did not redact the body of the letter. However, to be consistent, WMATA has redacted employee names that are not already in the public domain.

238 Day Delay Claim:

ERG requests that WMATA redact the above-referenced document because it represents requirements to do normal business with WMATA in resolution of delay claims, would not be generally disclosed to the public, and the REA is not closed out, which can harm ERG's final negotiations with WMATA.

WMATA does not agree with ERG's basis to redact the above-referenced document. However, WMATA agrees that the document should be redacted in its entirety. WMATA believes that the information contained in the above-referenced document, if released prematurely, would jeopardize WMATA's bargaining position, and therefore, is exempt from release pursuant to PARP section 6.1.5. See, Fed. Open Market Comm. of Fed. Reserve Sys. v. Merrill, 443 U.S. 340 (U.S. 1979).

Letter dated April 20, 2004, regarding RFCO-00003 – Paper Products Support:

ERG requests that WMATA redact the fifth paragraph of the above-referenced document, which addresses ERG's rough estimate of the duties that the CSR person(s) will actually perform. ERG notes that costs, rates, prices, and durations may cause harm to ERG's competitive position because it allows a competitor to gauge how much it costs ERG to do specific work. ERG also claims that process descriptions should be redacted because they reveal ERG's confidential methodology that may harm its competitive position. WMATA disagrees with the redaction of the fifth paragraph. The paragraph does not reveal any costs or durations, is not detailed enough to reveal any proprietary process, and does not reveal any commercial information. Therefore, we did not redact the fifth paragraph.

ERG did not redact its employee names. To be consistent, WMATA redacted the employee names ██████████████████████ because they are not already in the public domain.  It would be a clearly unwarranted



Page 5

invasion of personal privacy to release private employees' names that are not already in the public domain.

Request for Change Order - 0003:

ERG did not provide any redactions for the above-referenced document. Thus, WMATA did not make any redactions.

List of Attachments for Paper Products page 2:

ERG requests that WMATA redact the Project Staff Position Rate Table and Cost Proposal from the List of Attachments for RFCO-0003. ERG notes that costs, rates, prices, and durations may cause harm to ERG's competitive position because it allows a competitor to gauge how much it costs ERG to do specific work. ERG also claims that process descriptions should be redacted because they reveal ERG's confidential methodology, which may harm it's competitive position. WMATA disagrees with ERG's redactions under this section. The mere mention of ███████████████████ ████████████████████does not reveal any proprietary process or reveal confidential commercial information. Thus, we did not make any redactions to the above-referenced document.

Attachment 1 - Project Staff Positions and Hourly Rates Table:

ERG requests that WMATA redact the positions and hourly rates from the above-referenced attachment. ERG notes that costs, rates, prices, and durations may cause harm to ERG's competitive position because it allows a competitor to gauge how much it costs ERG to do specific work. ERG also claims that process descriptions should be redacted because they reveal ERG's confidential methodology, which may harm it's competitive position. WMATA disagrees with the redaction of the positions because the list of positions does not reveal any confidential or proprietary information that is likely to cause ERG substantial competitive harm if released. However, WMATA agrees that the hourly rates should be redacted. Here, the hourly rates are detailed and specific enough for a competitor to determine ERG's pricing strategy, which is likely to cause ERG substantial competitive harm. Therefore, WMATA has redacted the hourly rates.

Attachment 2 - Cost Proposal:

ERG requests that WMATA redact information regarding the number of employees, the job title, labor per hour, labor hours, extended price and est cost/per transaction. ERG notes that costs, rates, prices, and durations may cause harm to ERG's competitive position because such information can



Page 6

allow a competitor to gauge how much it costs ERG to do specific work. ERG also claims that process descriptions should be redacted because they reveal ERG's confidential methodology that may harm its competitive position. WMATA agrees that the labor rates and number of hours should be redacted. The labor rates and number of hours are detailed and specific enough to aid a competitor in determining ERG's pricing strategy, which is likely to cause ERG substantial competitive harm. Therefore, WMATA has redacted the labor rates and labor hours.

Attachment 3: Payment Terms, Attachment 4: CDRL 1 References, Attachment 5: CDRL 3 References, Attachment 6: CDRL 4 References, Attachment 7: CDRL 5 References, and Attachment 8: Reporting and Training:

ERG did not provide any redactions for the above-referenced documents. Thus, WMATA did not make any redactions.

Attachment 9 - Potential Work Flows:

ERG requests that WMATA redact the above-referenced document in its entirety. ERG notes that costs, rates, prices, and durations may cause harm to ERG's competitive position because it allows a competitor to gauge how much it costs ERG to do specific work. ERG also claims that process descriptions should be redacted because they reveal ERG's confidential methodology that may harm its competitive position. WMATA disagrees that the information contained in the work flow charts are likely to cause ERG harm if released. The information seems general and does not appear to reveal any proprietary process, system or confidential commercial information. Thus, WMATA did not redact any information from Attachment #9.

Attachment 10 - Fare Distribution and Sales Procedures:

ERG did not provide any redactions for the above-referenced document. Thus, WMATA did not make any redactions.

Letter dated June 18, 2004 regarding RFCO-0004 Data Synchronization:

ERG requests that WMATA withhold employee names and job titles from the above-referenced letter because disclosure may cause harm to ERG's competitive position by allowing a competitor to attempt to recruit ERG's key personnel. As noted above, WMATA disagrees with ERG's basis for redaction of employee names. However, WMATA redacted the employee's name ▮▮▮▮▮▮from the above-referenced document because it would



Page 7

be a clearly unwarranted invasion of personal privacy to release a private employee name that is not already in the public domain. WMATA disagrees that job titles should be redacted, as they do not reveal any confidential or proprietary information that is likely to cause ERG substantial competitive harm if released. Therefore, we did not redact the job titles.

Request for Change Order - 00004, List of Attachments, and Attachment 1 General Scope of Work:

ERG did not provide any redactions for the above-referenced documents. Thus, WMATA did not make any redactions.

Attachment 2 - Project Staff Position and Hourly Rate Table:

ERG requests that WMATA redact the hourly rates from the above-referenced document because they may cause harm to ERG's competitive position by allowing a competitor to gauge how much it costs for ERG to do specific work. WMATA agrees that the hourly rates should be redacted because they are detailed and specific enough for a competitor to determine ERG's pricing strategy, which is likely to cause ERG substantial competitive harm.

ERG also requests that position titles be withheld from the above-referenced document. WMATA disagrees that the job titles should be redacted, as they do not reveal any confidential or proprietary information that is likely to cause ERG substantial competitive harm if released. Therefore, we did not redact the job titles.

Attachment 3 - Cost Proposal:

ERG requests that WMATA redact the above-referenced document in its entirety because the costs, rates, and prices may cause a competitor to gauge how much it costs for ERG to do specific work. ERG also requests that the employee names and job titles should be redacted because release may cause harm to ERG's competitive position by allowing competitors to attempt to recruit key personnel.

WMATA agrees that the breakdown of labor hours, rates, sub-total actual hours, sub-total projected time, total ERG labor hours, total hourly rates, extended labor prices, and profit amounts should be redacted because they are detailed and specific enough to aid a competitor in determining ERG's pricing strategy, which is likely to cause ERG substantial competitive harm. Therefore, WMATA has redacted these items. However, WMATA disagrees with ERG's redactions of the total pivotal cost, total non-ERG labor cost, and



Page 8

total price. These lump sum figures consist of too many variables to reveal proprietary information. <u>Acumenics Research and Technology v. United States Dep't of Justice</u>, 843 F.2d 800, 807 - 8 (4th Cir. 1988). Therefore, WMATA has not redacted the total pivotal cost, total non-ERG labor cost, and total price.

As stated above, WMATA disagrees with ERG's basis to redact employee names. However, WMATA agrees to redact employee names that are not already in the public domain.

Finally, WMATA disagrees that the headings and descriptions contained on the left hand side of the above-referenced document that refer to labor hours, actual time, projected time, total ERG Labor Hours, Hourly Rates, Extended Price, Pivotal Cost, Total non-ERG Labor Cost, Profit, Labor Price and Total Price should be redacted. Such information does not contain any confidential or proprietary data that is likely to reveal a proprietary process or system, which is likely to cause ERG substantial competitive harm. Therefore, we did not redact such information.

<u>Attachment 4 Payment Terms:</u>

ERG did not provide any redactions for the above-referenced documents. Thus, WMATA did not make any redactions.

<u>Letter dated June 24, 2004, regarding the delay notice - Point of Sale Network:</u>

ERG requests that WMATA redact the third paragraph, which addresses the risks of hiring a subcontractor with a lack of experience. ERG did not provide a basis for the redaction. WMATA disagrees that the third paragraph should be redacted, because the paragraph is not detailed enough to reveal any proprietary process and does not reveal any privileged or confidential commercial information.

ERG also requests that WMATA withhold the name and job title of an ERG employee because disclosure of employee names may cause harm to ERG's competitive position by allowing a competitor to recruit key personnel. WMATA disagrees with ERG's basis for the redaction. However, we have redacted the employee's name because it would be a clearly unwarranted invasion of personal privacy to release employee names that are not already in the public domain. Therefore, ███████ name has been redacted. However, WMATA disagrees that job title should be redacted, as it does not reveal any confidential or proprietary information that is likely to cause ERG



Page 9

substantial competitive harm if released. Therefore, we did not redact the job title.

<u>Letter dated March 10, 2005 regarding RFCO-00010 Pre Bill Autoload and RRCO-00010</u>:

ERG did not provide any objections to disclosure for the above-referenced letter and cover sheet for the RFCO-00010, therefore, WMATA did not make any redactions to the document.

<u>Letter dated February 25, 2005 regarding SIRS Costs for the period of February 2004 to January 2005 and SIRS Costs Attachment</u>:

ERG requests that WMATA withhold the employee names and job titles from the above-referenced letter dated February 25, 2005 because a competitor can use employee names to bring harm to ERG's competitive position by attempting to recruit key personnel. WMATA disagrees with ERG's basis for the redaction of employee names. However, we have redacted ██████ ████████ name because it is not already in the public domain, and therefore, release would be an invasion of personal privacy. Also, WMATA disagrees that job titles should be redacted, as they do not reveal any confidential or proprietary information that is likely to cause ERG substantial competitive harm if released. Therefore, we did not redact the job title.

Additionally, ERG requests that WMATA redact the entire SIRS Costs Attachment because it contains costs, rates, prices, and duration that may cause harm to ERG's competitive position by allowing a competitor to gauge how much it costs ERG to do specific work and the task lists show ERG's confidential methodology that may harm its competitive position. WMATA agrees that the hours and rates should be redacted because the figures are detailed enough to reveal ERG's pricing strategy. However, the extended total costs and totals contain too many variables to reveal ERG's pricing strategy. Therefore, we did not redact the total cost and the bottom-line figures. Also, we did not redact the dates or the descriptions because they are not specific or detailed enough to reveal a proprietary process.

<u>Letter dated October 13, 2004 with attached May 5, 2005 letter regarding RFCO -00011 Supplemental Income for CTF Connectivity</u>:

WMATA did not receive any objections to the release of the above-referenced letters. To be consistent, WMATA has redacted the employee's name that is not already in the public domain. Therefore, ██████████ ██████████ name has been redacted.

Mr. Kevin Teske
Page 10

Letter dated July 15, 2005, regarding RFCO-00014 – Implement Website
Functionality Specified in Workshops and Discussions with WMATA:

ERG requests that WMATA withhold the employee names and job titles from
the above-referenced document because a competitor can use the
employee's name and job title to bring harm to ERG's competitive position by
attempting to recruit key personnel. WMATA disagrees with ERG's basis for
the redaction of the employee's name. However, we have redacted ███████
████████████ name because the employee's name is not already in the
public domain, so release would be an unwarranted invasion of personal
privacy. Also, WMATA disagrees that job titles should be redacted, as they
do not reveal any confidential or proprietary information that is likely to cause
ERG substantial competitive harm if released. Therefore, we did not redact
the job title.

Request for Change Order – 00014:

ERG requests that WMATA redact the fact that it will take ████████████
████████████████████ because it contains costs, rates, prices, and
duration that may cause harm to ERG's competitive position by allowing a
competitor to gauge how much it costs ERG to do specific work.  WMATA
disagrees with ERG's redaction of the schedule impact.  The description of
the amount of time it would take ERG to complete a project does not provide
detailed information that will allow a competitor to determine ERG's pricing
strategy.  Therefore, we did not redact the above-referenced document.

Request for Change Order – 00014 Attachment 1: Scope of Work:

ERG requests that WMATA redact the changes applicable to the above-
referenced change order because the costs, rates, and prices may cause a
competitor to gauge how much it costs for ERG to do specific work.  WMATA
disagrees with ERG's position.  The information contained under the changes
applicable to the above-referenced change order does contain any pricing
information.  Also, the information under this section does not contain
detailed and specific information that reveals a proprietary process.
Therefore, WMATA did not make any redactions to the Scope of Work
document.

Request for Change Order – 00014 Attachment 2 - Cost Proposal:

ERG requests that WMATA redact  the above-referenced document in its
entirety because the costs, rates, and prices contained in the document may
cause a competitor to gauge how much it costs for ERG to do specific work.



Page 11

WMATA disagrees that the above-referenced document should be redacted in its entirety. We have redacted the labor rates and hours. However, we did not redact the lump sum totals because lump sum figures consist of too many variables to reveal proprietary information. <u>Acumenics Research and Technology v. United States Dep't of Justice</u>, 843 F.2d 800, 807 - 8 (4th Cir. 1988). We did not redact the Task Descriptions, Resource columns, information under attachment 3, and information under attachment 4 because they do not contain detailed and specific information that reveal a proprietary process that is likely to cause ERG substantial competitive harm.

<u>Letter dated May 27, 2005 and Request for Change Order 12:</u>

ERG did not provide any redactions to the above-referenced document because ERG thought it was a duplicate of Request for Change Order 00014. WMATA asks that ERG provide any objections to disclosure of the above-referenced document no later than October 26, 2007. Otherwise, the document will be released in its entirety.

The enclosed records that are labeled "WMATA's Redactions" contain our redactions. We intend to release the records with the marked redactions on October 26, 2007.

Finally, we have located some additional records that were not included in the records that WMATA mailed to you on August 15, 2007. The records consist of the following: (1) a letter dated June 18, 2004, regarding RFCO-00004 – Data Synchronization including the attached Data Synchronization Document #WDC-00139 – Data Synchronization, (2) a letter dated March 10, 2005, including the RFCO0010 - PreBill Autoload document, (3) letter dated May 5, 2005, including RFCO00011- Supplemental Income for CTF Connectivity, (4) RFCO-00013, and (5) a letter dated April 4, 2006, which includes contract modifications 10 and 11. If you consider any portion of the above-referenced records proprietary or confidential, identify it (preferably by highlighting the information) and explain why. Where WMATA required you to submit the information, it is confidential if disclosure is likely to cause substantial harm to your competitive position. If, on the other hand, you voluntarily submitted the information to us (the submission was not required as part of doing business with WMATA) the information is confidential if it is the type of information that you do not generally disclose to the public. Where you make such claims, you must provide a detailed explanation of your position.

WMATA will give full consideration to your identification of proprietary data, but will ultimately determine whether redaction or non-disclosure is warranted. In accordance with the PARP, a submitter is afforded ten (10) business days to provide a response, which in your case is October 26, 2007.



Page 12

If I do not receive your response by October 26, 2007, I will assume that you do not have any objections to disclosure and the enclosed records that were not previously sent to ERG for review will be released in their entirety without redactions on October 27, 2007.

Sincerely,

Keysia A. Thom
PARP/Privacy Policy Administrator

Enclosures

**Attachment E**



January 10, 2008

**FEDERAL EXPRESS**
**TRACKING NO.: 859457502846**
███████████████

ERG Transit Systems
1800 Sutter Street, Suite 900
Concord, CA 94520

Re:    Contract #C05034
       SmarTrip Regional Customer Service Center

Dear ████████████:

This presents our final determination for the second set of records regarding
a request that we received pursuant to the Public Access to Records Policy
(PARP) for copies of records relating to claims submitted by ERG Transit
Systems.  This determination was made under PARP § 7.11 and in
consideration of ERG's position as stated in its letter of October 26, 2007.
We intend to release the records with the redactions described below on
January 28, 2008.

Our PARP exemptions are based on the federal Freedom of Information Act
(FOIA), and we look to federal regulations, DOJ guidance and FOIA
exemption case law for guidance in determining what is exempt.  The records
were either developed by the parties or required by WMATA, in either case
an involuntary submission in FOIA parlance.  See McDonnell Douglas Corp v.
NASA, 895 F.Supp 316, 318 (D.D.C. 1995) (information submitted under
contract requirement is involuntary).  We understand that your position is that
these documents were provided voluntarily, and appreciate the more detailed
explanation of that position in your October 26 letter.  Ultimately, however, we
do not agree.  The standard for voluntary submissions was developed to
encourage cooperation by those not obliged to provide information to the
government.  Critical Mass Energy Project v. Nuclear Regulatory Com'n, 975
F.2d 871, 873 (D.C. Cir. 1992).  It is most commonly applied in absence of a
statutory, regulatory or some less formal requirement for the submission.
E.g. Ctr. for Auto Safety v. Nat'l. Highway Traffic Safety Admin., 244 F.3d
144, 149 (D.C. Cir. 2001) (information voluntary submitted in response to

Washington
Metropolitan Area
Transit Authority

600 Fifth Street, NW
Washington, DC 20001
202/962-1234

By Metrorail:
Judiciary Square—Red Line
Gallery Place-Chinatown—
Red, Green and
Yellow Lines
By Metrobus:
Routes D1, D3, D6, P6,
70, 71, 80, X2

A District of Columbia,
Maryland and Virginia
Transit Partnership



Page 3

hasten and reduce the cost of producing a competitive product or service. Frazee v. United States Forest Serv., 97 F.3d 367 (9th Cir. 1996); Worthington Compressors, Inc. v. Costle, 662 F.2d 45 (D.C. Cir. 1981). Further, conclusory claims of harm are insufficient to establish substantial competitive harm. Public Citizen Health Research Group v. Food & Drug Admin., 704 F.2d 1280 (D.C. Cir. 1983). We observe that your October 26 letter does not adequately explain ERG's proposed redactions, such as why specific information is likely to cause substantial competitive harm or is not generally released. Thus, even if we had found the records to be submitted voluntarily, we would not be in a position to assert PARP exemption 6.1.4.

The following presents WMATA's final determination:

Letter dated June 18, 2004, regarding RFCQ-00004 Data Synchronization and Data Synchronization Cover Sheet and Document History (ERG's reference #B-E-1 pages 1 - 3):

ERG requests that WMATA withhold employee names and job titles from the above-referenced documents because disclosure may cause harm to ERG's competitive position by aiding a competitor in an attempt to recruit ERG's key personnel.

WMATA disagrees with ERG's basis for redacting employee names. We based our decision, in part, on Hecht v. United States Agency for Int'l Dev., 1996 U.S. Dist. LEXIS 22894 *25-26 (D. Del. 1996). In Hecht, the Court ruled that disclosure of "biographical information" about a contractor's employees would not cause competitive harm because the "possibility of another company recruiting away one's employees is present in nearly every industry, regardless of whether the public is furnished with a list of each company's employees." As such, we do not find that this information is likely to place ERG at risk of substantial competitive harm if employee names are released. However, WMATA has redacted███████████████████████ ████████████████████████ names from the above-referenced documents because it would be a clearly unwarranted invasion of personal privacy to release the names of private employees that are not already in the public domain. Further, WMATA disagrees that the job titles should be redacted, as they do not reveal any confidential or proprietary information that is likely to cause ERG substantial competitive harm if released. Therefore, we did not redact the job titles.



**Page 4**

Data Synchronization Specification Contents Page and Exhibits (ERG's reference #B-E-1 pages 4-5):

ERG requests that WMATA redact the information referenced under the Functional Requirements and Data Exchange Requirements headings, WMATA To RCSC File Format, and the list of figures from the exhibits page because the information can allow a competitor to gauge how much it costs for ERG to do specific work and reveals confidential ERG methodology that will harm ERG's competitive position.

WMATA disagrees with ERG's objections to disclosure under the above-referenced sections. The mere mention of what is contained in each section does not contain information that reveals any proprietary process, system or confidential commercial information. Therefore, WMATA did not redact anything under this section.

Data Synchronization Specification pages 5 - 6 (ERG's reference #B-E-1 pages 6 - 7):

ERG did not provide any objections to disclosure of the above-referenced pages. Thus, WMATA did not redact any information under this section.

Data Synchronization Specification pages 7 -11 (ERG's reference #B-E-1 pages 8 -12):

ERG requests that WMATA redact the information referenced in the Systems Requirements and Database Requirements because the information allows a competitor to gauge how much it costs for ERG to do specific work, and they reveal ERG's confidential methodology that will harm ERG's competitive position.

WMATA agrees that the information referenced under the sections marked, "Systems Requirements" and "Database Requirements" should be redacted. The information contained on those pages are specific and detailed enough to reveal a proprietary process or system, which is likely to cause ERG and/or Pivotal substantial competitive harm. Therefore, WMATA has withheld the above-referenced pages.

Data Synchronization Specification pages 12 -19 (ERG's reference #B-E-1 pages 13 - 20):

ERG requests that the diagrams under this section be redacted because they contain information that allows a competitor to gauge how much it costs for



Page 5

ERG to do specific work and they reveal ERG's confidential methodology that will harm ERG's competitive position.

WMATA disagrees that the information contained on the above-referenced pages should be redacted. The diagrams appear to be general in nature, are readily available in the industry, and they do not reveal any proprietary data or business processes. Thus, WMATA did not redact anything under this section.

Data Synchronization Specification pages 20 - 22 (ERG's reference #B-E-1 pages 21- 23):

ERG requests that the charts regarding the WMATA to RCSC File Format be redacted because they contain information that allows a competitor to gauge how much it costs for ERG to do specific work and they reveal ERG's confidential methodology that will harm ERG's competitive position.

WMATA disagrees that the charts should be redacted because the data formats listed under this section were provided by WMATA as a contract requirement for ERG to satisfy. Thus, WMATA did not redact any information under this section.

Data Synchronization Specification pages 23 -24 (ERG's reference #B-E-1 pages 24 - 25):

ERG requests that the Outstanding Issues Log be redacted because it contains information that allows a competitor to gauge how much it costs for ERG to do specific work and it reveals ERG's confidential methodology that will harm ERG's competitive position.

WMATA disagrees that the information under this section should be redacted. The information contained in the Outstanding Issues Log is general in nature and does not contain information that reveals any proprietary process, system or confidential commercial information. Thus, WMATA did not redact anything under this section.

Letter dated March 10, 2005 from ERG to WMATA regarding RFCO-0010 Change Request for Pre-Bill Autoload (ERG reference #B-E-2 page 1):

ERG requests that WMATA redact employee names and job titles because release of this information may cause harm to ERG's competitive position by allowing a competitor to attempt to recruit ERG's key personnel.

██████████████████

Page 6

WMATA disagrees with ERG's basis for redaction of employee names. However, WMATA redacted the employee's name (██████) from the above-referenced document because it would be a clearly unwarranted invasion of personal privacy to release the names of private employees that are not already in the public domain. WMATA disagrees that ██████ job title should be redacted, as it does not reveal any confidential or proprietary information that is likely to cause ERG substantial competitive harm if released. Therefore, WMATA did not redact the job title.

RFCO-00010 Pre-Bill Autoload and Attachment 1 Cover Sheet (ERG reference #B-E-2 pages 2-3):

ERG did not provide any objections to disclosure of the above-referenced documents. Thus, WMATA did not redact any information under this section.

Pre-Bill Autoload Description (ERG's reference #B-E-2 pages 4-5):

ERG requests that WMATA withhold employee names and job titles from the above-referenced document because disclosure may cause harm to ERG's competitive position by allowing a competitor to attempt to recruit ERG's key personnel.

WMATA disagrees with ERG's basis for redaction of employee names. However, WMATA redacted the employees' names (████████████████████████████████) from the above-referenced document because it would be a clearly unwarranted invasion of personal privacy to release the names of private employees that are not already in the public domain.

Pre-Bill Autoload Description pages iii -iv, and 5-6 (ERG's reference #B-E-2 pages 6-9):

ERG did not provide any objections to disclosure for the above-referenced pages. Thus, WMATA did not redact any information under this section.

Pre-Bill Autoload Description page 7 (ERG's reference #B-E-2 page 10):

ERG requests that WMATA redact the information under WMATA Variation because it allows a competitor to gauge how much it costs for ERG to do specific work and they reveal ERG's confidential methodology that will harm ERG's competitive position.



Page 7

WMATA disagrees that the information under this section should be
redacted. With the exception of the bold printed headings, the information
contained in this section was created by WMATA and is a direct excerpt from
the scope of services requirements documents that WMATA released to the
industry with the RFP. Because information is WMATA-created, ERG is not
in a position to assert PARP exemption 6.1.4. Moreover, information that is
otherwise publicly available is not exempt from disclosure. Additionally, the
headings are general in nature and do not contain information that reveals
any proprietary process, system or confidential commercial information.
Thus, WMATA did not redact anything under this section.

Pre-Bill Autoload Description page 8-12 (ERG's reference #B-E-2 page 11-
15):

ERG requests that WMATA redact the information contained under the
sections marked, "Autoload Workflows," "Autoload Setup," "Variation," "Pre-
Bill Autoload Processing," "Autoload Load Recall," and "Autoload Withdrawal"
because the information contained in these sections allows a competitor to
gauge how much it costs for ERG to do specific work and they reveal ERG's
confidential methodology that will harm ERG's competitive position.

WMATA disagrees that the information in these sections should be redacted.
The information contained under this section seems general in nature and
does not contain information that reveals any proprietary process, system or
confidential commercial information. Thus, WMATA did not redact anything
under this section.

Pre-Bill Autoload Description Attachment 2: Cost Proposal (ERG's reference
B-E-2 page #16):

ERG requests that WMATA redact the notes regarding the system design,
development and integration and Test, labor hours and cost data from the
Cost Proposal because the information contained in these sections allows a
competitor to gauge how much it costs for ERG to do specific work and they
reveal ERG's confidential methodology that will harm ERG's competitive
position.

WMATA disagrees with ERG's redactions of the notes because they seem
general in nature and do not contain information that reveals any proprietary
process, system or confidential commercial information. We have redacted
the labor hours, direct hours and rate information under PARP exemption
6.1.4. However, WMATA did not redact the lump sum totals because lump



Page 8

sum figures consist of too many variables to reveal proprietary information. <u>Acumenics Research and Technology v. United States Dep't of Justice</u>, 843 F.2d 800, 807 - 8 (4th Cir. 1988).

<u>Pre-Bill Autoload Description Attachment 4 (ERG's reference B-E-2 page #17):</u>

ERG requests that WMATA redact "███████████████████████ and "██████████████████████████" because this information allows a competitor to gauge how much it costs for ERG to do specific work and it reveals ERG's confidential methodology that will harm ERG's competitive position.

WMATA disagrees that the information under this section should be redacted. The information contained under this section seems general in nature and does not contain information that reveals any proprietary process, system or confidential commercial information. Thus, WMATA did not redact anything under this section.

<u>Pre-Bill Autoload Description Attachment 5 Schedule (ERG's reference page #17):</u>

ERG did not provide any objections under this section. Thus, WMATA did not make any redactions under this section.

<u>Letter from ERG to WMATA dated May 5, 2005 regarding RFCO-00011 Supplemental Income for CTF Connectivity (ERG's reference #B-E-3 page 1):</u>

ERG requests that WMATA withhold employee names and job titles from the above-referenced document because disclosure may cause harm to ERG's competitive position by allowing a competitor to attempt to recruit ERG's key personnel.

WMATA disagrees with ERG's basis for redaction of employee names. However, WMATA redacted the employee's name (███████████████) from the above-referenced document because it would be a clearly unwarranted invasion of personal privacy to release the name of a private employee that is not already in the public domain. Therefore,███████████ ████████name has been redacted. However, WMATA disagrees that the job title should be redacted, as it does not reveal any confidential or proprietary information that is likely to cause ERG substantial competitive harm if released. Therefore, we did not redact the job title.



**Page 9**

<u>RFCO-00011 Supplemental Income for CTF Connectivity (ERG's reference #B-E-3 page 2):</u>

ERG requests that WMATA redact the Schedule Impact because the information contained in this section allows a competitor to gauge how much it costs for ERG to do specific work and it reveals ERG's confidential methodology that will harm ERG's competitive position.

WMATA disagrees that the Schedule Impact should be redacted.  The information contained under this section seems general in nature and does not contain information that reveals any proprietary process, system or confidential commercial information.  Thus, WMATA did not redact anything under this section.

<u>RFCO-00011 Supplemental Income for CTF Connectivity Attachment 1 - Scope of Work (ERG's reference #B-E-3 page 3):</u>

ERG requests that WMATA redact information regarding CDRL 11, Network Infrastructure under the sections marked, "Additional Site" and "Conclusion" because the information contained in these sections allows a competitor to gauge how much it costs for ERG to do specific work and it reveals ERG's confidential methodology that will harm ERG's competitive position.

WMATA disagrees with ERG's redactions for in the above-referenced document. The information contained under this section seems general in nature and does not contain information that reveals any proprietary process, system or confidential commercial information.  Thus, WMATA did not redact anything under this section.

<u>RFCO-00011 Supplemental Income for CTF Connectivity Attachment 2 - Cost Proposal (ERG's reference #B-E-3 pages 4-5):</u>

ERG requests that WMATA redact the Cost Proposal because the information contained in these sections allows a competitor to gauge how much it costs for ERG to do specific work and they reveal ERG's confidential methodology that will harm ERG's competitive position.

WMATA disagrees with ERG's redactions of the notes because they seem general in nature and do not contain information that reveals any proprietary process, system or confidential commercial information.  We have redacted the labor hours, direct hours and rate information under PARP exemption 6.1.4.  However, WMATA did not redact the lump sum totals because lump



Page 10

sum figures consist of too many variables to reveal proprietary information. <u>Acumenics Research and Technology v. United States Dep't of Justice</u>, 843 F.2d 800, 807 - 8 (4th Cir. 1988).

<u>RFCO-00011 Supplemental Income for CTF Connectivity Attachments 3 (Payment Terms) and 4 (Schedule) (ERG's reference #B-E-3 page 5)</u>

ERG requests that WMATA redact  the upon execution of change order amount and the information contained under for the balance because it contains information that allows a competitor to gauge how much it costs for ERG to do specific work and reveals ERG's confidential methodology that will harm ERG's competitive position.

WMATA disagrees with ERG's redactions for in the above-referenced document.  The information contained under this section seems general in nature and does not contain information that reveals any proprietary process, system or confidential commercial information.  Thus, WMATA did not redact anything under this section.

<u>Network Infrastructure Plan (CDRL 11) Cover Page (ERG's reference # B-E-4 page 1)</u>:

ERG requests that WMATA withhold employee names and job titles from the above-referenced record because disclosure may cause harm to ERG's competitive position by allowing a competitor to attempt to recruit ERG's key personnel.

WMATA disagrees with ERG's basis for redaction of employee names. However, WMATA redacted the employees' names (████████ ███████████████████████) from the above-referenced document because it would be a clearly unwarranted invasion of personal privacy to release a private employee name that is not already in the public domain.

<u>Network Infrastructure Plan (CDRL 11) Page ii - iii (ERG's reference # B-E-4 page 2-3)</u>:

ERG requests that WMATA withhold employee names and job titles from the above-referenced record because disclosure may cause harm to ERG's competitive position by allowing a competitor to attempt to recruit ERG's key personnel.  ERG also requests that WMATA withhold information contained in the Document History Chart and Table of Contents that would contribute to security breaches and reveal proprietary processes and technical solutions.

**Page 11**

WMATA disagrees with ERG's basis for redacting employee names. However, WMATA redacted the employees' names (██████████████ ██████████████████) from the above-referenced document because it would be a clearly unwarranted invasion of personal privacy to release private employee names that are not already in the public domain.

WMATA disagrees that the entire "Reasons for Issue" column should be redacted because not all of the information contained in that column is detailed and specific enough to reveal a proprietary process or system or compromise the security of WMATA customers and/or employees. However, we have redacted the reason for issue for revisions 0.2, 0.4 - 1.2, 1.4, and 1.6 - 4.0 under PARP exemptions 6.1.1, 6.1.4, 6.1.6, and 6.1.8 because they contain information that is detailed and specific and would compromise the security of WMATA customers and/or employees.

Network Infrastructure Plan (CDRL 11) Page iv (ERG's reference # B-E-4 page 4):

ERG did not provide any objections under this section. Thus, WMATA did not make any redactions under this section.

Network Infrastructure Plan (CDRL 11) Page v (ERG's reference # B-E-4 page 5):

ERG requests that WMATA withhold information that would contribute to security breaches and reveal proprietary processes and technical solutions.

WMATA disagrees that the this entire document should be redacted. We have redacted the locations of the sites because the details about the various locations is likely to cause substantial competitive harm to ERG and compromise the security of WMATA customers and/or employees under PARP exemptions 6.1.1, 6.1.4, 6.1.6, and 6.1.8. However, the remainder of the information is general in nature and does not reveal any proprietary process or system nor does it reveal information that would compromise the security of WMATA customers and/or employees.

Network Infrastructure Plan (CDRL 11) Page vi and 7-10 (ERG's reference # B-E-4 pages 6-10):

ERG did not provide any objections under this section. Thus, WMATA did not make any redactions under this section.

███████████████
Page 12

Network Infrastructure Plan (CDRL 11) 11- 60 (ERG's reference # B-E-4 page 11-60):

ERG requests that WMATA withhold information that would contribute to security breaches and reveal proprietary processes and technical solutions.

WMATA agrees that information contained on these pages are detailed and specific enough to reveal confidential and proprietary process that is likely to cause substantial competitive harm to ERG under PARP exemption 6.1.4. WMATA also agrees that information contained under this section would compromise the security of WMATA customers and/or employees under PARP exemption 6.1.1. WMATA also believes that release of information under this section would lead to a clearly unwarranted invasion of personal privacy under PARP exemptions 6.1.6 and 6.1.8. Therefore, we have withheld these pages in their entirety.

Letter from ERG to WMATA dated April 4, 2006, regarding Contract Modification #10 and Modification #11 (ERG's reference #B-E-5 page 1):

ERG requests that WMATA withhold employee names and job titles from the above-referenced record because disclosure may cause harm to ERG's competitive position by allowing a competitor to attempt to recruit ERG's key personnel.

WMATA disagrees with ERG's basis for redaction of employee names. However, WMATA redacted the employee's name (███████████) from the above-referenced document because it would be a clearly unwarranted invasion of personal privacy to release a private employee name that is not already in the public domain. Therefore,███████████ name has been redacted. However, WMATA disagrees that job title should be redacted, as it does not reveal any confidential or proprietary information that is likely to cause ERG substantial competitive harm if released. Therefore, we did not redact the job title.

Modification # 10 dated March 28, 2006 page 1 (ERG's reference #B-E-5 page 2):

ERG requests that WMATA withhold employee names and job titles from the above-referenced document because disclosure may cause harm to ERG's competitive position by allowing a competitor to attempt to recruit ERG's key personnel.

Page 13

WMATA disagrees with ERG's basis for redaction of employee names. However, WMATA redacted the employee's name (████████████) from the above-referenced document because it would be a clearly unwarranted invasion of personal privacy to release the names of private employees that is not already in the public domain. Therefore, ████████████ name has been redacted. However, WMATA disagrees that job titles should be redacted, as they do not reveal any confidential or proprietary information that is likely to cause ERG substantial competitive harm if released. Therefore, we did not redact ████████████ job title.

Modification # 10 dated March 28, 2006 page 2 (ERG's reference #B-E-5 page 3):

ERG requests that WMATA redact the pricing information because this information allows a competitor to gauge how much it costs for ERG to do specific work, contributes to security breach and reveals proprietary processes and technical solutions, contains detailed claim/change order components and reveals ERG's confidential methodology that will harm ERG's competitive position.

WMATA disagrees with ERG's redactions of the lump sum dollar amounts contained in the above-referenced letter are aggregate figures consist of too many variables to reveal proprietary information. Acumenics Research and Technology v. United States Dep't of Justice, 843 F.2d 800, 807 - 8 (4th Cir. 1988). Also, the pricing data is already publicly accessible because it is for an executed contract modification that was approved by the WMATA Board of Directors. Therefore, we did not redact the lump sum dollar amounts.

Modification # 10 dated March 28, 2006 page 3 (ERG's reference #B-E-5 page 4):

ERG requests that WMATA redact the entire payment schedule because this information allows a competitor to gauge how much it costs for ERG to do specific work, contributes to security breach and reveals proprietary processes and technical solutions, contains detailed claim/change order components and reveals ERG's confidential methodology that will harm ERG's competitive position.

WMATA disagrees with ERG's redactions of the lump sum dollar amounts contained in the above-referenced document are aggregate figures consist of too many variables to reveal proprietary information. Acumenics Research and Technology v. United States Dep't of Justice, 843 F.2d 800, 807 - 8 (4th Cir. 1988). Additionally, the pricing data is already publicly accessible

██████████████

**Page 14**

because it is for an executed contract modification that was approved by the WMATA Board of Directors. WMATA also disagrees that the notes contained in the payment schedule should be redacted. The information contained under this section seems general in nature and does not contain information that reveals any proprietary process, system or confidential commercial information. Thus, WMATA did not redact anything under this section.

Contract C05034 Agreement of Open Issues (ERG's reference #B-E-5 page 5):

ERG requests that WMATA withhold employee names and job titles from the above-referenced document because disclosure may cause harm to ERG's competitive position by allowing a competitor to attempt to recruit ERG's key personnel. ERG also requests that WMATA redact the pricing information and details regarding settlement of claims because this information allows a competitor to gauge how much it costs for ERG to do specific work, contributes to security breach and reveals proprietary processes and technical solutions, contains detailed claim/change order components and reveals ERG's confidential methodology that will harm ERG's competitive position.

WMATA disagrees with ERG's basis for redaction of employee names. However, WMATA redacted the employee's name ██████████████from the above-referenced document because it would be a clearly unwarranted invasion of personal privacy to release the names of private employees that is not already in the public domain. Therefore, ██████████████name has been redacted. However, WMATA disagrees that job titles should be redacted, as they do not reveal any confidential or proprietary information that is likely to cause ERG substantial competitive harm if released. Therefore, we did not redact ██████████job title.

Additionally, WMATA disagrees with ERG's redactions of the lump sum dollar amounts contained in the above-referenced document are aggregate figures consist of too many variables to reveal proprietary information. Acumenics Research and Technology v. United States Dep't of Justice, 843 F.2d 800, 807 - 8 (4th Cir. 1988). Additionally, the pricing data is already publicly accessible because it is for an executed contract modification that was approved by the WMATA Board of Directors. WMATA also disagrees that the information regarding ERG's claims should be redacted. The claim information seems general in nature and does not contain information that reveals any proprietary process, system or confidential commercial information. Thus, WMATA did not redact anything under this section.

██████████████

Page 15

<u>Modification # 11 dated March 28, 2006 (ERG's reference #B-E-5 pages 6):</u>

ERG requests that WMATA withhold employee names and job titles from the above-referenced document because disclosure may cause harm to ERG's competitive position by allowing a competitor to attempt to recruit ERG's key personnel.

WMATA disagrees with ERG's basis for redaction of employee names. However, WMATA redacted the employee's name ██████████) from the above-referenced document because it would be a clearly unwarranted invasion of personal privacy to release the names of private employees that is not already in the public domain. Therefore, ██████████ name has been redacted. However, WMATA disagrees that job titles should be redacted, as they do not reveal any confidential or proprietary information that is likely to cause ERG substantial competitive harm if released. Therefore, we did not redact ██████████ job title.

<u>Modification # 11 dated March 28, 2006 (ERG's reference #B-E-5 pages 7):</u>

ERG requests that WMATA withhold information regarding increasing staff for the Regional Customer Service Center, reimbursement, and pricing information because it allows a competitor to gauge how much it costs for ERG to do specific work, contributes to security breach and reveals proprietary processes and technical solutions, contains detailed claim/change order components and reveals ERG's confidential methodology that will harm ERG's competitive position.

WMATA disagrees with ERG's redactions of withhold information regarding increasing staff for the Regional Customer Service Center and reimbursement. This information seems general in nature and does not contain information that reveals any proprietary process, system or confidential commercial information. WMATA also disagrees with ERG's redactions of the lump sum dollar amounts contained in the above-referenced document are aggregate figures consist of too many variables to reveal proprietary information. <u>Acumenics Research and Technology v. United States Dep't of Justice</u>, 843 F.2d 800, 807 - 8 (4th Cir. 1988). Additionally, the pricing data is already publicly accessible because it is for an executed contract modification that was approved by the WMATA Board of Directors. Thus, WMATA did not redact anything under this section.

Page 16

Letter from ERG to WMATA dated May 27, 2005 regarding RFCO-00012 and
RFCO-0013 (ERG's reference #B-E-6 page 1):

ERG requests that WMATA withhold employee names and job titles from the
above-referenced document because disclosure may cause harm to ERG's
competitive position by allowing a competitor to attempt to recruit ERG's key
personnel.

WMATA disagrees with ERG's basis for redaction of employee names.
However, WMATA redacted the employee's name ███████████████████
from the above-referenced document because it would be a clearly
unwarranted invasion of personal privacy to release a private employee name
that is not already in the public domain. Therefore,███████████████
name has been redacted. However, WMATA disagrees that job title should
be redacted, as it does not reveal any confidential or proprietary information
that is likely to cause ERG substantial competitive harm if released.
Therefore, we did not redact the job title.

RFCO-00012 Change Request for Multi-language Support for the OSS
Website (ERG's reference #B-E-6 page 2):

ERG requests that WMATA redact the schedule impact of time to complete
this change order be withheld because disclosure allows a competitor to
gauge how much it costs for ERG to do specific work.

WMATA disagrees that the schedule impact should be because the amount
of time it may take to complete this change order is general in nature and
does not contain information that reveals any proprietary process, system or
confidential commercial information. Thus, WMATA did not redact anything
under this section.

RFCO-00012 Change Request for Multi-language Support for the OSS
Website Attachment 1 Scope of Work (ERG's reference #B-E-6 page 3):

ERG requests that WMATA redact the costs, rates, prices and payment
terms, along with durations because disclosure allows a competitor to gauge
how much it costs for ERG to do specific work. Specifically, ERG requests
that WMATA withhold the amount of translation pages required per year and
the increase amount of the license fee.

WMATA disagrees with ERG's redactions under this section because the
information is general in nature and does not contain information that reveals
any proprietary process, system or confidential commercial information.
Thus, WMATA did not redact anything under this section.



Page 17

RFCO-00012 Change Request for Multi-language Support for the OSS
Website Attachments 2 - 4 (ERG's reference #B-E-6 page 4):

ERG requests that WMATA withhold the task descriptions, resources, labor
rates, labor hours, extended price, the upon execution of change order
percentage, for the balance and initiation because disclosure allows a
competitor to gauge how much it costs for ERG to do specific work.

WMATA disagrees with all of ERG's redactions. We have redacted the labor
rates and hours. However, we did not redact the lump sum totals because
lump sum figures consist of too many variables to reveal proprietary
information. Acumenics Research and Technology v. United States Dep't of
Justice, 843 F.2d 800, 807 - 8 (4th Cir. 1988). We did not redact the Task
Descriptions, Resource columns, information under attachment 3, and
information under attachment 4 because they do not contain detailed and
specific information that reveal a proprietary process that is likely to cause
ERG substantial competitive harm.

RFCO - 00013 Change Request to Implement Changes Identified in SIRS
CR#47 to Change the Soft Serial Number Format in SIRS (ERG's reference
#B-E-7 page 1):

ERG requests that WMATA redact the schedule impact of time to complete
this change order be withheld because disclosure allows a competitor to
gauge how much it costs for ERG to do specific work.

WMATA disagrees that the schedule impact should be because the amount
of time it may take to complete this change order is general in nature and
does not contain information that reveals any proprietary process, system or
confidential commercial information. Thus, WMATA did not redact anything
under this section.

RFCO - 00013 Change Request to Implement Changes Identified in SIRS
CR#47 to Change the Soft Serial Number Format in SIRS Attachment 1
Scope of Work (ERG's reference #B-E-7 page 3):

ERG did not provide any objections under this section. Thus, WMATA did
not make any redactions under this section.


Page 18

RFCO - 00013 Change Request to Implement Changes Identified in SIRS CR#47 to Change the Soft Serial Number Format in SIRS  Attachment 2 - 4 (ERG's reference #B-E-7 page 2):

ERG requests that WMATA withhold the task descriptions, resources, labor rates, labor hours, extended price, the upon execution of change order percentage, for the balance and initiation because disclosure allows a competitor to gauge how much it costs for ERG to do specific work.

WMATA disagrees with all of ERG's redactions.  We have redacted the labor rates and hours.  However, we did not redact the lump sum totals because lump sum figures consist of too many variables to reveal proprietary information. Acumenics Research and Technology v. United States Dep't of Justice, 843 F.2d 800, 807 - 8 (4th Cir. 1988).  We did not redact the Task Descriptions, Resource columns, information under attachment 3, and information under attachment 4 because they do not contain detailed and specific information that reveal a proprietary process that is likely to cause ERG substantial competitive harm.

The enclosed records  contain our redactions.   We intend to release the records with the marked redactions on January 28, 2008.

Sincerely,

Keysia A. Thom
PARP/Privacy Policy Administrator

Enclosures

**EXHIBIT 2**





# SECTION 1

# SUPPLY AND SERVICE CONTRACT
# GENERAL PROVISIONS

**1.    DEFINITIONS**

As used throughout this Contract, the following terms shall have the meanings set forth below:

a.    The term Authority means The Washington Metropolitan Area Transit Authority created effective February 20, 1967, by Interstate Compact by and between Maryland, Virginia, and the District of Columbia, pursuant to Public Law 89-774, approved November 6, 1966.

b.    The term Contracting Officer means the person executing this Contract on behalf of the Authority, and his or her successor, and the term includes, except as otherwise provided in this Contract, the authorized representative of a Contracting Officer acting within the limits of his authority.

c.    Except as otherwise provided in this Contract, the term subcontracts includes purchase orders under this Contract.

d.    Wherever in the scope of the work the words directed, ordered, designated, prescribed, or words of like import are used, it shall be understood that the direction, requirement, order, designation, or prescription of the Contracting Officer is intended and similarly the words approved, acceptable, satisfactory, or words of like import shall mean approved by, or acceptable to, or satisfactory to the Contracting Officer, unless otherwise expressly stated.

**2.    CHANGES (Revised 09/14/94)**

a.    The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this Contract, in any one or more of the following:

    (1)    Description of services to be performed.

    (2)    Time of performance (i.e., hours of the day, days of the week, etc.).

    (3)    Place of performance of the services.

    (4)    Drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Authority, in accordance with the drawings, designs, or specifications.

    (5)    Method of shipment or packing of supplies.

    (6)    Place of delivery.

b.    If any such change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this Contract, whether changed or not changed by the order, the Contracting Officer shall make an equitable adjustment in the Contract price, the delivery schedule, or both, and shall modify the Contract.

c.    The Contractor must assert its right to an adjustment under this article within 30 days from the date of receipt of the written order.  However, if the Contracting Officer decides that the facts justify it, the Contracting Officer may receive and act upon a proposal submitted before final payment of the contract.





   d.   If the Contractor's proposal includes the cost of property made obsolete or excess by the change, the Contracting Officer shall have the right to prescribe the manner of the disposition of the property.

   e.   Failure to agree to any adjustment shall be a dispute under the Disputes article. However, nothing in this article shall excuse the Contractor from proceeding with the contract as changed.

## 3.  EXTRAS

Except as otherwise provided in this Contract, no payment for extras shall be made unless such extras and the price therefor have been authorized in writing in advance by the Contracting Officer.

## 4.  VARIATION IN QUANTITY

No variation in the quantity of any item called for by this Contract will be accepted unless such variation has been caused by conditions of loading, shipping, or packing, or allowances in manufacturing processes, and then only to the extent, if any, specified elsewhere in this Contract.

## 5.  INSPECTION

   a.   All supplies, which term throughout this article includes without limitation raw materials, components, intermediate assemblies, and end products, shall be subject to inspection and test by the Authority, to the extent practicable at all times and places including the period of manufacture, and in any event prior to acceptance.

   b.   In case any supplies or lots of supplies are defective in material or workmanship or otherwise not in conformity which the requirements of this Contract, the Authority shall have the right either to reject them (with or without instruction as to their disposition) or to require their correction. Supplies or lots of supplies which have been rejected or required to be corrected shall be removed or, if permitted or required by the Contracting Officer, corrected in place by and at the expense of the Contractor promptly after notice, and shall not thereafter be tendered for acceptance unless the former rejection or requirement of correction is disclosed. If the Contractor fails promptly to remove such supplies or lots of supplies which are required to be removed or promptly to replace or correct such supplies or lots of supplies, the Authority may either:

      (1)   By contract or otherwise replace or correct such supplies and charge to the Contractor the cost occasioned the Authority thereby; or

      (2)   Terminate this Contract for default as provided in the DEFAULT article of this Contract. Unless the Contractor corrects or replaces such supplies within the delivery schedule, the Contracting Officer may require the delivery of such supplies at a reduction in price which is equitable under the circumstances. Failure to agree to such reduction of price shall be a dispute concerning a question of fact within the meaning of the DISPUTES article of this Contract.

   c.   If any inspection or test is made by the Authority on the premises of the Contractor or a subcontractor, the Contractor without additional charge shall provide all reasonable facilities and assistance for the safety and convenience of the Authority inspectors in the performance of their duties. If Authority inspection or test is made at a point other than the premises of the Contractor or a subcontractor, it shall be at the expense of the Authority except as otherwise provided in this Contract; provided, that in case of rejection, the Authority shall not be liable for any reduction in value of samples used in connection with such inspection or test. All inspections and tests by the Authority shall be performed in such a manner as not to unduly delay this work. The Authority reserves the right to charge to the Contractor any additional cost of Authority inspection and test when supplies are not ready at the time such inspection and test is requested by the Contractor or when reinspection or retest is necessitated by prior rejection. Acceptance or rejection of the supplies shall be made as promptly as practicable after delivery, except as otherwise provided in this Contract; but failure to inspect and accept or reject supplies shall neither relieve the Contractor from responsibility for such

**EXHIBIT 3**



made to meet its goal, the Contractor shall be presumed to be in compliance with said Appendix. But, if the Contracting Officer finds the Contractor not to be in compliance with said Appendix, the progress of the work shall also be deemed to be unsatisfactory and there shall be retained from payment (or progress payments) made to the Contractor pursuant to this Article of the General Provisions an amount equal to the DBE/WBE participation in the Contract. Additionally, if the Contractor fails to submit monthly DBE reports, the Contracting Officer may suspend payment (or progress payments) until such time as the monthly reports have been submitted and accepted by the Authority.

## 9.  DELAY OF WORK

a.  If the performance of all or any part of the work is delayed or interrupted by an act of the Contracting Officer in the administration of this Contract, which act is not expressly or impliedly authorized by this Contract, or by his failure to act within the time specified, an adjustment (excluding profit) shall be made for any increase in the cost of performance of this Contract caused by such delay or interruption and the contract modified in writing accordingly. Adjustment shall be made also in the delivery or performance dates and any other contractual provision affected by such delay or interruption. However, no adjustment shall be made under this article for any delay or interruption

  (1)  to the extent that performance would have been delayed or interrupted by any other cause, including the fault or negligence of the Contractor; or

  (2)  for which an adjustment is provided or excluded under any other provision of this Contract.

b.  No claim under this clause shall be allowed

  (1)  for any costs incurred more than 20 days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved; and

  (2)  unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of such delay or interruption, but not later than the date of final payment under the Contract.

## 10.  STOP WORK ORDER

a.  The Contracting Officer may, at any time, by written order to the Contractor, require the Contractor to stop all, or any part of the work called for by this Contract for a period of 90 days after the order is delivered to the Contractor, and for any further period to which the parties may agree. Any such order shall be specifically identified as a STOP WORK ORDER issued pursuant to this article. Upon receipt of such an order, the Contractor shall forthwith comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage. Within a period of 90 days after a stop work order is delivered to the Contractor, or within any extension of that period to which the parties shall have agreed, the Contracting Officer shall either:

  (1)  Cancel the stop work order, or

  (2)  Terminate the work covered by such order as provided in the TERMINATION FOR CONVENIENCE article of this Contract.

b.  If a stop work order issued under this article is cancelled or the period of the order or any extension thereof expires, the Contractor shall resume work. An equitable adjustment shall be made in the delivery schedule or Contract price, or both, and the Contract modified in writing accordingly, if:

  (1)  The stop work order results in an increase in the time required for, or in the Contractor's cost properly allocable to, the performance of any part of this Contract, and

**EXHIBIT 4**



## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY POLICY/INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

## 1.0    POLICY

It is the policy of the Washington Metropolitan Area Transit Authority (WMATA) to make official public records, including electronic records, available to the public for inspection and copying to the greatest extent possible unless exempted from disclosure by a provision herein. WMATA will interpret and apply this Policy consistent with the federal Freedom of Information Act (FOIA), 5 U.S.C. § 552, and federal practice, including when determining whether to waive exemptions. WMATA's disclosable records will be made available at the earliest feasible time and to the fullest extent permissible. This Policy shall not be construed to hinder the public's access to records that departments and/or independent offices provide to the public in the course of doing business. Therefore, unless specifically prohibited by this Policy or the Privacy Policy and other applicable laws, departments and offices shall continue to make such records available without requiring adherence to the procedures of this Policy where such releases are consistent with the office's or department's established business practices.

## 2.0    PURPOSE

WMATA, in the regular course of its business, receives from outside sources and generates, through its employees, significant quantities of records on a variety of topics. Some of the records, if released, could benefit selectively or could cause personal or economic harm to members of the public, other organizations, WMATA employees, or the interests of WMATA. This Policy/Instruction (P/I) establishes policy and procedures on making records available to the public by WMATA's officers, employees, and agents.

## 3.0    SCOPE

All records received or generated by WMATA, its officers, employees and agents in and through the regular course of WMATA's business, and in WMATA's control at the time of the response are covered by this P/I unless such records are published and are offered for sale by WMATA. Records shall be handled,

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

safeguarded or released in accordance with this P/I in order to: (1) assure fair and equitable treatment of the public and of the officers, employees and agents of WMATA; (2) protect against detriment to WMATA's interests or those of its officers, employees and agents, or those of the public; and (3) prevent a clearly unwarranted invasion of personal privacy. Accordingly, records in the possession of WMATA, its officers, employees and agents and received or generated in the regular course of WMATA's business shall be released unless an exemption from release is identified herein in which case, to the extent possible, the exempt information shall be redacted and the redacted record(s) will be released.

## 4.0    DEFINITIONS

4.1    "Critical Infrastructure Information" or "CII" is defined in 6 Code of Federal Regulations § 29.2 and is information not customarily in the public domain which relates to the security of critical infrastructure or protected systems that WMATA or a third party has voluntarily submitted to the Department of Homeland Security in accordance with 6 C.F.R. § 29.5.

(a)    "CII" is WMATA's systems and assets, physical or computer-based, that are vital to national or regional defense and/or national or regional security. For the purposes of this Policy, examples of critical infrastructures include the Metrorail stations, rolling stock, and Operations Control Center computers/equipment that support the operation of the Metrorail/Metrobus systems. This definition is derived in part from the definition of critical infrastructure in the USA PATRIOT Act (see Pub. L. 107-56, section 1016; 42 U.S.C. § 5195c(e)) but was modified to apply to substantial disruptions of WMATA's critical infrastructure that are regional, rather than national, in scope.

4.2    "Decision" is a writing by the Authority that either grants in whole, grants in part, or denies a request for records under this P/I.

4.3    "Direct Costs" are expenses that are actually incurred in searching for and duplicating records to respond to a request for WMATA records. Overhead



**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
POLICY/INSTRUCTION**

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

expenses such as the costs of space and heating or lighting the facility and housing the records are not included as Direct Costs.

4.4    "Official Custodian" is an employee who has been designated by a "Responsible Official" to process records in accordance with this P/I. For purposes of this P/I, the Responsible Official shall be considered an Official Custodian unless s/he has designated a subordinate as the Official Custodian and so notified the Public Access to Records Policy (PARP) Administrator.

4.5    "PARP Administrator" is the WMATA employee who is responsible for administering this Policy.

4.6    "Privacy Policy" is the WMATA Privacy Policy (P/I 9.2/0) that protects the privacy of individuals who are subjects of records maintained by WMATA in systems of records.

4.7    "Records" means:

(a)    any existing writing, drawing, map, recording, tape, film, microfilm, correspondence, form, card, photograph, optical disk, photostatic copy, and records stored by computer (electronic records) that are made or received by WMATA in connection with the transaction of public business. A record does not include uncirculated personal notes, papers, electronic records and any other records, that were created and retained solely as work papers for personal use; and

(b)    records include only existing records, not a compilation(s) of existing records or the results of any additional work done to develop or create information in response to a request. However, where electronic files or databases can be readily searched and where specified data can be readily formatted, without imposing a significant operational and/or financial burden on WMATA, such resulting electronic records shall constitute "records" for purposes of this Policy.

| APPROVED | Supercedes | Page |
|---|---|---|
| by the WMATA Board of Directors effective October 1, 2005 | 1.12/0 | 3 of 27 |



**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY POLICY/INSTRUCTION**

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

4.8 "Requester" means any person or entity (including corporations, federal, state, local or foreign governments) who requests WMATA Records under this P/I.

4.9 "Responsible Official" is an Officer, Deputy General Manager, Assistant General Manager, Chief Operating Officer, or Director of an Independent Office who shall be responsible for the implementation of this P/I for his/her department/office, including appointing an Official Custodian.

4.10 "Sensitive Security Information" (SSI) is information defined in 49 C.F.R. § 1520.5, including, but not limited to, vulnerability assessments, security programs and contingency plans, that is generated by WMATA or a covered person under 49 C.F.R. § 1520.7, that has been, or will be, submitted to the Transportation Security Administration or the Secretary of Transportation.

4.11 "SmarTrip® Information" is information submitted by customers for issuance of SmarTrip® cards or generated by use of SmarTrip® cards.

## 5.0    RESPONSIBILITIES

5.1 The Office of Marketing shall be responsible for posting a current copy of this Policy, PARP Quarterly Reports, WMATA's frequently-requested Records and Records that WMATA determines are of public interest and likely to be frequently requested, with exempt information redacted, on WMATA's internet website.

5.2 The PARP Administrator is an employee in the Office of General Counsel who is responsible for all written and oral communications with the Requester as provided herein, and for preparing PARP Quarterly Reports for the General Manager/Chief Executive Officer (GM/CEO).

5.3 Responsible Officials in each department or independent office shall develop, maintain, and update, as necessary, the department/office Records Retention Schedule in compliance with section 4.03 of WMATA's Records Management Policy (P/I 6.1/3) and shall designate and supervise Official



| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY POLICY/INSTRUCTION |
| --- |

| Subject | Classification | Lead | Date Approved | P/I Number |
| --- | --- | --- | --- | --- |
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

Custodians of Records for their respective departments or offices ("Official Custodian"). Responsible Officials shall notify the PARP Administrator of the name, telephone number, facsimile number, and e-mail address of the current Official Custodian for their respective departments or offices, and update this information as necessary.

5.4    The Official Custodians are responsible for (1) assuring that Records are maintained/preserved in accordance with the department/office's Records Retention Schedule and WMATA's Records Management Policy; (2) searching for and/or retrieving Records in their respective departments or independent offices; (3) forwarding any retrieved Records to the PARP Administrator; (4) providing a recommendation regarding redactions or withholding of Records; (5) verifying that the Records released and recommendations are accurate and complete; (6) recording all Direct Costs associated with responding to each request; and (7) providing the Office's/Department's frequently-requested Records and Records that the department or office determines are of public interest and will be frequently requested, with exempt information redacted, to the Office of Marketing for placement on WMATA's internet website:

(a)    Qualifications of Official Custodian.  An Official Custodian must: (ii) be a regular, full-time employee; (ii) have been employed within the department or office for a minimum of two (2) years; and (iii) have an education level of at least a Bachelor's Degree.

(b)    Evaluation Requirements for Official Custodian.  Newly assigned custodians must receive at least five (5) hours of training regarding this Policy and the Privacy Policy within the first month of the assignment and must become thoroughly familiar with this Policy and WMATA's information/record protection policies.  The custodian's annual performance evaluation will include the employee's performance as the "Official Custodian" for the PARP.

5.5    The Assistant General Manager of the Department of System Safety and Risk Protection and the Police Chief of Metro Transit Police Department shall



**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY POLICY/INSTRUCTION**

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

be responsible for identifying information/Records that have been designated CII or SSI or that may otherwise qualify for Exemption 6.1.1 of this Policy.

5.6    The PARP Administrator shall (1) assign requests to a department or office for response/necessary action ("assigned department or office") and/or coordination with other department(s) and/or office(s) ("coordinating department or office"); (2) assign a request number for future reference; (3) be responsible for coordinating and gathering the requested Records from the Official Custodians in the assigned departments and/or offices, and shall be responsible for making the Decision on redacting, withholding or providing Records in response to requests; (4) determine, based on requests received, the most frequently requested Records; and (5) shall direct the Official Custodian of the Records to provide the Office of Marketing with redacted copies of frequently-requested Records for placement on WMATA's internet website.

## 6.0    EXEMPTIONS FROM DISCLOSURE AND EXCLUSIONS FROM PARP

6.1    This P/I exempts from disclosure information/Records to the extent that they are:

6.1.1    CII and/or SSI and/or Records that if released, would compromise the security of the Metrorail and bus systems' infrastructure and/or rolling stock, computer systems or equipment that support the operation of the Metrorail/Metrobus systems, and/or the physical safety of its customers and/or employees;

6.1.2    solely related to the internal personnel rules and practices of WMATA;

6.1.3    specifically exempted from disclosure by statute (other than the Open Records statutes of WMATA's signatories) provided that such statute (a) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (b) establishes a particular criteria for withholding or refers to particular types of matters to be withheld;

| **APPROVED** | Supercedes | Page |
|---|---|---|
| by the WMATA Board of Directors effective October 1, 2005 | 1.12/0 | 6 of 27 |



## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
## POLICY/INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

6.1.4   trade secrets and commercial or financial information obtained from a person and is privileged or confidential;

6.1.5   intra-agency and inter-agency (WMATA Compact signatories and political subdivisions and representatives) memoranda or letters which would not be made available by law to a party in litigation with WMATA;

6.1.6   personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy; and

6.1.7   Records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement Records or information (a) could reasonably be expected to interfere with enforcement proceedings; (b) would deprive a person of a right to a fair trial or an impartial adjudication; (c) could reasonably be expected to constitute an unwarranted invasion of personal privacy; (d) could reasonably be expected to disclose the identity of a confidential source, including state, local, or foreign agency or authority or any private institution which furnished information on a confidential basis; (e) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law; or (f) could reasonably be expected to endanger the life or physical safety of any individual.

6.1.8   All SmarTrip® information that is identifiable personal information, unless the request is made:

(a)      pursuant to a Court order;

(b)      by a law enforcement official that meets the requirements of section 6.1(d) of WMATA's Privacy Policy; or



# WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
## POLICY/INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

    (c)    by the registered user of the SmarTrip® card upon proof of identity for release only to that user.

        (i)    For purposes of this subsection, registered user is the individual or entity who/that has registered the SmarTrip® card with WMATA.

        (ii)    SmarTrip® information will not be released to a third party even with the written consent of the registered user except as provided in (a) and (b) of this subsection.

  6.1.9  All financial information, including transactional information, regarding individuals who are WMATA customers unless the request is made:

    (a)    pursuant to a Court order;

    (b)    by a law enforcement official that meets the requirements of section 6.1(d) of WMATA's Privacy Policy; or

    (c)    by the individual customer upon proof of identity for release only to the individual customer.

        (i)    Financial information regarding individual customers will not be released to a third party even with the written consent of the customer except as provided in (a) and (b) of this subsection.

    (d)    As used in this section "financial information" does not include information for which all personal identifiers have been removed and that cannot be used alone or in combination with other information to identify the subject(s) of that information.

  6.2    Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are



**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**
**POLICY/INSTRUCTION**

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

exempt under this section. The amount of information deleted shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this section under which the deletion is made. If technically feasible, the amount of the information deleted and the reason for the deletion shall be indicated at the place in the record where such deletion is made.

6.3    Exclusions from PARP. Law Enforcement Records the Release of Which Could Interfere with Enforcement Proceedings

    6.3.1    Whenever a request is made which involves access to Records described in subsection 6.1.7(a) and –

        (a)    the investigation or proceeding involves a possible violation of criminal law; and

        (b)    there is reason to believe that (i)  the subject of the investigation or proceeding is not aware of its pendency; and (ii)  disclosure of the existence of the Records could reasonably be expected to interfere with enforcement proceedings.

WMATA may, during only such time as that circumstance continues, treat the Records as not subject to the requirements of this Policy.

    6.3.2    Whenever informant Records maintained by WMATA's law enforcement department under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, WMATA shall treat the Records as exempt from the requirements of this Policy unless the informant's status as an informant has been officially confirmed.

6.4    Requests for employee Records shall be released consistent with WMATA's Personnel Policy and Procedures Manual, other applicable WMATA policies



| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY POLICY/INSTRUCTION | | | | |
|---|---|---|---|---|
| **Subject** | **Classification** | **Lead** | **Date Approved** | **P/I Number** |
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

and rules, including WMATA's Privacy Policy and applicable federal laws and regulations.

## 7.0    PROCEDURES

7.1     Requests for Records shall be in writing and sent by mail to the Office of General Counsel, Washington Metropolitan Area Transit Authority, 600 Fifth Street, NW, Washington, D.C. 20001, or by electronic mail, or by facsimile to the attention of the PARP Administrator.

7.2.    If a request for Records is sent directly from the Requester to a department or independent office, that department or office shall immediately forward the request to the PARP Administrator.

7.3     The date of receipt of a request shall be the date it is received by the PARP Administrator.

7.4     A request for Records shall be considered an agreement by the Requester to pay all applicable fees charged under section 8 of this P/I, unless the Requester seeks a waiver of all or part of the fees in writing, and such request is granted in writing by the PARP Administrator.  A Requester may specify in writing that he wishes to be notified in advance if the fees are expected to exceed $50 or some larger sum.

7.5     The Requester should describe the Records that are being requested in sufficient detail to enable WMATA to locate them with a reasonable amount of effort.  Specific information about each record that is being requested should include such information as the date, title or name, author, recipient, and subject matter of the record. If the PARP Administrator determines that the request does not reasonably describe WMATA Records, the PARP Administrator shall contact the Requester to advise that the request is insufficient and to identify what additional description is needed.

7.6     When a Requester makes a request for Records, not exempted under section 6 of this P/I, containing personal or confidential information about the



## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
## POLICY INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

Requester, the Requester must verify his/her identity, state the Requester's full name, current address, and date and place of birth. The Requester must sign the request and the signature must be notarized.

7.7    If a request is made for Records about another individual and release of such Records would be an unwarranted invasion of the individual's privacy, the request must be accompanied by a written release permitting disclosure of the Records to the Requester with the notarized signature of the individual or proof that the Requester has the legal authority to act on the individual's behalf (e.g., a copy of a power of attorney). In the event that the individual is deceased, the request must be accompanied by proof that the individual is deceased (e.g., copy of death certificate or newspaper obituary) and proof that the Requester has the legal authority to act on behalf of the deceased person's estate or that the Requester is the designated beneficiary relating to the Records requested or has the authority to act on the designated beneficiary's behalf.

7.8    If the Requester is a guardian of an individual determined by a Court to be incompetent, the Requester must establish: (1) the identity of the individual who is the subject of the requested record by stating the name, current address, date and place of birth of the individual; (2) the Requester's identity, by stating his/her name, current address, date and place of birth as required by section 7.6 of this P/I; (3) proof that the Requester is the guardian by providing a copy of a Court order establishing guardianship; and (4) a statement that the Requester is acting on behalf of the individual in making the request.

7.9    <u>Processing Requests</u>. The PARP Administrator shall issue a Decision, in accordance with the time limits of section 7.10 of this P/I, notifying the Requester whether the request was granted in whole, granted in part, or denied.

7.9.1    If the request is granted in whole or in part, the Decision shall include:



## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
## POLICY/INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

   (a)   the Direct Costs to provide records that respond to the request; and

   (b)(i)   in accordance with section 8.9 of this P/I, to the extent feasible, copies of the records shall also be included unless more than $250 dollars is owed by the Requester; or the records are voluminous or unwieldy or difficult to retrieve; or notice regarding business Records is required pursuant to section 7.11.5 of this P/I; or

   (b)(ii)   if record production is not feasible, the name of and telephone number of the person that the Requester is to contact to arrange for an inspection of the Records that shall be disclosed.

7.9.2   If the request is denied in whole, or in part, the PARP Administrator shall make a reasonable effort to estimate the volume of any requested matter being denied, and shall provide such estimate to the Requester, unless providing such estimate would harm an interest protected by the exemptions in section 6 pursuant to which the denial is made. Where denial is in part, the Records shall be marked or annotated to show both the amount and the location of the Records deleted wherever practicable.

The PARP Administrator's Decision shall include the following:

   (a)   the reasons for the denial, citing the exemption(s) and explaining why it applies unless such explanation is otherwise prohibited;

   (b)   the name and title or position of each person responsible for denial; and



| WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY POLICY/INSTRUCTION | | | | |
|---|---|---|---|---|
| **Subject** | **Classification** | **Lead** | **Date Approved** | **P/I Number** |
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

        (c)    the right to an internal administrative appeal under section 9.1 of this P/I and subsequent right to judicial review under section 9.2 and 9.3 of this P/I.

7.10   <u>Time Period for Processing Requests</u>.

    7.10.1    <u>Regular Processing of Requests</u>. Within twenty (20) working days of receipt of the request, the PARP Administrator shall determine whether to comply with such request and shall immediately notify the Requester of the Decision in accordance with section 7.9.

        (a)    In unusual circumstances, the time limits prescribed above may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten (10) working days, except as provided in clause (b) of this subsection.

        (b)    If the request cannot be processed within thirty (30) working days, as allowed in clause (a), WMATA shall provide the Requester the opportunity to limit the scope of the request so that it may be processed within the thirty (30) day time limit or an opportunity to arrange with WMATA an alternative time frame for processing the request or a modified request. Refusal by the Requester to reasonably modify the request or arrange such an alternative time frame shall be considered a factor in determining whether exceptional circumstances exist for purposes of subsection 9.3.5 of this Policy.



# WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
## POLICY/INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

(c)    As used in this section, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular request:

(i)    the need to search for and collect the requested Records from field facilities or other establishments that are separate from the office processing the request;

(ii)    the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct Records which are demanded in a single request; or

(iii)    the need for consultation, which shall be conducted at all practicable speed, with another entity having a substantial interest in the determination of the request or among two or more components of WMATA having substantial subject-matter interest therein.

7.10.2    Expedited Processing of Requests.

(a)    A Requester may apply for expedited processing at the time of the initial request for Records. Within ten (10) calendar days of its receipt of a request for expedited processing, WMATA shall decide whether to grant it, and shall notify the Requester of the Decision. Once the determination has been made to grant expedited processing, WMATA shall process the request as soon as practicable.

(b)    A request will be taken out of order and given expedited treatment whenever the PARP Administrator



| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 6/19/2005 | 9.3/1 |

determines that the Requester has established either of the following criteria:

(i)     circumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

(ii)    an urgency to inform the public about an actual or alleged WMATA government activity, if made by an individual primarily engaged in disseminating information.

Representatives of the news media would normally qualify as individuals primarily engaged in disseminating information; however, other Requesters must demonstrate that their primary activity involves publishing or otherwise disseminating information to the public as a whole, and not just a particular segment or group. "Urgency" contemplates that the information has a particular value that will be lost if not disseminated quickly. Ordinarily this means a breaking news story of general public interest. Information of historical interest only or information sought for litigation or commercial activities would not meet the test of urgency, nor would a news media publication or broadcast deadline unrelated to the news-breaking nature of the information.

(c)    A Requester who seeks expedited processing must provide a written statement, explaining in detail the basis for requesting expedited processing. WMATA is not obligated to consider a request for expedited processing unless it is accompanied by a signed





## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY POLICY/INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

statement that the "forgoing is true and correct to the best of" the Requester's knowledge.

    (d)    No Court shall have jurisdiction to review WMATA's denial of expedited processing of a request for Records after WMATA has provided a complete response to the request.

7.11    <u>Handling of Requests for Records Potentially Exempt Under Section 6.1.4</u>.

    7.11.1    <u>In General</u>.  Business information obtained by WMATA from a Submitter will be disclosed only pursuant to this section.

    7.11.2    <u>Definitions</u>.  For the purposes of this section:

        (a)    business information means information that may be protected from disclosure under subsection 6.1.4 of this Policy; and

        (b)    "Submitter" means any person or entity from whom WMATA obtains business information, directly or indirectly.

    7.11.3    <u>Designation of Business Information</u>.  A Submitter of business information will use good-faith efforts to designate, by appropriate markings, either at the time of submission or at a reasonable time thereafter, any portions of its submission that it considers to be protected from disclosure under section 6.1.4 of this Policy.  These designations will expire ten (10) years after the date of submission unless the Submitter requests, and provides justification for a longer designation period. Nothing in this provision shall override the requirements of the WMATA Procurement Procedures Manual where it applies.



| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

7.11.4   <u>Notice to Submitters</u>. The PARP Administrator shall provide a Submitter with prompt written notice of a PARP request that seeks its business information as required by subsection 7.11.5 of this section, except as provided in section 7.11.8 of this section, in order to give the Submitter an opportunity to object to disclosure of any specified portion of that information under section 7.11.6 of this section. The notice shall either describe the business information requested or include copies of the requested record or record portions pertaining to the information. When notification of a voluminous number of Submitters is required, notification may be made by posting or publishing the notice in a place reasonably likely to accomplish it.

7.11.5   <u>Where Notice is Required</u>.   Notice shall be given to a Submitter wherever:

(a)   the information has been designated in good faith by the Submitter as information considered to be protected from disclosure under subsection 6.1.4; or

(b)   WMATA has reason to believe that the information may be protected from disclosure under subsection 6.1.4.

7.11.6   <u>Opportunity to Object to Disclosure</u>. The PARP Administrator will allow a Submitter ten (10) working days to respond to the notice described in subsection 7.11.4 of this Policy and will specify that time period within the notice. If a Submitter has any objection to disclosure, it is required to submit a detailed written statement. The statement must specify all grounds for withholding any portion of the information under any exemption of section 6.1 and, in the case of subsection 6.1.4, it must explain why the information is a trade secret or commercial or financial information that is privileged or confidential. In the event that a Submitter fails to respond to the notice within the

| | Supercedes | Page |
|---|---|---|
| | 1.12/0 | 17 of 27 |



# WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY POLICY/INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

time specified in it, the Submitter will be deemed to have waived any objection to disclosure of the information. Information provided by the Submitter that is not received until after WMATA's disclosure Decision has been made shall not be considered by the PARP Administrator.   Information provided by a Submitter under this section may itself be subject to disclosure under this Policy.

7.11.7    Notice of Intent to Disclose.  The PARP Administrator shall consider a Submitter's objections and specific grounds for nondisclosure in deciding whether to disclose business information.  Whenever the PARP Administrator decides to disclose business information over the objection of the Submitter, the PARP Administrator shall give the Submitter written notice, return receipt requested, which shall include:

(a)    a statement of the reason(s) why each of the Submitter's disclosure objections was not sustained;

(b)    a description of the business information to be disclosed; and

(c)    a specified disclosure date, which shall be no earlier than ten (10) working days after the Submitter receives the written notice under this subsection.

7.11.8    Exceptions to Notice Requirements.  The notice requirements of subsections 7.11.4 and 7.11.7 of this section shall not apply if:

(a)    the PARP Administrator determines that the information should not be disclosed;

(b)    the information lawfully has been published or has been officially made available to the public;



**APPROVED**
by the WMATA Board of Directors effective
October 1, 2005

| | Supercedes | Page |
|---|---|---|
| | 1.12/0 | 18 of 27 |



**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY POLICY/INSTRUCTION**

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

       (c)     disclosure of the information is required by statute; or

       (d)     the designation made by the Submitter under subsection 7.11.3 appears obviously frivolous – except that, in such a case, the PARP Administrator shall, within ten (10) working days prior to a specified disclosure date, give the Submitter written notice of any final Decision to disclose the information.

7.11.9     <u>Notice of PARP Lawsuit</u>.  Whenever a Requester files a lawsuit seeking to compel the disclosure of business information, the PARP Administrator shall promptly notify the Submitter

7.11.10    <u>Corresponding Notice to Requesters</u>.  Whenever the PARP Administrator provides a Submitter with notice and an opportunity to object to disclosure under subsection 7.11.7 of this section, the PARP Administrator shall also notify the Requester(s). Whenever a Submitter files a lawsuit seeking to prevent the disclosure of business information, the PARP Administrator shall notify the Requester(s).

7.12   In responding to a request for records, WMATA shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of WMATA's automated information systems.  For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

7.13   In making any record available, WMATA shall provide the Records in any form or format requested if the record is readily reproducible in that form or format.  WMATA shall make reasonable efforts to maintain its records in forms or formats that are reproducible.



## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
## POLICY/INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

## 8.0    COSTS, REMEDIES, AND DISCIPLINE

8.1    Fees are charged for record search, review, and duplication (and any necessary redaction) when records are sought for commercial use. Review costs shall include only the Direct Costs incurred during the initial examination of a record for the purposes of determining whether the record must be disclosed and for the purposes of withholding any portions exempt from disclosure. Review costs will not include any costs incurred in resolving issues of law or policy that may be raised in the course of processing a request.

8.2    Fees shall be limited to the charges for copying when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media.

8.3    For any request not described in section 8.1 and 8.2, fees shall be limited to the cost of record search and duplication.

8.4    WMATA will furnish without charge or at a charge reduced below the fees established in sections 8.1 - 8.3, if WMATA determines that the disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations of WMATA and is not primarily in the commercial interest of the Requester.

8.5    Fees will not be charged for staff time of less than two (2) hours or for minor duplication (duplication of one hundred (100) pages or less) or when the costs of routine collection and processing of the fee are likely to equal or exceed the amount of the fee.

8.6    Requests for waiver or reduction fees shall be in writing. The PARP Administrator shall determine whether fees shall be reduced or waived in accordance with sections 8.1 through 8.5 and shall provide the Requester a written response to a waiver request prior to incurring costs to respond to the request. If only some of the requested records satisfy the requirements for



| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

a waiver or reduction of fees, a waiver or reduction may be granted for those qualifying records. If a request for waiver is denied, the Requester must confirm an agreement to pay fees before WMATA will incur costs to respond to the request.

8.7   For a black and white duplication produced by photocopy machine of a record (only one (1) copy shall be supplied) or by scanning a record, the fee shall be fifteen (15) cents per page. For copies produced by computer, such as tapes, floppy disc, or printouts, direct costs, including operator time of producing the copy, shall be assessed by the Office of Information Technology and Services (ITSV). Direct Costs of the duplication shall be assessed for other forms of duplication.

8.8   Direct Costs also include (1) the search time to locate a record, (2) the examination of a record to determine whether any portion of it is exempt from disclosure, (3) the processing of any record for disclosure, e.g., redacting the record, and (4) the time spent considering any formal objection to disclosure. Requesters will only be charged once for a review to determine whether an exemption applies to a particular record. Subsequent reviews of the same record will not result in additional fees. Fees associated with staff time shall be at regular hourly rates, plus an additional 50 percent (which percent is subject to adjustment by the Office of Financial Management) to cover benefits. At its discretion, WMATA may provide special services such as certifying that records are true copies or sending them by other than ordinary mail. The Direct Costs of providing such services shall be charged to the Requester.

8.9   Fees shall not be paid in advance of receipt or inspection of the Records unless the Requester has previously failed to pay fees in a timely fashion or the Authority has estimated that the fees will exceed $250.00. Fees in excess of $250 are due within thirty (30) working days of the Authority's written Decision, after which the request shall be deemed withdrawn. Fees of $250 or less are due within ten (10) working days of the Requester's receipt of records. If a requester fails to pay a fee after receiving requested records, the requester shall be required to pay a deposit of $250 or the



| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

amount that is due from the requester, which ever is greater, before the Authority is required to respond to any further request. Payments and deposits shall be made by certified check or money order made payable to the Washington Metropolitan Area Transit Authority. The certified check or money order shall be sent to the PARP Administrator.

8.10   If WMATA reasonably believes that a Requester or a group of Requesters acting together is attempting to divide a request into a series of requests for the purpose of avoiding fees, WMATA may aggregate those requests and charge the total aggregated fees. Multiple requests involving unrelated matters shall not be aggregated.

## 9.0    ADMINISTRATIVE APPEALS, EXHAUSTION, AND JUDICIAL REVIEW

9.1    Administrative Appeals.

9.1.1   A Requester may seek an administrative review of a denial of a request for or denial of fee waiver by filing a written appeal of the denial with the Chief of Staff within thirty (30) working days of the date of the denial letter.

9.1.2.   The date of receipt of an appeal shall be the date it is received by the Chief of Staff.

9.1.3   An Appeal Panel consisting of the Chief of Staff, or his/her designee, the General Counsel, or his/her designee, and the Assistant General Manager for the Official Custodian or his/her designee shall be responsible for reviewing appeals. The Appeal Panel shall inform the Requester of its determination concerning the appeal within thirty (30) working days.

9.1.4   If the Appeal Panel grants the appeal, the Chief of Staff, or his/her designee, shall inform the Requester of the applicable conditions surrounding granting the request (e.g., payment of fees) and the approximate date upon which compliance will be effected. If the



## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY POLICY/INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

Appeal Panel grants only a portion of the appeal, it shall treat the portion not granted as a denial.

9.1.5 If the Appeal Panel denies the appeal, either in part or in whole, the Chief of Staff, or his/her designee, shall inform the Requester of that Decision and of the following:

(a) the reasons for the denial;

(b) the name and title or position of each person responsible for denial of the appeal; and

(c) the right to judicial review.

9.1.6 Any attorney assigned to the appeals process shall not have had any involvement with the initial denial of the request.

9.2. Exhaustion of Administrative Remedies.

9.2.1 A Requester must exhaust the administrative appeal process, before seeking judicial review of a denial of request for records or a fee waiver.

9.2.2 A Requester has exhausted his administrative remedies if his request for records or for a fee waiver has been denied and if that denial has been upheld on administrative appeal.

9.2.3 A Requester shall be deemed to have exhausted his administrative remedies if WMATA fails to issue a Decision on a request within twenty (20) working days or within the time authorized by any extension pursuant to 7.10.1, or if WMATA fails to issue a Decision on an administrative appeal within thirty (30) working days.



## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
## POLICY/INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

9.3    Judicial Review:

    9.3.1    The Requester may bring a civil action only for injunctive relief or a declaratory judgment.  Nothing in this Policy shall be construed to authorize any civil action for damages.

    9.3.2    In accordance with section 81 of the WMATA Compact, an action to enforce this P/I may be brought in any state or federal Court of the United States located in the District of Columbia, Maryland, or Virginia without regard to the amount in controversy.  Such action shall be filed within two (2) years of the date of exhaustion under section 9.2, except that where WMATA has materially and willfully misrepresented any information required under this Policy to be disclosed to an individual and the information so misrepresented is material to WMATA's disclosure obligation under this Policy, the action may be brought at any time within two (2) years after discovery by the individual of the misrepresentation.

    9.3.3    The Court may enjoin WMATA from withholding and order the production of any improperly withheld.  In such a case, the Court shall determine the matter de novo, and may examine the contents of WMATA in camera to determine whether such or any part thereof shall be withheld under any of the exemptions or exclusions set forth in section 6, and the burden is on WMATA to sustain its action.  In addition to any other matters to which a Court accords substantial weight, the Court shall accord substantial weight to an affidavit of WMATA concerning WMATA's determination as to technical feasibility under section 7.12 and reproducibility under section 7.13 of this P/I.

    9.3.4    The Court may assess against WMATA reasonable attorney fees and other litigation costs reasonably incurred in any case under section 9.3 of this Policy in which the complainant substantially prevailed.  Fees shall not be assessed in "Reverse FOIA" cases filed by Submitters.  See 7.11.10.



## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
## POLICY INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---------|---------------|------|---------------|------------|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

9.3.5   If suit is filed, and if WMATA can show that exceptional circumstances exist and that it is exercising due diligence in responding to the request, the Court may retain jurisdiction and allow WMATA additional time to complete its review of the Records.

(a)   For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless WMATA demonstrates reasonable progress in reducing its backlog of pending requests.

(b)   Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause 7.10.1(b) after being given an opportunity to do so by WMATA, shall be considered a factor in determining whether exceptional circumstances exist for the purposes of this subsection.

9.3.6   Whenever the Court orders the production of any WMATA record improperly withheld from the complainant and assesses against WMATA reasonable attorney fees and other litigation costs, and the Court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether WMATA personnel acted arbitrarily or capriciously with respect to the withholding, the Office of Auditor General shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding.   The Auditor General, after investigation and consideration of the evidence submitted, shall submit the findings and recommendation to the Deputy General Manager or equivalent of the Office or Department concerned and shall send copies of the findings and recommendations to the officer or employee or his/her representative.   The Deputy General Manager or equivalent of the Department concerned shall take the corrective action that the Auditor



# WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
## POLICY/INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

General recommends or implement an alternative correction action with the approval of the Auditor General.

Where attorneys' fees are awarded against WMATA and the award was due to WMATA's delay or failure to respond to a request, the office/department(s) that is/are determined to be at fault, based on the investigation conducted by the Auditor General, shall bear the cost of the attorneys' fees award in addition to what ever sanction the Auditor General determines is appropriate.

9.3.7 In the event of noncompliance with the order of the Court, the District Court may punish for civil contempt the responsible employee.

9.3.8 Nothing in this Policy shall be construed to authorize a civil action by reason of any injury sustained as the result of the withholding of a record prior to the approval of this Policy by the Board of Directors of WMATA.

## 10.0   DISCIPLINE

Each officer, employee, and agent of WMATA is responsible for ensuring that he/she does not release records that are not releasable and for cooperating with the PARP Administrator and/or Official Custodian by taking all steps necessary to release records releasable under this P/I in a timely manner.  Any WMATA officer, employee, or agent who releases other than in accordance with this P/I and/or who unduly delays or refuses to cooperate with necessary record  release shall be subject to discipline up to and including dismissal from WMATA.

## 11.0   REPORTING REQUIREMENTS

11.1 At the end of each quarter, the PARP Administrator shall submit to the GM/CEO, a report that shall cover the preceding quarter and include:



# WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY POLICY/INSTRUCTION

| Subject | Classification | Lead | Date Approved | P/I Number |
|---|---|---|---|---|
| Public Access to Records Policy | Legal | COUN | 5/19/2005 | 9.3/1 |

    (a)    the number of determinations made by WMATA to deny requests for records made to WMATA pursuant to the PARP and the reasons for such denial;

    (b)    the number of requests for records pending before WMATA as of the end of the preceding quarter, and the number of days that such requests had been pending before WMATA as of that date;

    (c)    the number of requests for records received by WMATA and the number of requests which WMATA processed;

    (d)    the median number of days taken by WMATA to process different types of requests; and

    (e)    the total amount of fees collected by WMATA for processing requests.

11.2     WMATA shall make each such report available to the public including by computer telecommunications, or if computer telecommunications means have not been established by WMATA, by other electronic means.

11.3     The GM/CEO shall inform the Board of Directors that such reports are available by electronic means.

## 12.0   APPLICABILITY

This Policy shall apply to requests for records received after this Policy is adopted by the Board of Directors. Requests for records received before the date of adoption of this amended Policy shall be governed by the Public Access to Policy adopted by the GM/CEO on April 17, 2000.

| APPROVED | Supercedes | Page |
|---|---|---|
| by the WMATA Board of Directors effective October 1, 2005 | 1.12/0 | 27 of 27 |

**EXHIBIT 5**

 **CUBIC**

May 2, 2007

PARP Administrator
Office of General Counsel
Washington Metropolitan Area Transit Authority
600 Fifth Street, NW
Washington, D.C. 20001

Subject:    Request for Records pertaining to Contract CO5034 Regional Customer Service
            Center (RCSC) and ERG Transit Systems (USA) Inc.

Reference:   1) MEAD ID Nos. 99264 and 99698
             2) CP#6, Paper Products;
             3) CP#7, Delays Due to Changes in Clearing and Settlement during the period
                7/21/2003 - 3/15/2004;
             4) CP#8, Data Synchronization;
             5) CP#10, Delay of POS Devices;
             6) CP#15, SIRS development Feb. 2004 to Aug. 2005;
             7) CP#17, Pre-Bill Autoload;
             8) CP#18, Connectivity to Carmen Turner Facility for Disaster Recovery;
             9) CP#19, Additional Website Functionality;
            10) CP#20, Multiple Language Capability; and,
            11) Contract Modifications titled "Piece 1 Delay Claim, Incremental Costs, Etc."
                and "Additional Labor III - RCSC" to Contract C05034, Regional Customer
                Service Center, in the amounts of $820,000 and $496,000 respectively
            12) Any and all other claims submitted by ERG and any contract adjustments
                /contract modifications made by WMATA

Dear PARP Administrator:

This request is being made in accordance with WMATA's Public Access to Records Policy
(PARP).

We hereby request the following for Reference 1-12 above:

    A. Copy of any ERG Requests for Equitable Adjustments and all Contract Modifications
    B. Copy of WMATA/ERG Negotiated Settlement Agreements
    C. All ERG claim documents
    D. Dispositions on all claims

Should you have any questions, I may be reached at (858) 598-1118.

Sincerely,

Rocco A. Rutledge
Director, Contracts

Cubic Transportation Systems, Inc. · 5650 Kearny Mesa Road · San Diego, CA 92111
+1-858-268-3100 · Fax +1-858-292-9987 · www.cubic.com

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ERG TRANSIT SYSTEMS (USA), INC., | } | |
| | } | |
| *Plaintiff,* | } | |
| | } | Judge Rosemary M. Collyer |
| v. | } | Case No. 1:07-cv-01924 |
| | } | |
| WASHINGTON METROPOLITAN | } | |
| AREA TRANSIT AUTHORITY, | } | |
| | } | |
| *Defendant.* | } | |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Comes now the Plaintiff, ERG Transit Systems Inc., ("ERG"), by and through its undersigned counsel, pursuant to Local Rules of Civil Procedure 7(a), hereby respectfully submits the following Memorandum of Points and Authorities in Support of its Motion for Summary Judgment.

### I.    INTRODUCTION AND SUMMARY

#### A.    Background

ERG and Cubic Transportation Systems, Inc. ("Cubic") are direct competitors in the global marketplace for transit fare collection systems and technology. Though competitors, ERG and Cubic were both awarded contracts by the Washington Metropolitan Area Transit Authority ("WMATA") in support of WMATA's SmarTrip® program in 2003. WMATA directed the two companies to work together to integrate their respective systems. Due primarily to the difficulty of integrating systems, in addition to other reasons, there have been many delays and changes to the contract and ERG submitted many documents negotiating contract requirements and compensation for delays.

On May 2, 2007, Cubic made a request for documents under WMATA's Public Access to Records Policy ("PARP"). The PARP is similar to and interpreted in accordance with the federal

Freedom of Information Act ("FOIA"). Cubic requested the following:

    A. Copy of any ERG Requests for Equitable Adjustment and all Contract Modifications
    B. Copy of WMATA/ERG Negotiated Settlement Agreements
    C. All ERG claim documents
    D. Dispositions on all claims

Exhibit 5 (Cubic Request).

On October 11, 2007, WMATA informed ERG that it intended to release certain of ERG's information to Cubic, over ERG's objection. The parties referred to these documents as the "First Wave" set of documents. On this date, WMATA also informed ERG that it had found additional documents responsive to Cubic's request. The parties referred to these documents as the "Second Wave" set of documents. On October 25, 2007, ERG filed suit to prevent WMATA from releasing the "First Wave" documents to Cubic.

On January 10, 2008, WMATA informed ERG that it again intended to release certain of ERG's information to Cubic, over ERG's objection. On January 25, 2008, ERG filed an amended complaint, to include the "Second Wave" documents as subject to the action.

**B.**    **Summary of Argument**

ERG seeks declaration and enforcement of its rights under the PARP to protect from disclosure, and permanently enjoin WMATA from releasing, pursuant to the request for disclosure of ERG's competitor, Cubic Transportation Systems, Inc. ("Cubic"), confidential and proprietary commercial and financial information and trade secrets ERG submitted to WMATA in connection with administration of WMATA Contract No. C05304.

Section 9.3.2 of the PARP provides that, "[I]n accordance with Section 81 of the WMATA Compact, an action to enforce the [PARP] may be brought in any state or federal Court of the United States located in the District of Columbia, Maryland or Virginia, without regard to the amount in controversy."

The PARP expressly provides that "WMATA will interpret and apply this Policy consistent with the federal Freedom of Information Act (FOIA), 5 U.S.C. § 552, and federal practice . . . ." PARP, § 1, at p. 1.

Such information and trade secrets are exempt from disclosure under federal FOIA law governing application of Section 6.1.4 of the PARP, pursuant to the exemption at 5 U.S.C. § 552(b)(4), and the co-extensive protection of the federal Trade Secrets Act, 18 U.S.C. § 1905, as applied in federal FOIA jurisprudence.

Under Exemption 4, courts must first make a threshold determination whether to characterize the information at issue as voluntarily or involuntarily submitted. Information is involuntarily submitted if it is required by actual legal authority. Within a given submission, only that material that is specifically required is considered to be involuntary. The characterization is critical because it determines what standard applies to release. If the submission is voluntary, the information will be withheld so long as it is not customarily disclosed to the public by the submitter. If involuntary, a higher standard applies. Under this standard, information will be withheld only so long as the submitter can demonstrate that release would result in competitive harm or impair the agency's ability to obtain necessary information in the future.

ERG submitted the CNS in the course of negotiating contract administration issues with the expectation known to WMATA, that the information be kept confidential. While ERG's contract with WMATA contained provisions creating a contractual right to submit a claim for contract changes ordered by the contracting officer or for compensation for a delay, other than a requirement that ERG state an amount for delay claim, no other requirements exist, either in the contract, or in WMATA procurement regulations. As a result, anything that ERG submitted, other than an amount for a delay, was submitted voluntarily. Therefore, WMATA must apply the "voluntary" standard of submission. Under the "voluntary" standard, WMATA must withhold voluntarily submitted documents under the PARP so long as the submitter does not customarily disclose the information to the public. Because ERG does not customarily disclose the information contained in the CNS, WMATA should not have released any part of the CNS.

Even if this Court finds that the CNS were not voluntarily submitted, WMATA still should have withheld the CNS because disclosure will result in competitive harm to ERG for

several reasons. The CNS contain ERG's insight into contract administration issues also affecting ERG's competitor, Cubic, who could use to undermine ERG's negotiating position in regard to unresolved contract administration issues. Cubic could also use the information in the CNS in an effort to obtain a greater scope of the work under this and other contracts. Additionally, the CNS contain confidential information regarding ERG's system architecture, workflows, business processes and cost and financial data, disclosure of which will lead to competitive harm.

## II. REFERENCES TO STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Where in the following Section III (Argument and Authorities) we make reference to the Statement of Material Facts Not in Dispute filed herewith ("SMF"), such statement is supported by the materials cited in the corresponding paragraphs of the SMF, including admissions in the pleadings, exhibits "2" through "5" and a declaration attached to the SMF as Exhibit "1" and documents attached to Exhibit "1", which are referred to as "Attachments." In this Memorandum, a citation to a particular paragraph of the SMF should be understood to also cite to the materials cited in the SMF in support of the proposition.

## III. ARGUMENT AND AUTHORITIES

### A.    Summary Judgment Standard: Movant's Burden

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 307 U.S. App. D.C. 185, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, Plaintiffs, as the moving party, bear the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Reverse FOIA cases are typically resolved on motions for summary judgment. *See, e.g.,*

*Canadian Commercial Corp. v. Dep't of the Air Force*, 442 F.Supp.2d 15 (D.D.C. 2006),
*affirmed by Canadian Commercial Corp. v. Dep't of the Air Force*, 514 F.3d 37 (D.C. Cir.
2008).

**B.    Plaintiffs Are Entitled to Judgment as A Matter of Law on ERG's Claim that WMATA's Decision to Release Documents Is in Violation of the PARP**

The administrative record, as established by WMATA's October 11, 2007 and January
10, 2008 decision letters demonstrate WMATA acted arbitrarily, capriciously, and contrary to
established legal authority when it decided to release materials in both the First Wave and
Second Wave over ERG's objections. WMATA erred by concluding that ERG submitted the
CNS involuntarily. WMATA reached this conclusion by both applying a non-existent legal
standard and relying on illusory contractual authorities to find that the CNS were required
submissions, and thus "involuntary." Had WMATA applied the appropriate legal standard, it
would have found that aside from the amount sought for compensation for delay, no legal
authority required the particular content of ERG's submissions, rendering them voluntary. As
ERG does not customarily release this type of information to the public, the information should
have been withheld without requiring ERG to meet the higher standard of competitive harm.

Even if WMATA correctly applied the law as to the characterization of the submissions
as "involuntary," its decision to release the CNS remains arbitrary, capricious and contrary to
established legal authority, because release, will manifestly cause ERG substantial competitive
harm. The CNS contain the contents of submissions made in the course of negotiating contract
administration issues, which WMATA knew ERG expected. WMATA withheld portions of the
requested documents citing harm to WMATA's negotiating position, but refused to apply that
same rationale regarding ERG's negotiating position. Furthermore, WMATA decided to release
proprietary information concerning system architecture, businesses processes and cost and
financial data that constitute trade secrets and should be withheld under FOIA.

**1.    WMATA Erred in Refusing to Characterize ERG's Submissions "Involuntary"**

In its October 11, 2007 decision letter, WMATA concluded that "the records were either

5

developed by the parties or required by WMATA, in either case, an involuntary submission in FOIA parlance." SMF ¶ 36; Winyard Dec. Ex. 1 & Att. D (hereinafter "First Decision Letter"). In its January 10, 2008 decision letter, WMATA repeated this same assertion. SMF ¶ 36; Winyard Dec. Ex. 1 & Att. E (hereinafter "Second Decision Letter"). Although, in the Second Decision Letter letter, it attempted to support the "required to be submitted" argument by citing to the provisions of the contract and adding the rationale that, "[f]or the most part, the requested records were required in order for ERG to get paid under the contract." *Id.*, p. 2. WMATA therefore failed to consider whether ERG customarily released to the public the information contained in the CNS. It wrongly considered only whether release would result in the likelihood of substantial competitive harm. These decisions are wrong on both the law and the facts. The CNS were submitted voluntarily, were not required for WMATA "to get paid under the contract" and contain the type of information that ERG does not customarily release to the public, therefore WMATA erred by deciding to disclose the CNS.

### a.    Discussion of The Two Standards that Could be Applied

"Exemption 4 of the Freedom of Information Act protects 'matters that are . . . trade secrets and commercial or financial information obtained from a person and privileged or confidential.' 5 U.S.C. 5552(b)(4)." *Canadian Commercial Corp. v. Department of the Air Force*, 514 F.3d 37, 39 (D.C. Cir. 2008). It is axiomatic that the Trade Secrets Act, 18 U.S.C. § 1905, "'is at least co-extensive with . . . Exemption 4 of the FOIA.'" *Id., citing CAN Fin. Corp. v. Donovan*, 830 F.2d 1132, 1151 (D.C. Cir. 1987). The Trade Secrets Act requires each agency to withhold information subject to withholding pursuant to Exemption 4 of the FOIA. *Id.* This court has authority to entertain so-called "reverse FOIA" actions by a submitter of information to stop the release of that information. *Id.*

When records are submitted voluntarily, they must be withheld under FOIA Exemption 4 if the records are "of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871, 879 (D.C. Cir. 1992) *(en banc)*, *cert. denied*, 507 U.S. 984 (1993). On the other

6

hand, when records are submitted involuntarily, they must only be withheld when disclosure would be likely to "(1) impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Id.* at 878, *citing National Parks and Conservation Ass'n v. Morton*, 498 F.2 765, 770 (D.C. Cir. 1974). The *Critical Mass* decision modified the *National Parks* holding by creating a separate basis for withholding voluntarily submitted materials that did not require "impairment." *Critical Mass*, 975 F.2d at 879; *see also McDonnell Douglas Corp. v. NASA*, 895 F.Supp. 316, 317-318 (D.D.C. 1995). Of the two standards, the voluntary standard militates more in favor of withholding materials than the involuntary standard because of the more easily met standard of demonstrating the absence of customary public release. *Mallinckrodt Inc v. West*, 140 F.Supp.2d 1, 4 (D.D.C. 2000), *citing Critical Mass*, 975 F.2d 871.

Courts in this Circuit apply an objective test to determine the character of submissions as explained by *Defenders of Wildlife v. Dep't of the Interior*, 314 F.Supp.2d 1, 16 (D.D.C. 2004).

> [T]he D.C. Circuit has explained that whether a submission is involuntary is determined based on an objective test—"actual legal authority, rather than the parties' beliefs or intentions, governs judicial assessments of the character of submissions . . . if an agency has no authority to enforce an information request, submissions are not mandatory.

*Id.*, *quoting Ctr. For Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 149 (D.C. Cir. 2001); *see also Airline Pilots Ass'n v. United States Postal Service*[1], not reported in F.Supp.2d, 2004 WL 5050900 (D.D.C. 2004), *citing Ctr. for Auto Safety* 244 F.3d at 149. The objective test had been applied to a variety of areas including the government contract area. *See Judicial Watch v. Dep't of the Army*, 466 F.Supp.2d 112, 125 (D.D.C. 2006) (finding that submissions to negotiate the administration of a contract were voluntary because no authority required them).

However, in accordance with the objective test, not all information submitted in a bid or proposal is involuntary; only that information required by the Federal Acquisition Regulation or the contract solicitation. *Canadian Commercial Corp. v. Dep't of the Air Force*, 442 F.Supp.2d

---

[1] We cite this unpublished decision as persuasive but not precedential authority.

15, 29 (D.D.C. 2006), *affirmed by Canadian Commercial Corp. v. Dep't of the Air Force*, 514

F.3d 37 (D.C. Cir. 2008).

> Pricing information is required to be submitted because:
>
> [T]he federal government is required by law to consider price when it decides which competitor should be awarded a contract. FAR § 15.304(c)(1); *see also* FAR §§ 15.101, 15.101-1, 15.101-2. this type of information is most often deemed a required element of government solicitations, and hence involuntarily submitted. [citing references omitted].

*Id.*

Therefore, additional information, beyond that specifically required by actual legal

authority is deemed to be voluntary, and, accordingly, comments accompanying pricing

information were found to be involuntary. *See McDonnell Douglas v. NASA*, 895 F. Supp. 316,

318 (D.D.C. 1995) *discussing, McDonnell Douglas v. NASA*, No. 93-1540 (RCL) 1993 WL

796612 (D.D.C. Nov. 17, 1993) (comments, in addition to pricing in a contract proposal were not

required).  Underscoring the requirement for actual legal authority for all information to be

released, courts have found that not even all pricing information submitted in a bid or proposal is

required.  While certain contract rates were required, rate ceilings were not, and thus were

deemed voluntarily submitted. *Cortez III Service Corp. v. NASA*, 921 F.Supp. 8 (D.D.C. 1996).

The same has been held true of rebate and incentive pricing, as opposed to pricing specifically

required by the solicitation. *Mallinckrodt Inc. v. West*, 140 F.Supp.2d 1, 6 (D.D.C. 2000).

The same holds true for submissions made in the course of contract administration.

Notably, a recent district court decision applied the objective standard to find that information

submitted by a contractor to negotiate contract administration matters—as were the CNS in this

case—was submitted voluntarily. *Judicial Watch v. Army*, 446 F.Supp.2d at 112.  The case

involved a decision whether communications between contractor personnel to the contracting

officer were an involuntary submission under FOIA exemption 4 and found that information is

only involuntary when it is submitted under "actual legal authority" rather than the "parties'

beliefs or intentions." *Judicial Watch v.  Army*, 466 F.Supp.2d at 125, *citing Ctr. for Auto Safety*

244 F.3d at 149.  The *Judicial Watch v. Army* court found that contract negotiation submissions

were voluntary because no legal authority required them. *Id*. The court also distinguished

contract administration submissions from bid and proposal information:

> [T]he [submitter] provided the information in these documents not in an effort to bid for or obtain a contract but to negotiate the administration of the contract. The [submitter] provided this information after it had been awarded a contract by the defendant, and the discussion contained in these documents concerns ongoing contract implementation, not bid proposals or contract procurement.

*Id*. at 125-26. Just as in *Judicial Watch v. Army*, the materials at issue here were submitted to

"negotiate the administration of the contract" rather than bid or proposal submissions, nor were

they required by any specific legal authority. *See also Judicial Watch v. United State Dep't. of*

*Energy*, 310 F.Supp.2d 271, 308-10, (D.D.C. 2004), *aff'd in part and rev'd in part on other*

*grounds, Judicial Watch v. United Stated Dep't. of Energy*, 412 F.3d 125 (D.C. Cir. 2005)

(finding that settlement agreement was voluntarily submitted because no legal authority

compelling negotiations existed).

### b.    Application of the Voluntary Standard

In its October 11, 2008 letter addressing the "first wave," WMATA conducted the

following analysis to determine the involuntary nature of the CNS:

> The records were either developed by the parties or required by WMATA, in either case, an involuntary submission in FOIA parlance. See McDonnell Douglas Corp. v. NASA, 895 F.Supp. 316, 318 (D.D.C. 1995) (information submitted under contract requirement is involuntary).

First Decision Letter.  WMATA did not reference what contract requirement, or other actual

legal authority, upon which it relied for this assertion.  ERG notes that WMATA's assertion that

the records were "developed by the parties" does not reflect a recognized legal standard nor does

it accurately describe the documents at issue.

Some documents reflect a settlement between WMATA and ERG, for instance, the

modifications attached to Exhibit 1 as Attachments A, B and C represent the final output of

settlement negotiations, approved by WMATA's Board in a public session, and ERG agrees that

they are no longer subject to withholding as voluntary submissions.  In contrast, the remaining

documents, still at issue here, were generated and submitted to WMATA by ERG, in support of

ERG's settlement positions, and were most certainly not "developed by the parties."

After filing of the complaint on October 25, 2008, WMATA had a second chance to articulate its position on this issue, which changed. In its January 10, 2008 decision letter, WMATA cited to certain authorities as a secondary position, however, perhaps in recognition of the weakness of its first argument, WMATA advanced a new one. *See* Second Decision Letter. In the second round, WMATA took the position that *all* the CNS were involuntarily submitted because such submissions were "required in order to do business with or obtain a benefit from WMATA."[2] *Id.*, p. 2.

In doing so, WMATA clearly failed to apply this Circuit's objective standard, which requires *specific legal authority* requiring the information at issue. Even WMATA's description of the case it chiefly relies on for the proposition that materials submitted to "realize the benefits of a voluntary program" are involuntary, (*McDonnell Douglas Corp. v. Department of the Air Force*, 375 F.3d 1182 (D.C. Cir. 2004)), fails to support position. WMATA describes this case as "applying the involuntary standard to *pricing* provided in order to compete for government contracts." Second Decision Letter, p. 2 (emphasis added). WMATA fails to recognize that courts apply the involuntary standard to pricing in a *contract bid or proposal* because specific legal authority in the Federal Acquisition Regulation requires specific information in connection with a contract bid or proposal. *Canadian Commercial Corp. v. Dep't of the Air Force*, 442 F.Supp.2d at 29; *see also, McDonnell Douglas Corp v. NASA*, 895 F.Supp. at 318 (D.D.C. 1995). The context of this case is not source selection, where regulations require all bidders or proposers to submit certain specific pricing information to promote open and competitive contract awards, but a confidentially negotiated, consensual resolution of contract administration issues, long after the source selection phase is closed and the contract awarded.

In a secondary argument, WMATA attempted to create its own convoluted legal authority to require the CNS. It found that when a contractor submits records "in order to get

---

[2] This argument implies that the identity of the requester matters. It could be that WMATA confuses Exemption 4 case law with that of Exemption 5, in which the identity of the submitter plays a role in deciding whether to release the information. *See Department of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001).

paid under the contract" those records are involuntary:

> The provisions of contract C05034 required ERG to assert its right to *additional compensation* in writing. See General Provision 2, "Changes," and 9 "Delay of Work. For the most part, the requested records were required in order for ERG to get paid under the contract . . . . Judicial Watch [v. Army] . . . does not support applying the voluntary standard to submissions required in order to get paid under the contract.

Second Decision Letter, p. 2 (emphasis added). First, WMATA clearly fails to apply the appropriate legal standard in the circuit. It does so at its own peril, just as did a party in another case.

> Plaintiff ignores recent D.C. Circuit precedent that instructs the Court's analysis as to whether information was submitted voluntarily or was required to be submitted. The Circuit prescribed an objective test –"actual legal authority, rather than parties' belief or intentions, governs judicial assessments of the character of submissions . . . if an agency has no authority to enforce an information request, submissions are not mandatory.

*Airline Pilots Ass'n*, not reported in F.Supp.2d, 2004 WL 5050900 (D.D.C.), *citing Ctr. for Auto Safety*, 244 F.3d at 78 (D.D.C. 2001). In *Airline Pilots Ass'n*, the court found that a contract resulting from arms length negotiations between the Postal Service and Federal Express represented voluntarily submitted information because "there is no indication that there was any specific terms that had to be submitted for consideration." *Id.* at 4.

To the extent that WMATA attempts to apply the proper objective standard, it fails because it does not cite to specific legal authority requiring the contents of the CNS. WMATA attempted to support its position based on the general assertion that the RFCOs and delay claims[3] must be made in writing. Second Decision Letter, p. 2. Though it is difficult to discern, WMATA appears to argue that because there was a requirement for those types of submissions to be in writing, and that the submissions all "were required to get paid under the contract" that everything in those submissions was required because it was all necessary "to get paid." WMATA cannot subsume all the information in the CNS as "required" based on the generalized authority on which it relies. *See Mallinckrodt, Inc. v. West*, 140 F.Supp.2d at 6. This sweeping

---

[3] Without so stating, apparently WMATA characterized, without analysis, all the CNS as fitting neatly within either of these two categories

rationale is not a substitute for the requisite specific and actual legal authority. Nor is the underlying premise accurate as a matter of fact or law —that because delay claims and requests for changes are required to be in writing, any and all information or documents submitted in any connection with the contractor's effort to "get paid" are perforce also required, and therefore, involuntary.

The factual problems with WMATA's position are abundant. WMATA cites to General Provision ("GP") 2 of the contract entitled "Changes" and GP 9 of the contract entitled "Delay of Work." *See* Ex. 2, 3 (General Provisions 2 and 9). WMATA goes on to say that "[f]or the most part, the requested records were required in order for ERG to get paid under the contract." Second Decision Letter, p. 2. This statement is simply not accurate. First, ERG, like any contractor, submitted invoices, not the detailed type of information in the CNS, "to get paid under the contract." Second, it submitted the CNS to negotiate changes to contract requirements, scope of work, period of performance, and pricing for increased work as well as compensation for delays, along with the documents memorialize ERG's negotiations positions and rationale supporting them. SMF ¶ 17. None of these objectives can fairly be characterized as necessary "to get paid under the contract." Therefore, WMATA's assertion that the CNS were submitted to "get paid" is not correct. Furthermore, to the extent that it could be said that the REA was a delay claim, basic Government contract law principles hold that the purpose of an REA is to obtain relief (which relief can be in forms other than monetary compensation) for changed circumstances, not simply to "get paid under the contract." *See* Arnavas, Donald P., *Government Contract Guidebook*, 3d Edition, § 17 (2001).

Further, WMATA's apparent contention that requests for change orders and delay claims both are required to be made in writing is simply wrong—the requirement for a written submission only applies to delay claims. *See* Exs. 2, 3. Nothing in GP 2 states a requirement for a written submission in regard to contract change orders: "The Contractor *must assert* its right an adjustment under this article within 30 days from the date of the receipt of the written order." Ex. 2 (emphasis added). Second, nothing in GP 2 addresses requests for change orders based on

12

constructive changes or even changes requested at the instance of the Contractor; only changes made by "written order" by the "contracting officer." *Id.* Many of the RFCOs submitted by ERG addressed constructive changes to the contract, which were never ordered by the contracting officer, but instead requested by ERG to address unforeseen circumstances. Therefore, such requests are expressly outside the scope of GP 2 clause, which does not address this circumstance, and cannot be read to impose any mandatory requirement as to contractor-initiated change requests. SMF ¶ 17. All GP 2 does is establish a requirement for a contractor to "assert its right to an adjustment . . . within 30 days" when issued a change order by the contracting officer. Ex. 2. Conspicuously absent from GP 2 are any specific requirements. *Id.* GP 2 does not require that a request include anything in particular, such as pricing information, or a narrative description, or workflows, or technical information, all of which are included in the CNS at issue here. *Id.* The same is true of GP 9. While GP 9 does require that a delay claim be made in writing, all it requires of such a claim is that it include "an amount stated" and no more. Ex. 4.

The lack of any specific requirement—other than for an amount stated in the case of a delay claim—renders ineffectual WMATA's reliance on GP 2 and GP 9 as "actual legal authority" requiring submission of any and all information submitted by ERG in the CNS. Here, in regard to the CNS, where no specific requirements exist, other than to assert "an amount stated" for delay claims, what specific information to submit and in what form were at the sole discretion of ERG, and therefore voluntary. *Ctr. for Auto Safety* 244 F.3d 144; *Mallinckrodt, Inc. v. West*, 140 F.Supp.2d at 6.

In the Second Decision Letter, WMATA attempted to salvage its patently insufficient analysis on the voluntariness standard by stating that, even if it had found that the records were submitted voluntarily, ERG had not adequately explained why "specific information . . . is not generally released." Second Decision Letter, p. 3. ERG made a statement that it did not publicly release such information, which WMATA never challenged. SMF ¶ 37; Winyard Dec. Ex. ¶ 11 & Attchs. D, E. This statement was supported by the confidential markings on the documents,

and the proprietary nature of the materials at issue. *Parker v. Bureau of Land Management*, 141

F.Supp.2d 71, 79; SMF ¶ 18. In any event, ERG's arguments addressing competitive

impairment spoke for themselves and demonstrated that ERG would not publicly release such

documents. WMATA did not offer any rationale, much less any factual evidence, that ERG

would or did disclose this kind of evidence to the public. *See Id.*

In light of the foregoing, there is no reason that this Court should reach a different result

than the *Judicial Watch v. Army* court and find that information contained in documents

submitted for purposes of negotiating contract administration matters, absent specific actual

authority requiring them, are voluntary. WMATA's decision on this issue was arbitrary,

capricious, an abuse of discretion and not in accordance with the law. Aside from a total amount

stated in the REA for delay, WMATA should have withheld the totality of the CNS pursuant to

Exemption 4 as voluntarily submitted materials of the type not customarily disclosed to the

public. As WMATA did not make any specific finding as to whether ERG customarily released

the subject materials, but simply refused to credit, without analysis or explanation, ERG's

statement that it did not customarily release such information, ERG submits that the court owes it

no deference on this point.

### 2.    Even If WMATA Applied the Correct Standard, the Documents Cannot Be Released

Even assuming, contrary to the facts and applicable case law, that WMATA correctly

found that the CNS were submitted involuntarily, the disclosure of the CNS will manifestly lead

to substantial competitive harm to ERG, and should therefore be withheld. *See Critical Mass*,

975 F.2d 871. The CNS contain proprietary information regarding ERG's systems and

procedures, as well as confidential cost and financial data, submitted in the course of confidential

negotiations, release of which will case substantial competitive harm. SMF ¶ 35-42.

14

a.   **All The Documents Were Submitted in the Course of Confidential Negotiations, the Release of Which Will Lead to A Substantial Likelihood of Competitive Harm**

All the documents remaining subject to the lawsuit were submitted in the course of confidential negotiations with WMATA regarding contract administration issues. SMF ¶ 17. ERG understood and expected that such documents would remain confidential. SMF ¶ 18. As detailed below, release of the documents presents a likelihood of substantial competitive harm, therefore they should not be released. *CNA Financial Corp. v. Donovan*, 830 F.2d 1132, 1152, (D.C. Cir. 1987) *citing National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974).

WMATA flatly rejected ERG's claim that competitive harm would jeopardize ERG's bargaining position. First Decision Letter, p. 4. WMATA's position in regard to competitive harm is belied by other redactions it made. Invoking PARP § 6.1.5, which allows the agency to withhold records to preserve the integrity of its internal processes, it withheld large portions of the REA on the grounds that public release would compromise WMATA's bargaining position. *Id.* While this raises the obvious question as to how releasing ERG's information could result in harm to WMATA but not also to ERG, it also indicates that WMATA, consistent with ERG's understanding, also understood that the settlement negotiations between WMATA and ERG, of which the CNS submitted by ERG were an integral part, were intended by both parties to be kept confidential.

Release of the CNS unquestionably harms ERG's bargaining position. If Cubic obtains this information, it could use it to assist in recovering on claims it anticipates filing against WMATA for issues related to the contract, including delay. SMF ¶ 38. Given that ERG has outstanding delay claims against WMATA, and ERG and Cubic will likely have competing, if not mutually exclusive, theories of the delay, Cubic could use the information to harm ERG's claim in addition to assisting its own claim. *Id.* Furthermore, as WMATA is in the process of determining how to proceed on the contract, and how to allocate the remaining work, Cubic could undoubtedly use the information in the CNS to influence WMATA's decisions. *Id.* This

not only impacts WMATA's decisions regarding allocation (as between Cubic and ERG) the scope of work, but also whether to award contract option year periods, as well as selecting a contractor for any follow-on contract. *Id.*

Not only would release of the CNS harm ERG's negotiating position and give an unfair advantage to its competitor, it would also put at risk ERG's proprietary technology and business processes. SMF ¶ 39-40. ERG has developed world-leading systems in clearing and settlement unique to ERG through years of effort, which are not shared by competitors. *Id.* This type of commercially valuable secret process that is the end product of innovation and substantial effort is a trade secret and warrants protection under FOIA. *Public Citizen Health Research Group v. Federal Drug Administration*, 704 F.2d 1280, 1288 (D.C. Cir. 1983) (defining "trade secret"). However, WMATA proposes to release information in the CNS diagrams, workflow descriptions and descriptions of ERG's processes and methodology detailing ERG's system architecture, technical processes and workflow. *Id.* Cubic could use this to either duplicate ERG's solutions or assist it in reaching the same result by reverse engineering. SMF ¶ 40. This would put in jeopardy years of research in making ERG the world leader on matters such as clearing and settlement for transit systems. SMF ¶ 39. As this type of information constitutes a trade secret, WMATA erred by not withholding it.

> **b.     Some of The Documents Contain Proprietary Cost and Pricing Data, the Release of Which Will Lead to A Substantial Likelihood of Competitive Harm**

The CNS contain cost information concerning labor rates, subcontract rates and other costs that standing alone or in combination with other data, would allow Cubic to derive or obtain breakdown pricing. SMF 41. For its decision, WMATA cited to a Fourth Circuit opinion for the proposition that it did not redact certain cost information because "the sum figures consist of too many variables to reveal proprietary information." First Decision Letter, pps. 2, 8, 11; Second Decision Letter, pps. 8, 10, 13, 14, 15, 17, 18 *citing Acumenics Research and Technology v. United States Department of Justice*, 843 F.2d 800, 807-8 (4th Cir. 1988).

While courts in this Circuit have been more inclined to find lack of competitive harm in line item pricing under the rationale that there are too many components involved in the line item pricing for a competitor to adequately to take advantage of the information, that is not the case with information at issue in this case.   SMF ¶ 41.  The cost and pricing information at issue is the type of "breakdown" pricing has been found to constitute trade secret material, exempt from disclosure under FOIA exemption 4.  *See Canadian Commercial Corp.*, 514 F.3d at 40.  Disclosure of this information would allow customers other than WMATA to "ratchet down" prices and for competitors to undercut ERG.  *See McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 306 (D.C. Cir. 1999); SMF ¶ 41.

In any event, there is no per se rule that even the more general line item pricing is releasable.  *McDonnell Douglas Corp v. Dep't of the Air Force*, 375 F.3d 1182 (2004).  Courts review competitive harm on a case by case basis in regard to pricing information.  *Id.*  Here, the cost information WMATA proposes to release is much more specific than the line item pricing typically found releasable in government contract proposals.

In the CNS, ERG provides the type of cost information that is typically a sub-part, and therefore undisclosed, part of line item pricing.  Overall the cost, combined with easily identifiable duration could allow a competitor to identify how much it costs WMATA to do certain functions, thereby undercutting ERG's prices.  The harm is especially acute when as here, work subject to these labor rates is being negotiated for current requirements, and quite likely, future requirements as well.  SMF ¶ 38.

//
//
//
//
//
//
//
//
//
//
//
//

17·

IV.    <u>**CONLCUSION AND PRAYER FOR RELIEF**</u>

**WHEREFORE**, for the foregoing reasons, Plaintiff respectfully requests this Court to enter an Order granting it summary judgment on each and every one of its claims.

Respectfully submitted,

**ERG TRANSIT SYSTEMS (USA), INC.**

By its attorneys:    <u>/s/ Benjamin J. Lambiotte</u>
Benjamin J. Lambiotte, Esq.
D.C. Bar No. 421288
blambiotte@gsblaw.com
Matthew C. Hoyer, Esq.
D.C. Bar. No. 975544
Robert A.W. Boraks, Esq.
D.C. Bar No. 72132
**GARVEY SCHUBERT BARER**
1000 Potomac Street, Fifth Floor
Washington, D.C. 20007
(202) 965-7880

Dated: May 30, 2008

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ERG TRANSIT SYSTEMS (USA), INC.,** | } | |
| | } | |
| *Plaintiff,* | } | |
| | } | |
| | } | **Judge Rosemary M. Collyer** |
| v. | } | **Case No. 1:07-cv-01924** |
| | } | |
| **WASHINGTON METROPOLITAN** | } | |
| **AREA TRANSIT AUTHORITY,** | } | |
| | } | |
| **Defendant.** | } | |

## ORDER

The Court having considered Plaintiff's Motion for Summary Judgment, the Opposition thereto, and the parties' respective arguments, it is this _____ day of _____, 2008, hereby

ORDERED that Plaintiff's Motion for Summary Judgment is GRANTED on all claims; and it is further

ORDERED that Defendant Washington Metropolitan Area Transit Authority ("WMATA") is permanently enjoined from releasing Plaintiff's confidential and proprietary commercial and financial information and trade secrets submitted to WMATA in connection with WMATA Contract No. C05304.

So ORDERED.

Dated:_____                     _____
                                                   The Honorable Rosemary M. Collyer
                                                   United States District Judge

Copies to:

All counsel of record, via ECM:
blambiotte@gsblaw.com
pstaub@WMATA.com
rglover@wileyrein.com