IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ERG TRANSIT SYSTEMS (USA), INC., } | |
| } | |
| *Plaintiff,* } | Judge Rosemary M. Collyer |
| } | Case No.  1:07-cv-01924 |
| v. } | Next Event: Replies to Oppositions |
| } | to Dispositive Motions |
| WASHINGTON METROPOLITAN } | Due July 31, 2008 |
| AREA TRANSIT AUTHORITY, } | |
| } | |
| *Defendant.* } | |

**PLAINTIFF ERG TRANSIT SYSTEMS, INC.'S
CONSOLIDATED OPPOSITION TO MOTIONS FOR
SUMMARY JUDGMENT OF DEFENDANT WMATA
AND INTERVENOR CUBIC TRANSPORTATION SYSTEMS, INC.**

**COME NOW** the Plaintiff, ERG Transit Systems Inc., ("ERG"), by and through its

undersigned counsel, pursuant to Local Rules of Civil Procedure 7(a), hereby respectfully

submits the following Consolidated Opposition to the Motions for Summary Judgment filed by

Defendant Washington Metropolitan Transit Authority ("WMATA") and Memorandum of

Points and Authorities in Support of its Motion for Summary Judgment.

**I.     *Introduction and Summary***

The Motions for Summary Judgment filed by WMATA and Cubic must be denied

because, as set forth in detail below:  (1) WMATA acted arbitrarily, capriciously, and contrary to

law in concluding that the specific information at issue, which ERG submitted to negotiate a

consensual resolution of contract administration issues with WMATA, was "required to be

submitted" by actual legal authority, and in refusing to apply standards applicable to voluntary

submissions; (2) there is no genuine dispute that ERG does not customarily release the

information at issue publicly; and (3) WMATA failed to apply the *National Parks* "substantial

competitive harm/impairment" test consistently and logically, or, in the alternative, because there are genuine issues of material fact concerning competitive harm and impairment which preclude the Court from upholding WMATA's conclusions that release of certain information would not likely cause competitive harm or impairment.

## II.    *Material Facts Genuinely In Dispute and Those That Are Not*

Pursuant to LCvR 7(h), ERG submits the following counterstatement, identifying those material facts as to which it appears that there may be a genuine dispute.  To the extent that the disputed issues in this case turn on matters of fact, ERG submits that resolution of those issues are mixed questions of law and fact, and require the Court to make certain ultimate factual findings, based on historical or underlying facts presented to the Court on the summary judgment record.  *See Pullman-Standard* v. *Swint*, 456 U.S. 273, 289 n.19 (1982) (mixed questions are "questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.").

Disputed "mixed" issues include: (a) whether ERG's submissions were voluntary; and (b) whether the specific records WMATA refused to withhold or redact over ERG's objections and requests for redaction: (1) would be likely to cause ERG substantial competitive harm; or (2) would impair WMATA's ability to obtain similar information in the future.

### A.    *Issues of Fact Not Presently in Dispute*

It may be helpful to the Court for ERG here to survey the historical and subsidiary facts which appear to *not* be in dispute, at present.  Largely, there appears to be no genuine dispute as to the "historic" facts set forth in the parties' respective LCvR 7(h) Statements of Material Facts ("Statements" or "SMF") concerning:  Cubic's PARP request; procedures followed by WMATA in handling and disposing of that request; positions taken by ERG in its objections to disclosure

of records identified by WMATA as responsive to the request; and the reasoning WMATA followed in making decisions concerning withholding and redaction of records it identified as responsive to Cubic's request. *See* WMATA SMF (filed under seal) *and* Cubic SMF (Docket Document # 22-3), *passim.* Nor do the LCvR 7(h) Statements of WMATA and Cubic and the supporting materials marshaled by them in support of their respective summary judgment motions effectively contradict certain material facts set forth in ERG's LCvR 7(h) Statement and the Declaration of John Winyard supporting it (filed as Exhibit 1 to ERG's SMF).

Among other things, there appears to be *no dispute* that:

- WMATA considered the records it proposed to disclose to Cubic over ERG's objections to have been submitted involuntarily by ERG. WMATA rejected ERG's arguments that those records should not be disclosed because ERG submitted them voluntarily and did not customarily disclose such information publicly. *See* ERG SMF at ¶¶ 31-32, 36; WMATA SMF at ¶¶ 10-11.

- The information at issue was submitted to the agency by ERG in connection with ERG's efforts to negotiate settlements of contract administration issues, that the documents at issue bore confidentiality markings, and that ERG understood and expected that such documents would remain confidential when submitting them to WMATA. ERG SMF ¶ 17-18 & 37 and Winyard Dec. ¶¶ 10-11.

- The records submitted by ERG to WMATA in connection with those settlement negotiations are of a type ERG does not customarily release to the public. ERG SMF ¶ 37 and Winyard Dec. at ¶¶ 11 & 24.

- The requests for contract changes and adjustments which formed the basis of the ERG submissions still at issue here were initiated by ERG, and not changes directed or ordered by WMATA. ERG SMF ¶ 17.[1]

- WMATA withheld certain delay claim records associated with ERG's Request for Equitable Adjustment ("REA") under PARP Exemption 6.1.5, in recognition that premature public disclosure of them would compromise WMATA's negotiating position;

- ERG had argued to WMATA essentially the obverse: that release of REA and delay claim records as proposed by WMATA would harm ERG's negotiating position. WMATA SMF ¶¶ 5 & 7; ERG SMF ¶ 37.

- WMATA agreed to withhold certain records and redact others on the grounds that the information was "detailed and specific enough to aid a competitor," and "detailed enough to reveal ERG's pricing strategy," WMATA SMF, ¶ 7, "specific and detailed enough to reveal a proprietary process or system," "labor hours, direct hours, and rate information," and "information that is detailed and specific and would compromise the security of WMATA customers and employees," and "would lead to a clearly unwarranted invasion of privacy." WMATA SMF ¶ 12.

**B.**     ***"Mixed" Issues of Fact and Law Which May Be in Dispute***

ERG believes that whether ERG's submissions were "voluntary," and subject to the *Critical Mass Energy Project* v. *Nuclear Regulatory Commission*, 975 F.2d 871, 879 (D.C. Cir. 1992) (*en banc*), legal standard (which compels the agency to withhold records that the submitter

---

[1] The "238 Day Delay" claim, which WMATA redacted on its own initiative to protect its bargaining position under PARP exemption 6.1.5, was the result of the issuance of a formal change order by WMATA, but it has been withheld and is not at issue here.

does not customarily release publicly), or, on the other hand, "involuntary," and subject to the more demanding *National Parks and Conservation Association* v. *Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974), "likely to cause substantial competitive harm/impairment" test, is a question of law. *See, e.g., McDonnell Douglas Corp.* v. *NASA*, 895 F.Supp 316, 319 (D.D.C. 1995) (whether *National Parks* or *Critical Mass* controls is a "legal conclusion.").

The query upon which the voluntary/involuntary standard turns -- whether ERG's submissions were required by specific, actual legal authority -- case law suggests, is also an issue of law. *See Ctr. For Auto Safety* v. *Nat'l Highway & Traffic Safety Admin.*, 244 F.3d 144, 149 (D.C. Cir. 2001) (test is an objective one; existence of actual, legal authority compelling disclosure, rather than party's subjective beliefs and intentions, governs judicial assessment of "voluntary vs. required to be submitted" dichotomy). But to the extent that the Court views WMATA's argument that those submissions were so required to be a matter of fact, ERG disputes that contention. The materials advanced by the parties in support of their motions for summary judgment amply illustrate the existence of a dispute on the "required to be submitted" issue. ERG SMF at ¶¶ 31-32, 36; WMATA SMF at ¶¶ 10-11. Again, however, ERG submits that this is a purely legal issue.

Assuming *Critical Mass* applies, then, as noted previously, there appears to be no dispute that the singular factual predicate of confidentiality under that test is met in this case. Nothing in the record effectively puts at issue ERG's contention that it does not customarily release publicly the type of records at issue here -- submissions made as part of confidential settlement negotiations regarding contract administration issues.[2] Accordingly, if ERG is correct, and

---

[2] Nonetheless, if the Court agrees with ERG that WMATA erred in refusing to consider whether the records were voluntarily submitted within the meaning of *Critical Mass*, in its opening brief, WMATA asks the Court to remand the case to WMATA so that WMATA may consider that question, "to the extent *ERG can demonstrate that they are not customarily disclosed to the public.*" WMATA SJ Brief, at 16 (emphasis added). As we show below in Section

*Critical Mass* applies, then ERG is entitled to judgment as a matter of law without further ado, and WMATA must withhold all the records it proposes to release to Cubic.

If, however, the Court agrees with WMATA that all of ERG's submissions were "involuntary," and the *National Parks* "substantial competitive harm/impairment" test applies, then it will be necessary for the Court to reach questions whether disclosure of the specific materials of record, as redacted, WMATA proposed to release would be likely to cause ERG substantial competitive harm or would impair the agency's ability to receive similar information in the future.

As noted previously, WMATA appears to not dispute that, as a general proposition, disclosure of information submitted in the course of confidential settlement negotiations can compromise a party's bargaining position. WMATA also appears to concede that disclosure of unit pricing, as well as information, when viewed in the light of other unredacted information, which would permit unit prices to be discerned, and technical information that would give a competitor insight into the submitter's proprietary processes and workflows, and compromise system security, all would likely result in substantial competitive harm to ERG. Indeed, it acknowledged implicitly such likely harm when WMATA withheld and redacted certain information on those very grounds. WMATA SMF ¶ 12.

Thus, assuming the Court needs to reach it at all, the primary *National Parks* issue is whether WMATA applied those principals consistently and properly, or, as we contend below in Section III(C) of this opposition, in an inconsistent and irrational manner. Again, ERG submits, this is primarily a question of law.

---

III(B)(3), the Court must determine this case on the record WMATA made, and WMATA errs again in allocating the burden on this particular point to ERG, in any event.

To the extent that the Court disagrees, and views them as issues of fact, then the parties' Statements and materials supporting their respective summary judgment motions demonstrate that the following issues *are in dispute*:

- Generally, whether disclosure to ERG's arch-competitor, Cubic, of information submitted to WMATA in the course of ERG's confidential settlement negotiations of contract changes proposed by ERG would likely result in substantial competitive harm to ERG;

- Specifically, whether disclosure of information from which ERG contends unit pricing and its proprietary business and technical processes and system security and architecture could be discerned, would likely result in substantial competitive harm to ERG;

- In light of ERG's showing that disclosure of the records at issue will deter it in the future from submitting such detailed information in similar dealings with the agency, whether the agency's ability to obtain such information will be impaired in the future.

*Compare* ERG SMF ¶¶ 38-42 (and paragraphs of Winyard Dec. cited therein) *with* WMATA SMF ¶¶ 5-8 & 10-13 (and Exhibits and Affidavits cited therein, averring disclosure will not cause competitive harm and deter inclusion of such details in future submissions). *See also* Defendant WMATA's Statement of Points and Authorities, Section II (A) & (B) pp. 11-15, Docket Document # 23, ("WMATA SJ Brief"). *Washington Post* v. *U.S. Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C. Cir. 1989) (issue of fact as to applicability of FOIA exemption precludes summary judgment).

However, as we show below, ERG respectfully submits that the Court need not reach any questions raised by *National Parks,* because WMATA's conclusion that *Critical Mass* did not

govern because the materials submitted by ERG were "involuntary" was clearly erroneous, and

contrary to law. Whether WMATA erred in applying *National Parks* instead of *Critical Mass* is

a pure question of law. *See, e.g., McDonnell Douglas Corp.* v. *NASA,* 895 F.Supp 316, 319

(D.D.C. 1995)(whether *National Parks* or *Critical Mass* controls is a "legal conclusion.").

III.    **ERG is Entitled to Judgment As a Matter of Law, Because WMATA's
        Decision Must Be Set Aside As Arbitrary, Capricious and Contrary to Law**

   A.    **Even Under a Deferential Standard of Review, PARP's
         Public Policy Favoring Disclosure Must Yield to WMATA's
         Affirmative Legal Duty to Protect a Submitter's Confidential
         Commercial Information and Trade Secrets**

Both WMATA and Cubic, in their briefs in support of their respective motions for

summary judgment, place heavy reliance on the public interest policy embedded in the FOIA,

and reflected in WMATA's counterpart PARP, favoring disclosure of, in WMATA's words, "as

much contracting information as possible." WMATA SJ Brief, at 5; Memorandum of Points and

Authorities in Support of Intervenor/Defendant's Motion for Summary Judgment, Docket

Document # 22-2 ("Cubic SJ Brief"), at 4 (exemptions must be construed so as to afford

"maximum access.") But, while FOIA and PARP unquestionably implement a policy of broad

disclosure, they also reflect a realization that "legitimate governmental and private interests

could be harmed by release of certain types of information," and provide specific exemptions

under which disclosure must be refused. *Public Citizen Health Research Group* v. *FDA,* 185

F.3d 898, 904 (D.C. Cir. 1999) (citations and internal quotation marks omitted). FOIA

Exemption 4, and its counterpart applicable here, PARP Exemption 6.1.4, are intended for the

benefit of persons, like ERG, who submit information to agencies of a confidential nature. *Id.*

The core purpose of FOIA and the PARP is to contribute to public understanding of the

operations or activities of government, but that purpose is not fostered by disclosure of

confidential information that reveals little or nothing about the agency's own conduct, but,

rather, about the internal deliberations and workings of a contractor. *McDonnell Douglas Corp. v. U.S. Dept. of the Air Force,* 375 F.3d 1182, 1193 (D.C. Cir. 2004).

It is true, as WMATA and Cubic note, that WMATA's decisions under PARP are subject to a deferential standard of review, but that deference is not without limits. PARP Exemption 6.1.4 permits WMATA to withhold disclosure of "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." PARP 6.1.4. According to long-standing FOIA jurisprudence, because the Trade Secrets Act (18 U.S.C. § 1905), independently prohibits disclosure of confidential information submitted to an agency, PARP Exemption 6.1.4 and the Trade Secrets Act are to be treated as coextensive, with the result that if the information is "confidential commercial or financial information" within the meaning of the exemption, WMATA is *legally compelled* to withhold it. *McDonnell Douglas Corp,* 375 F.3d at 1186 (emphasis added) ("Whenever a party succeeds in demonstrating that its materials fall within Exemption 4, the government is precluded from releasing the information . . . .") (citation and internal quotation marks omitted).

A reviewing court must hold unlawful and set aside the agency's determination to release materials over the submitting party's objections if the decision is arbitrary, capricious, contrary to law, or if the agency decision is the product of a clear error of judgment. *MCI Worldcom, Inc. v. GSA,* 163 F.Supp.2d 28, 31-32 (D.D.C. 2001); *Mallinckrodt, Inc. v. West,* 140 F.Supp.2d 1, 4, D.D.C. 2000). This review must be determined solely upon the basis of the record before the agency at the time the decision was made. *Fund for Animals v. Williams,* 391 F.Supp.2d 191, 196 (D.D.C. 2005).

The Court must set aside the agency's decision as arbitrary and capricious, where the record reveals that the agency: employed an analytical framework in disregard of applicable precedent; or failed to consider all relevant factors, or if the reasoning supporting the decision is

not at least as compelling as that of the challenging party, *Canadian Commercial Corp.* v. *Dept. of the Air Force,* 442 F.Supp.F.2d 15, 32 (D.D.C. 2006) *aff'd on appeal*; 514 LF.3d 37 (D.C. Cir. 2008). *Airline Pilots Ass'n* v. *U.S. Postal Service*, 2004 WL 5050900 *1, *4 (D.D.C. 2004) (unreported); or if the agency decision is not logical or consistent, *McDonnell Douglas Corp.* v. *NASA*, 375 F.3d at 1191; *CNA Financial Corp.* v. *Donovan,* 830 F.2d 1132, 1155 (D.C. Cir. 1987). Nor is the reviewing Court obliged to defer to the agency's conclusory or unsupported suppositions, or assertions of empirical fact which are not substantiated in the record. *McDonnell Douglas Corp. v. NASA,* 375 F.3d at 1191; *Canadian Commercial Corp.,* 442 F.Supp. at 35-36.

> **B.**   ***WMATA's Peremptory Conclusion the Materials at Issue Were Submitted by ERG Involuntarily, and its Refusal to Consider ERG's Contention that It Does Not Customarily Disclose Such Materials Publicly, Were Arbitrary, Capricious, Clearly Erroneous, and Contrary to Law***

> **1.**   ***ERG's Submissions to WMATA Were Voluntary, Because There is No Actual Legal Authority Compelling ERG to Submit the Specific Information ERG Gave WMATA As Part of ERG's Negotiation of Contract Administration Issues***

As both WMATA and Cubic acknowledge (e.g., WMATA SJ Brief, at 5; Cubic SJ Brief, at 5), PARP exemption 6.1.4 exempts confidential information submitted to an agency by a person, and the threshold inquiry is whether the information was submitted to WMATA on a voluntary basis, or, on the other hand, "under compulsion." *Critical Mass*, 975 F.2d at 879. If the submission was voluntary, it is considered confidential for purposes of the exemption if it is "of a kind that would customarily not be released to the public" by the submitter. *Id.* Whether a submission is submitted under compulsion is determined based on an objective test. "Actual legal authority, rather than parties' beliefs or intentions, governs judicial assessments of the character of submissions . . . . [L]inking enforceability and mandatory submissions creates an

objective test; regardless of what the parties thought or intended, if an agency has no authority to

enforce an information request, submissions are not mandatory." *Center for Auto Safety* v. *Nat'l*

*Highway Traffic Safety Admin.,* 244 F.3d 144, 149 (D.C. Cir. 2001).

The documents at issue here consist of proposals for changes to ERG's contract,

including the scope of work, period of performance, and contract compensation, arising from

pervasive and severe problems ERG faced as a result of the manner in which WMATA

implemented and administered the contract it awarded to ERG. Notably, these requests were not

initiated by WMATA, nor did WMATA direct or require their submission, or dictate their form

or substance.[3]  Rather, ERG submitted them to resolve consensually contract administration

issues with WMATA, as part of an effort to avert, through the means of confidential settlement

negotiations, the necessity of pressing a formal dispute in litigation.

WMATA argues that it determined correctly that ERG's submissions were "required

submissions" and that it acted properly in refusing even to consider the *Critical Mass* standard

and factors relevant to it, in deciding whether or not to release the records it identified as

responsive to Cubic's PARP request.  WMATA SJ Brief at 5-9.  This was clear error.

WMATA offers no citations to any statute, nor any rule, nor any regulation mandating

the contents, form or substance of any request from a contractor pertaining to contract

administration issues like the ones presented by ERG.  Simply put, there is no such legal

authority.  WMATA answers the straightforward objective *Critical Mass* test – which asks

whether there is there any actual, legal authority under which the agency can compel the

contractor to submit to the agency the specific information at issue – with *ipse dixits* not rooted

in specific, actual, compulsory legal authority, but in WMATA's own views of what the contract

requires.

---

[3] *See* note 1, *supra.*

Citing General Provisions 2 and 9 of the contract, a self-serving declaration, and no more, WMATA asserts: "Once ERG decided to pursue a request for a change order, equitable adjustment or time extension, the documents it submitted are required by the contract. In addition, the contractor must submit these as a prerequisite to compensation." *Id.* at 7. The contract provisions upon which WMATA relies as the source of a requirement for the specific information ERG submitted – General Provisions 2 and 9 – do not constitute actual, compulsory legal authority compelling ERG to submit the information at issue to WMATA.

First, GP 2 simply does not apply, because the condition precedent it contemplates simply never occurred here. By its terms, GP 2, applies to a written change order issued *by the contracting officer. See* GP 2(a) ("The Contracting Officer may at any time, *by written order*, and with or without notice to the sureties, make changes, within the general scope of this Contract . . . ."). In that instance, GP 2 requires the contractor to assert its right to a contract adjustment within 30 days of receipt of the written order from the contracting officer. GP 2(c). As we have noted, it is undisputed that none of ERG's requests for adjustments or changes now at issue in this case were triggered by the issuance of a change order by WMATA[4]: ERG initiated the change requests at issue. GP 2 is inapposite, and certainly did not compel ERG to submit the information at issue to WMATA. Moreover, assuming hypothetically that the contracting officer had issued a change order, thus satisfying the condition embedded in GP 2, the provision requires no more than that the contractor "assert its right to an adjustment" within a certain time. GP 2 is nothing more or less than a timing provision. In any event, it does not oblige the contractor to submit any particular information in any specific form or mandate any particular substantive requirements in the "assertion of rights" the provision mentions.

---

[4] See note 1, *supra.*

General Provision 9 deals with delays caused by the Contracting Officer. It provides for an adjustment in contract compensation to cover the contractor's increased costs of performance (excluding profit). Insofar as submissions required of the contractor seeking compensation for such a delay, the provision obliges the contractor to submit a claim for increased costs "in an amount stated" as soon as practicable after the termination the delay, but not later than the date of final payment under the contract. GP 9. Thus, the specific information called for from the contractor by GP 9 in a delay claim is nothing more than "an amount stated."

No provision in either GP 2 or GP 9 actually required ERG to submit the type of detailed substantive information ERG in fact submitted. ERG volunteered information far beyond its increased costs of performance, and included ERG's proposals as to work requirements and tasks beyond the scope of the original contract, descriptions, charts and graphs of proposed processes and workflows, breakdowns of pricing and costs, ERG's identification of contract implementation and operational problems and issues to be resolved, and its views on the reasons why the changes it proposed were necessary in order to resolve those administration issues. *See* AR-8 and AR-13.

Moreover, WMATA's position in its brief that the full spectrum of information ERG presented in its confidential settlement documents was required "as a prerequisite to compensation" (ERG SJ Brief, at 6) is simply disingenuous. Even a cursory review of the documents at issue reveals that the ERG's settlement proposals encompassed far more than stating and demanding compensation for its costs. ERG's submissions addressed in detail how to proceed in light of WMATA's persistent difficulties in administering the contract. Examples include ERG's Request for Equitable Adjustment, which chronicled in detail ERG's views on how and why administration of the contract was deficient, who was to blame, and put forward

- 13 -

specific proposals as to how the dispute might be resolved without the necessity of formal litigation. *See* REA, AR-8.

Much of the submissions were devoted to detailed proposals describing tasks and contract requirements different from and beyond the scope of the original contract ERG believed were necessary because of the manner in which WMATA elected to administer the contract. In support of its proposals, ERG proposed detailed workflows, processes and procedures, and task descriptions not present in the original contract. Examples include proposed changes in scope regarding paper products support, data synchronization, pre-bill autoload, CTF connectivity, and network infrastructure, each of which, by their terms, deal with new requirements and tasks necessary to resolve operational problems, and modifications to existing contract requirement language and periods of performance. *See, e.g.,* AR-8 ("Wave 1" Documents): E2-1-27 (Paper Products Support); E4-1-8 (Data Synchronization); Pre-Bill Autoload (unnumbered); Network Redundancy legal position and proposal; CTF Connectivity letter, E8-1-4 (Website Functionality), and AR-13 ("Wave 2" Documents: B-E-1 1-25 (Data Synchronization); B-E-2 1-17 (Pre-Bill Autoload); B-E-3 1-5 (CTF connectivity); and B-E-4 1-10 (Network Infrastructure Plan).

Obviously, nothing in GP 2 or 9 imposes on ERG a requirement enforceable by WMATA compelling ERG to submit the type of comprehensive and detailed proposals reflected in the documents in suit. On their face, the contract provisions advanced by WMATA as its "actual authority," upon which it rests its "required submission" argument, fail the threshold *Critical Mass* test.

Perhaps recognizing the limitations of GPs 2 and 9 as support for its refusal to apply *Critical Mass,* WMATA resorts to the sweeping notion that *any* information a contractor submits in support of its efforts to win and get paid under a contract are perforce "required." This grossly

- 14 -

misstates applicable law. Relying on misleading generalities, WMATA cites cases holding that bidding and proposal documents submitted by a prospective government contractor are mandatory submissions.

These include *McDonnell Douglas Corp.* v. *NASA,* 895 F.Supp 316 (D.D.C. 1995). There, the Court endorsed the straightforward proposition that prices submitted by a bidder are required to be submitted in connection with a bid to win a government contract. Even though a contractor's choice to bid on a contract is voluntary, telling the government what the contractor is going to charge is not. *Id.* at 318-19. Relying on this and other "bid and proposal" cases, and on DOJ OIP guidance (which ERG submits is no substitute for binding Circuit Court precedent) WMATA declares that any document submitted by a contractor in any effort to secure and maintain a government contract, is involuntary, concluding "[t]his would indicate that ERG's documents were required submissions, since the documents were submitted by a WMATA contractor." *Id.* If that were the rule, the Circuit need not have troubled itself to write *Critical Mass*, or to adopt *Center for Highway Safety's* "objective" test linking "involuntariness" to actual, specific, mandatory legal authority compelling the particular information at issue; as all "contract-related" information submitted by a contractor would be automatically subject to the *National Parks* test.

Under the law applicable in this Circuit, even if submitted by the contractor and even if "contract-related," in order for submitted information to be "required," a nexus must exist between the particular information at issue and the agency's actual legal authority to compel its submission. In fact, the *McDonnell Douglas* case cited by WMATA case illustrates the importance of this inquiry. It, and other pertinent decisions of this Court, teach that only the precise, specific information mandated by actual legal authority is regarded as "required to be submitted." An agency may not, as WMATA has done here, extrapolate from contract

- 15 -

provisions specifying certain information a mandatory requirement that the contractor submit
other information not specified.

The District Court in *McDonnell Douglas Corp. v. NASA* cited an opinion in a related
case, in which the FOIA request at issue called upon NASA to disclose McDonnell Douglas'
comments submitted to the agency to justify non-disclosure of the line item prices. The court
held that the contractor "submitted explanations to help NASA make the right decision regarding
disclosure of the information at issue. NASA did not require McDonnell Douglas to provide
comments, *nor did the agency specifically require certain information to be included in the
voluntary comments.* " 895 F.Supp at 318 (emphasis added).

*Cortez III Service Corp.* v. *NASA,* 921 F.Supp. 8, 11-13 (D.D.C. 1996), *appeal dismissed
voluntarily,* (No. 96-5163) (D.C. Cir. July 3, 1996) provides another illustration of the same
principle. At issue there was disclosure of a bidder's actual "general and overhead" ("G&A")
rates, and a G&A rate ceiling proposed by the contractor. NASA relied on a clause of the
contract solicitation requiring disclosure in the bid of "indirect costs," including G&A, and
"from this fact, extrapolates the conclusion that the G&A rate ceilings were also a mandatory
part of the cost proposal." *Id.* at 12. The District Court rejected this "extrapolation" out of hand,
holding the disputed submission voluntary, because nothing in the request for proposal or the
resulting contract required the bidder to submit G&A ceilings in order to continue bidding. *Id.* at
13.

To similar effect is the District Court's decision in *Mallinckrodt, Inc.* v. *West,* 140
F.Supp.2d 1 (D.D.C. 2000) where the Court rejected an expansive approach similar to that
suggested by WMATA here. In that "reverse FOIA" case, the Department of Veterans Affairs
took the position that information concerning rebates and incentives submitted to the agency by a
contract bidder was involuntarily submitted, because "all of the information submitted in an

- 16 -

effort to win a government contract should be viewed as having been required by the contract solicitation." *Id.* at 5. The Court held that "[s]uch an argument is flatly inconsistent with the intent of *Critical Mass.*" *Id.* at 6. The Court recognized that, just as with the G&A ceilings in *Cortez III* "the rebates and incentives in this case may have made the bid more appealing or valuable to the government, but this information was not required to be submitted within the meaning of *Critical Mass.*" *Id.* The Court concluded that the rebates and incentives were protected from disclosure, and overturned the agency's contrary conclusion as arbitrary, capricious and contrary to law. *See also Airline Pilots Ass'n* v. *U.S. Postal Service.,* 2004 WL 5050900 at *4 ("Nor may plaintiff argue that disclosure is required simply because this information was submitted in an effort to win a contract from USPS. . . . USPS did not have the legal authority to compel FedEx to submit the redacted information to it." *Parker* v. *Bureau of Land Management,* 141 F.Supp.2d 71, 77-79 (D.D.C. 2001) (where BLM regulations do not mandate that information at issue be submitted, nor provide the agency with authority to compel project proponents to submit it, information was submitted voluntarily).

In the end, WMATA's reliance on cases arising in the context of an effort to bid for or obtain a contract is misplaced. Those cases involve situations where specific acquisition regulations require submission of particular types of information (including price data), so that the government will know what the prospective bidders propose to charge, and all prospective bidders may be evaluated according to the same criteria. WMATA has brought forward no cases to support its expansive contention that, once a contract is awarded, and contract administration issues arise, any document a contractor submits in connection with negotiating a contractor-initiated change or adjustment to a contract is required to be submitted.

Indeed, this Court recently held to the contrary. In *Judicial Watch* v. *Department of the Army,* 466 F.Supp.2d 112 (D.D.C. 2006), the Court considered the applicability of

- 17 -

FOIA Exemption 4, and *Critical Mass*, to certain documents containing communications

between the Army and Kellogg Brown & Root ("KBR") relating to contract

administration issues concerning "no bid" oil well fire fighting contracts awarded to KBR

in the aftermath of the invasion of Iraq.  The Court distinguished the "bid price" cases,

writing:

> Having reviewed these documents *in camera*, the court concludes that the
> information in them was submitted voluntarily.  [KBR] provided the information
> in these documents not in an effort to bid for or obtain a contract ***but to negotiate***
> ***the administration of the contract.  The intervenor provided this information***
> ***after it had been awarded a contract by the defendant, and the discussion***
> ***contained in these documents concerns ongoing contract implementation, not***
> ***bid proposals or contract procurement.***

466 F.Supp. at 125-26 (emphasis added).

   This case falls squarely within the rubric of Judge Urbina's decision in *Judicial Watch*,

No contract provision, no statute and no regulation vests WMATA with the authority to compel

ERG to submit to WMATA the type of information at issue here.  After it was awarded a

contract, and contract implementation issues arose, ERG voluntarily submitted the detailed

proposals at issue here to negotiate changes to the contract, in an effort to bring greater clarity

and certainty to a confused and chaotic contract administration situation, and to attempt to

conform the contract's provisions regarding scope of work, time of performance, as well as

compensation, to the actual conditions ERG faced in the field.  Accordingly, the disputed

information was submitted voluntarily, and is subject to *Critical Mass'* test of confidentiality, not

the more stringent *National Parks* standard.

   2.   *Protecting From Disclosure Information Volunteered*
        *By a Contractor in Confidential Settlement Negotiations*
        *to Avert a Litigated Dispute Serves the Policies Expressed*
        *in* Critical Mass

In *Critical Mass,* the full District of Columbia Circuit Court, sitting *en banc,* held that

protecting as confidential information voluntarily submitted to an agency serves the

governmental interest of "encouraging cooperation with the Government by persons having

information useful to officials."  975 F.2d at 878.  That interest is threatened by public disclosure

of information submitted, without legal compulsion, and of a type not customarily released

publicly, as a person "whose confidences have been betrayed will, in all likelihood, refuse

further cooperation."  *Id.*  The records remaining at issue here were submitted at the initiative

and in the first instance, by ERG, as part of its effort to avert the necessity of pressing a formal

dispute through the means of confidential settlement negotiations.

   The information in suit directly implicate the salutary policies recognized in *Critical*

*Mass.*  Consensual resolution of contract administration disputes extra-judicially through the

means of confidential settlement discussions is manifestly in the government's interests.  A

strong policy favoring confidentiality of materials submitted in settlement negotiations is

reflected in our jurisprudence in many ways.  *See e.g., U.S.* v. *El-Sayegh Hami*, 131 F.3d 158

(D.C. Cir. 1997) (discussing how refusing to seal plea bargain agreement would have practical

effect of "thwarting the use of documents that parties would not submit at all without assurances

of confidentiality.");  *Sears Roebuck & Co.* v. *EEOC,* 581 F.2d 941 (D.C. Cir.1978) (citing

"compelling policy reasons for not allowing the EEOC to give, even to charging parties,

information gleaned from settlement negotiations:  only by keeping such data strictly

confidential can employers be encouraged to discuss openly and frankly the possible grounds for

an amicable resolution of the disputes at hand. . . . knowledge that anything 'said or done' by

way of settlement with EEOC will be disclosed to potential litigants is bound to dissuade candor and even participation by employers in a negotiated settlement."). *See also,* Local Civil Rule LCvR 84.9 (confidentiality of all written and oral communications made in connection with or in any mediation session); Federal Rule of Evidence 408 (inadmissibility of statements made in connection with offers of compromise); *In re Subpoena Duces Tecum Issued to Commodity Futures Trading Commission WD Energy Servs.,* 439 F.3d 740 (D.C. Cir. 2006) (noting that CFTC withheld disputed settlement negotiation documents from disclosure in FOIA inquiry, refusing to reach merits of District Court's conclusion that no "settlement privilege" existed in D.C.; but affirming motion to compel, because party seeking protection failed to carry its burden of establishing that documents were created for the purpose of settlement discussions; whether settlement privilege exists "remains open in this circuit.").

Protecting settlement proposals and other submissions submitted by a contractor in confidence would encourage a contractor to cooperate in alternative dispute resolution and to provide detailed information that will help the agency in making its decisions. Disclosure of such information would discourage such a cooperative approach. The goals of FOIA as expressed in *Critical Mass* indicate that all the records at issue here should be protected.

>   **3.    *There is No Dispute That the Information at Issue Here is Not Customarily Released Publicly By ERG  WMATA Should Not be Afforded an Opportunity to Revisit on Remand ERG's Critical Mass Objections Squarely Raised Below***

If the Court determines that WMATA erred in characterizing ERG's submissions as "required to be submitted," WMATA asks the Court to remand the case, so that WMATA may revise its redactions applying the correct standard, "*to the extent that ERG can demonstrate that they are not customarily disclosed to the public.*" WMATA SJ Brief, at 16 (emphasis added).   The Court should decline to give WMATA this "second

bite at the apple," not only because WMATA is simply not entitled to it, but also because

WMATA, with this one brief afterthought, virtually guarantees the Court that it will

again act contrary to applicable Circuit precedent, by imposing a burden on ERG that

ERG is not obliged to discharge. Under the law applicable to "reverse-FOIA" suits like

this one, should the agency wish to negate the confidentiality of submitted information

and justify its release, WMATA bears the burden of proof that ERG engaged in public

disclosure of the records at issue, and it is not up to ERG to prove the contrary. In

*Occidental Petroleum Corp.* v. *SEC*, the Court of Appeals stated:

> [I]t does seem that a reverse-FOIA claimant should not be called upon to prove
> non-public availability; presumably it would have to identify all public sources in
> which the information contained in its documents is not reproduced. To state the
> task is to see that it is bootless. It is far more efficient, and obviously fairer, to
> place the burden of production on the party who claims the information is
> publicly available.

873 F.2d 325, 329 (D.C. Cir. 1989).

Had WMATA but cared to consider the points ERG put before it in support of its

"voluntary submission" contentions, the agency perhaps could have developed the record further

on this point. The existing administrative record contains multiple averments by ERG in its

objections to both the "first wave," and "second wave" of proposed releases, that ERG does not

customarily disclose these records to the public. *See* AR-6 and AR-9. As noted previously,

ERG has again made the averment here, in Mr. Winyard's declaration in support of ERG's

motion for summary judgment, and neither defendant has effectively controverted that fact. It is

also undisputed that ERG submitted the requests for changes and adjustments at issue here,

expecting and intending that they be held in confidence, and that they bore confidentiality

markings of one kind or another. *See* ERG SMF ¶ 17-18 & 37 and Winyard Dec. ¶¶ 10-11.

Taken together, these materials establish that the information contained in the documents at issue

is not customarily disclosed to the public by ERG.  *See Judicial Watch* v. *Department of the Army,* 466 F.Supp.2d 112, 126 (D.D.C. 2006).

In any event, WMATA willfully chose to ignore ERG's *Critical Mass* contentions, electing instead to view them as, essentially, irrelevant to the *National Parks* inquiry it decided to adopt.  So, to the extent the record is in any way underdeveloped on the question whether ERG customarily does or does not disclose the type of information it submitted to WMATA at issue here (again, ERG does not think there is any lacuna on this point), then WMATA's own failure and refusal to consider an issue squarely raised before it by ERG is the reason why.  The record WMATA developed is the one which must govern this case, and, on this record, ERG must prevail.  The Court should not oblige ERG to expend even more resources than it has already dissipated trying to explain to WMATA why these records are confidential.  *See,* e.g., *Cortez III Serv. Corp.* v. *NASA*, 921 F. Supp. 13 (declaring an agency decision to be "not in accordance with law" when "[n]either the administrative decision nor the sworn affidavits submitted by the [agency] support the conclusion that [the submitter] was required to provide" the requested information), *appeal dismissed voluntarily*, No. 96-5163 (D.C. Cir. July 3, 1996).

**C.**     ***WMATA Failed to Apply the* National Parks *Substantial Competitive Harm/Impairment Tests in a Consistent and Logical Manner***

Invoking exemption 6.5.1, WMATA withheld an ERG delay claim because WMATA believed disclosure of those records "would harm WMATA's bargaining position."  WMATA SMF ¶ 7.  As WMATA acknowledges, ERG requested that its entire Request for Equitable Adjustment be withheld because "[r]elease of the REA would certainly harm our final negotiations with WMATA." *Id.* ¶ 5.  Despite seeing clearly that confidential treatment was warranted because public disclosure of the delay claim associated with the REA submitted by ERG would harm WMATA's negotiating position, WMATA put a blind eye to the spyglass

when it refused to redact or withhold the entire REA, which ERG requested WMATA to withhold on the analogous grounds that disclosure would harm ERG's bargaining position with WMATA. Obviously, ERG submitted to WMATA the entire REA, and ERG was aware of its contents in its bilateral negotiations with WMATA. Thus, it was not ERG's knowledge of the claim's contents WMATA had in mind when it withheld the claim on grounds of "harm to its bargaining position." The reasons why WMATA invoked the "harm to its negotiating position" exemption, albeit selectively, well illustrate why disclosure of ERG's confidential settlement documents to the public (including to the requestor, ERG's competitor, Cubic, who was then and is now vying with ERG within WMATA for work under the contract (*see* ERG SMF ¶ 38)) before negotiations were concluded, would likely cause competitive harm to ERG.

Cubic's or any other contractor's knowledge of the contents of the delay claim would compromise WMATA's resolution of the complex contract administration issues ERG presented to WMATA (which involved and affected other contractors, including Cubic), and give Cubic or another contractor an unfair advantage in its own negotiations with WMATA over this ill-starred contract. By that same logic, it is also true that disclosure to other contractors would compromise ERG's negotiating position under the REA and all other documents ERG submitted in confidence to WMATA toward resolution of ERG's contract administration issues. This, alone, raises a sufficient likelihood of competitive harm to warrant withholding all records at issue.

Also, acting on ERG's requests, WMATA redacted information WMATA agreed was "detailed and specific enough to aid a competitor," and "detailed enough to reveal ERG's pricing strategy," WMATA SMF, ¶ 7, "specific and detailed enough to reveal a proprietary process or system," "labor hours, direct hours, and rate information," and "information that is detailed and specific and would compromise the security of WMATA customers and employees," and "would lead to a clearly unwarranted invasion of privacy." WMATA SMF ¶ 12. Disclosure of all of this

kind of information, WMATA essentially agreed, would cause ERG substantial competitive
harm. However, in its brief, WMATA defends its decisions to disclose or refuse to redact
information ERG claimed would cause it competitive harm if released, asserting that such
information, contrary to ERG's assertions, in fact, amounted to: (a) "lump sum, aggregate or
other pricing information;" (b) "readily available information;" and (c) "information lacking in
detail." WMATA SJ Brief, at 12-16. A reviewing Court owes no deference to an agency's
conclusory or unsupported suppositions, or assertions of empirical fact which are not
substantiated in the record. *McDonnell Douglas Corp,* 375 F.3d at 1191; *Canadian Commercial
Corp.,* 442 F.Supp. at 35-36.

    If it becomes necessary for the Court to review the submissions and to make findings of
fact concerning substantial competitive harm and impairment, it will find that WMATA failed to
apply standards consistently in respect of all the information it proposed to disclose. For
example, ERG's proposals include information WMATA refused to redact relating to ERG-
proposed workflows, procedures and processes relating to paper products support, data
synchronization, pre-bill autoload, CTF connectivity, and network infrastructure. *See, e.g.,* AR-8
("Wave 1" Documents) and AR-13 ("Wave 2" Documents). WMATA asserts that it declined to
redact certain of the processes described in ERG workflow documents, "based on its program
manager's knowledge that it is readily available in the industry." WMATA SJ Brief at 13. This
assertion is a classic statement of empirical fact which is not substantiated in the record with
anything other than conclusory suppositions of WMATA personnel. It is entitled to no deference
or weight here.

    But regardless of whether certain steps in ERG's workflows are or are not generally
known, WMATA fails to recognize the competitive harm disclosure of the workflow and process
documents in their entirety would cause ERG. As Mr. Winyard attested in his declaration, in the

real-world context in which this dispute arises, which includes interlocking WMATA contracts with both ERG and Cubic, and the likelihood of further contract modifications that will re-allocate work between those contractors; ERG's competitor, Cubic, will manifestly gain an advantage in its efforts to obtain more work at Cubic's expense by knowing exactly how ERG proposed to structure the tasks set out in its change requests, details concerning ERG's workflows, processes and procedures, and the precise order in which ERG proposes to perform those tasks. As noted previously, many of the tasks described in ERG's submissions are tasks outside the scope of the original contract, necessitated by the manner in which the contract has been structured and administered by WMATA.

In addition, despite recognizing that disclosure of "breakdown" or unit prices or rates clearly causes ERG competitive harm, as does disclosure of other information which, when combined with aggregate total prices, permits unit prices and rates to be discerned by "reverse engineering," WMATA failed consistently to apply this concept as well. For example, WMATA refused to redact from a change order request (which reveals the extended total price), the duration of performance. WMATA SJ Brief, at 12. But armed with the extended price for certain services, coupled with the duration of performance, a competitor could derive forbidden unit pricing.

At any rate, to the extent the Court cannot resolve these matters as issues of law by examining whether WMATA treated all of the information consistently and logically, it must delve into whether or not WMATA, on the one hand, or ERG, on the other, is correct concerning the likely competitive impact of disclosure of the specific information WMATA proposes to disclose, and/or any impairment of such disclosure may have on WMATA's ability to obtain similar information in the future disclosure may have. This would amount to resolving disputed

issues of fact.  Resolving issues of fact is a task the Court cannot undertake on summary

judgment.

        IV.    ***Conclusion and Prayer for Relief***

      **WHEREFORE,** for the foregoing reasons, ERG respectfully requests the Court to

**DENY** the Motions for Summary Judgment of Defendant WMATA and of Intervenor-Defendant

Cubic, and to **GRANT** the Motion for Summary Judgment of ERG.

                           Respectfully submitted,

                           **ERG TRANSIT SYSTEMS (USA), INC.**

By its attorneys:      /s/ Benjamin J. Lambiotte
                           Benjamin J. Lambiotte, Esq.
                           D.C. Bar No. 421288
                           blambiotte@gsblaw.com
                           Matthew C. Hoyer, Esq.
                           D.C. Bar. No. 975544
                           Robert A.W. Boraks, Esq.
                           D.C. Bar No.  72132
                           **GARVEY SCHUBERT BARER**
                           1000 Potomac Street, Fifth Floor
                           Washington, D.C. 20007
                           (202) 965-7880

Dated:  July 3, 2008