**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ERG TRANSIT SYSTEMS (USA), INC., } <br><br> *Plaintiff,* } <br><br> v. } <br><br> WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, } <br><br> Defendant. } | Judge Rosemary M. Collyer <br> Case No. 1:07-cv-01924 <br> Next Event: None Scheduled |

**PLAINTIFF ERG TRANSIT SYSTEMS, INC.'S CONSOLIDATED
REPLIES TO OPPOSITIONS OF DEFENDANT WAMTA AND
INTERVENOR CUBIC TRANSPORTATION SYSTEMS, INC.
TO ERG'S MOTION FOR SUMMARY JUDGMENT**

**COME NOW** the Plaintiff, ERG Transit Systems Inc., ("ERG"), by and through its undersigned counsel, pursuant to Local Rules of Civil Procedure 7(a), hereby respectfully submits the following Consolidated Reply to the Oppositions to ERG's Motion for Summary Judgment filed by Defendant Washington Metropolitan Transit Authority ("WMATA") and Intervenor Cubic Transportation Systems, Inc. ("Cubic"). This Reply includes ERG's response to Cubic's Objection to the Declaration of John Winyard filed with Cubic's Opposition.

## I.    *Introduction and Summary*

WMATA and Cubic suggest erroneously that certain points in ERG's motion for summary judgment, and the supporting Declaration of John Winyard, explaining the particular nature of the competitive harm ERG would likely suffer as a result of public disclosure of the materials at issue, should not be considered by the Court because they were not before WMATA at the time it made the decision at issue here. WMATA and Cubic overlook the fact that, in large part, the same points of fact made in Winyard's declaration were already before WMATA in

various documents from ERG or were otherwise known to WMATA, well before WMATA issued the final decision in this matter in January 2008.

In any event, both WMATA and Cubic continue to apply an incorrect legal standard on the key question of whether ERG's submissions were voluntary, as ERG contends, or, on the other hand, were required to be submitted by actual compulsory legal authority. Essentially, they argue that anything ERG submitted in connection with seeking the benefit of contract changes ERG initiated was perforce required to be submitted. In their myopic focus on ERG's purpose in submitting the information at issue, Defendants ignore a solid line of recent precedent from this Court rejecting expressly a test treating as "required" all information submitted in an effort to obtain a government contract benefit. Instead, the applicable test whether the *particular information at issue* was actually required to be submitted by compulsory legal authority

Finally, WMATA's suggestion that there is no authority for "piecemeal" review and disclosure of information submitted to an agency borders on specious: selective disclosure and redaction after careful review is the normal procedure in FOIA Exemption 4 cases. It is the approach WMATA, in fact, followed here. Applicable case law compels the conclusion that some parts of a submission may be disclosed and other parts may not be. That is why some information was redacted by WMATA and some was not.

Even if they were required to be submitted, WMATA applied the relevant "substantial competitive harm" standard in an inconsistent, irrational, arbitrary and capricious manner. WMATA withheld certain information on the grounds that disclosure would compromise its own position in confidential settlement negotiations, yet rejected ERG's equivalent argument that ERG would suffer harm to its own negotiating position were its submissions disclosed in response to the PARP request of its competitor. In respect of critical technical information, to

which WMATA's proposed disclosure ERG objected, WMATA endeavors to support its

decision with the *post hoc* rationalization that disclosure would not harm ERG because it "was

readily available in the industry." This is an entirely conclusory assertion of the type of empirical

fact that is capable of objective proof. Yet this supposition by WMATA is supported only by the

self-serving declaration of a WMATA employee, created for purposes of this litigation, merely

stating the proposition, and no other objectively verifiable evidence. As such, it is entitled to no

deference.

Neither WMATA or Cubic have overcome ERG's showing that it is entitled to judgment

as a matter of law on the undisputed facts. Neither defendant has advanced any actual legal

authority which compelled ERG: (a) to endeavor to resolve contract administration issues by

submitting confidential settlement proposals, as opposed to pursuing a formal claim under the

disputes clause of the contract; (b) as a means of resolving those issues, to propose changes to

the scope of the work, including new proposed contract tasks and requirements, proposed

workflows and processes, and adjustments to the contract price and periods of performance

necessitated by those proposed scope changes; or (c) to submit detailed information concerning

ERG's perspective on why the contract was being inefficiently administered, who was to blame,

and how resolve the issues ERG was facing. Accordingly, the particular information at issue

submitted by ERG was voluntary as a matter of law, and there is no dispute that it would not

normally be publicly disclosed by ERG.

/

/

/

/

## II.    _Argument_

**A.    _ERG Does Not Rely on Matters Outside the Record For the Most Part,_**
**_Facts Averred In Support of ERG's Position Defendants Assert Are Outside the_**
**_Record Were Already Presented by ERG or Otherwise Known to WMATA at_**
**_the Time it Made the Final Decision in This Case_**

Initially, WMATA in its opposition brief puts aside the critical question whether it

applied correctly the _Critical Mass_ "voluntary" vs. "required to be submitted" legal standard that

would resolve this case as a matter of law. It focuses instead on ERG's alternative argument that

ERG made an adequate showing of "likely competitive harm" under the more stringent _National_

_Parks_ test. WMATA argues that the Court cannot consider, _inter alia,_ ERG's points that the

fundamental competitive tension between ERG and Cubic, and the obvious fact that each were

and still are vying for work from WMATA, that, if awarded to one, would come at the expense

of the other, are key factors this Court should consider in assessing the prospect of competitive

harm to ERG. WMATA contends that those explanations and facts, among others, are

"immaterial," because they were not before WMATA when it made the disclosure decisions at

issue here. Without those explanations and facts, WMATA argues, ERG "contemporaneous"

objections were overly vague in detailing the likely competitive harm disclosure would cause.

Defendant's Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for

Summary Judgment (Filed Under Seal) ("WMATA Opp."), at 4-6.

For its part, Cubic makes a similar argument, and, on the same rationale, lodges an

objection to certain portions of the Declaration of John Winyard ("Winyard Dec."), submitted in

support of ERG's Motion for Summary Judgment, pronouncing those portions "irrelevant"

because they were not before WMATA when it made its decision. Intervenor/Defendant's

Memorandum of Points and Authorities in Opposition of Plaintiff's Motion for Summary

Judgment ('Cubic Opp."), at 9-10; Intervenor/Defendant's Objection to Plaintiff's Exhibit One.

- 4 -

At the outset, the Court should consider that WMATA, over ERG's objections, decided to address the PARP request in this case in piecemeal fashion, and issued two decisions, one in October 2007 and the final decision in January 2008. It is undisputed that ERG expressly objected to WMATA's proceeding in such piecemeal manner, and asked WMATA to defer issuing its "first wave" decision until after ERG had an opportunity to object to WMATA's proposed "second wave" disclosures, and WMATA had an opportunity to consider those objections. ERG SMF, at ¶ 34 & Defendant's Response to Plaintiff's Statement of Material Facts Not in Dispute, at ¶ 34. (undisputed). But WMATA refused, and ERG had no choice but to file this action in October 2007 to forestall disclosure of the "first wave." ERG has never conceded or accepted that the "first wave" determination was actually a "final determination." *See* ERG Complaint at ¶¶ 38 & 40 ("this approach deprives the Court of a complete record against which to measure WMATA's determinations as to the entire records request, yet ERG has no choice but to seek review now . . . ."). Consistent with that view and the reality of this case, the administrative record in this case was not complete or closed until WMATA issued the actual "final decision" in this case. That occurred on January 10, 2008.

In arguing that ERG relies on matters beyond the administrative record that properly may be considered by the Court, both parties-defendant are simply incorrect, on the facts and on the law. In fact, for the most part, the same points made in ERG's papers and Winyard's declaration were already before WMATA in various documents from ERG, or were otherwise known to WMATA, well before WMATA issued the final decision in this matter. By suggesting (incorrectly), that ERG had not raised such matters before WMATA, WMATA and Cubic hope to persuade the Court to blind itself to rather obvious, particular competitive disadvantages to

ERG disclosure of the confidential information at issue here would likely cause in the actual context of this case.

As demonstrated by the following citations to ERG's submissions to WMATA, and other matters undisputably known to WMATA prior to making its final decision in this case, ERG's summary judgment papers and the supporting Winyard declaration largely do not introduce new arguments or facts not previously before WMATA. ERG simply reiterates the same arguments ERG has made all along, recites historical facts of record not in dispute, or explains the "real world" factual context that existed at the time of WMATA's rejection of ERG's objections in its final decision and continues to exist to this day. The chronological sequence shows that the key facts were demonstrably known to WMATA in January 2008, when it issued the final decision in this matter, or long before that time. In addition, this recitation demonstrates that, contrary to WMATA's assertions that ERG's "contemporaneous" identification of the likely harms disclosure may cause were excessively vague, ERG, in fact, sufficiently particularized such harms:

- In a February 24, 2006, letter submitted in connection with ERG's Request for Equitable Adjustment, ERG noted that external dependencies, including ERG's dependency on certain items to be supplied by Cubic, had resulted in contract administration problems. ERG made reference to concerns ERG had regarding award of follow-on work to Cubic. AR-4, February 24, 2006, Letter from ERG to WMATA Contract Manager, ERCSC00198.

- ERG makes similar points in support of its motion for summary judgment. ERG's Statement of Material Facts Not in Dispute ("ERG SMF"), ¶¶ 11-15 Winyard Dec., at ¶¶ 6-8, 24-25.

- August 27, 2007: ERG submitted its objections to WMATA's "First Wave" Release. AR 6. August 28, 2007, Letter from ERG to WMATA Objecting to Proposed "First Wave" Release.

- In its August 27, 2007, objections, ERG urged that release of materials ERG submitted in connection with confidential settlement negotiations would harm ERG's bargaining

position with WMATA, result in competitive harm, and would not customarily be released to the public. AR 6.

- October 11, 2007:  WMATA issues its "First Wave" determination, and identifies proposed "Second Wave" release, soliciting ERG's objections thereto.

- October 25, 2007 – The original complaint was filed in this action, and served on WMATA the same day.

  o The Complaint alleged specifically: "Due to the interdependencies created by the manner in which WMATA has elected to administer the ERG and Cubic contracts, WMATA's proposed disclosures of ERG's confidential and proprietary commercial and financial information submitted to WMATA in connection with ERG's negotiations *would give Cubic an unfair insight into the details of the competitive and financial impact on ERG of Cubic's behavior in performance of its own contracts, and Cubic's attempts to influence WMATA contract administration practices*," to ERG's detriment in connection with the present contract, and in future option years and other procurements.  ERG Complaint, at ¶ 46 (emphasis added).

  o ERG makes the same points in support of its motion for summary judgment. ERG SMF, ¶¶ 11-15 Winyard Dec., at ¶¶ 6-8, 24-25.

- October 27, 2007 – ERG submitted to WMATA its objections to the "Second Wave" of WMATA's proposed disclosures. AR 9, October 27, 2007, Letter from ERG to WMATA Objecting to Proposed "Second Wave" Release.

  o In its October 27, 2007, "Second Wave" objections, ERG informed WMATA that if ERG had understood that its submissions to WMATA would not be held confidential, it would not have submitted the level of detail concerning technical solutions and pricing elements that it did.  AR-9.

  o ERG makes the same points in support of its motion for summary judgment ERG SMF ¶ 42; Winyard Dec. at ¶ 29.

  o In its "Second Wave" objections, ERG argued that disclosure of ERG submissions would cause ERG harm in connection with extensions of the present contract, that confidential information that disadvantages a contractor in relation to obtaining extensions of its contract must be protected, and that disclosure of ERG's submissions would give Cubic a basis to interfere with the award of future work to ERG.  AR-9

  o ERG makes the same points in support of its motion for summary judgment ERG SMF ¶ 38; Winyard Dec. at ¶¶ 24-25 (access to ERG's information would give Cubic valuable information to position itself with respect to option years and

follow on contracts, and to coordinate its position with WMATA's in future contract actions WMATA might take).

- o In its "Second Wave" objections, ERG noted that, if competitors had access to the ERG technical solutions and business/management processes contained in ERG's submissions, then such competitors "would have a blueprint to tailor their proposals to ours for similar, future proposals." AR-9.

- o ERG makes the same points in support of its motion for summary judgment. ERG SMF at ¶ 39; Winyard Dec. at ¶ 26 (ERG has advantage arising from integration of system architecture and proprietary business and technical processes; release of technical/business process submissions would jeopardize that advantage)

- o In its "Second Wave" objections, ERG argued that, if its competitors had such access, competitors could adopt ERG technical solutions and processes, without expending the resources ERG has in developing them. AR-9.

- o In its "Second Wave" objections, ERG argued that disclosure of ERG's Network Plan (CDRL 11) creates a security risk, providing a blueprint that may assist in an effort to breach the network. AR-9.

- o ERG makes similar points in support of summary judgment in its favor. ERG SMF at ¶ 39-40; Winyard Dec. at ¶ 27 (If Cubic had access to ERG technical and business process information, it would gain insight as to how to replicate ERG business model, or information which may assist it in reverse engineering, eroding ERG's competitive advantage).

- o In its "Second Wave" objections, ERG argued that disclosure of total prices and duration of performance would allow a competitor to discern unit pricing, which must be protected in accordance with applicable case law. AR-9.

- o ERG makes the same point in support of its motion for summary judgment. ERG SMF ¶ 41; Winyard Dec. ¶ 28. (WMATA's refusal to redact cost information from which, standing alone or in combination with other data, unit pricing may be discerned).

- On December 3, 2007, Cubic filed a motion to intervene in this case, which was served on WMATA on that day. In its Memorandum in support of its motion ("Cubic Intervention Memo."), Cubic alleged:

  - o "WMATA's decision to award two contracts, CO5034 to ERG and C4444 to Cubic, to implement the SmarTrip® Programs has led both Cubic and ERG to incur delay and additional costs in performing their contractual obligations." Cubic Intervention Memo., at 2.

- o "[I]n order to ensure that it is treated fairly and fully compensated by the MTA and WMATA, as ERG has been, Cubic has sought documents relative to WMATA's handling of the ERG's claims and REAs." *Id.*, at 3.

- o In support of its motion for summary judgment, ERG asserts that access to the information at issue in this case "would give Cubic valuable information coordinate its own contract negotiation efforts with WMATA" which Cubic could use "to formulate positions attacking ERG's theories and in favor of its own theories, which likely differ as to whom blame for delays should be attributed." ERG SMF, at ¶ 38; Winyard Dec. at ¶ 24.

- November 2007 – A WMATA consultant recommended that WMATA address operational problems on the SmarTrip® project by reducing ERG's scope of work. WMATA officials indicate their approval of this recommendation. Winyard Dec., at ¶ 21.

- January 10, 2008: WMATA issues its final decision on "Second Wave" disclosures.

Neither WMATA nor Cubic may claim credibly that the factual particulars of ERG's explanations and discussions of potential harm offered in support of ERG's dispositive motion here were not well known to WMATA before it made the final decision under review here. If WMATA chose to ignore ERG's objections, or to pretend that the papers filed in this litigation and other subsequent events crystallizing the detailed concerns ERG expressed in those objections are "outside the record" before WMATA when it made its final January 2008 decision, then the Court need not repeat that mistake.

Moreover, applicable case law suggests that declarations of submitters detailing facts material to the applicability of Exemption 4 in "reverse-FOIA" cases are accepted by the reviewing district court. *See, e.g., Judicial Watch* v. *Army,* 466 F.Supp2d at 126 (submitter may establish customary confidential treatment of voluntarily submitted materials through declarations) *citing Center for Auto Safety* v. *Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 153 (D.C. Cir. 2001) *and Parker* v. *Bureau of Land Mgmt.,* 141 F.Supp.2d 71, 79 (D.D.C. 2001). There is nothing improper in ERG's offering the Court, through the declaration of a participant

with knowledge, a full explanation of the history of events and circumstances leading up to the

final decision under review. Nor is it improper for the Court to consider the events recited in

Winyard's declaration after January 2008 (*see, e.g.,* Winyard Dec., at ¶¶ 22-23, events in April

2008), because they merely illustrate further the context of the same types of harms ERG

previously identified in detail to WMATA, before it made its final decision.

**B.**    ***ERG's Objections Explaining Likely Competitive Harm Were Sufficiently Detailed In Light of the Information Known to WMATA at the Time of its Final Decision***

As this litany illustrates, the basic facts, and detailed circumstances and positions

concerning likely competitive harm offered by ERG in support of its motion, were manifestly

known to WMATA at the time it made the final decision on release of records in this case. If

ERG's August and October 2007 objections were insufficient to bring home the points, ERG's

original Complaint, filed late in October 2007, was before WMATA prior to its final decision

some two and one half months later. Among other things, that pleading alleged specifically that

disclosure would give Cubic an unfair insight into the impact on ERG of Cubic's behavior in

performing its own contract, and an advantage in Cubic's own contract administration

negotiations with WMATA. So, too, WMATA had before it Cubic's Motion to Intervene, in

support of which Cubic confirmed that it was, in fact, planning to pursue contract adjustments of

its own with WMATA. Against this backdrop, occurred the events of November 21, 2007,

where WMATA announced that it was giving favorable consideration to a recommendation to

reduce ERG's scope of work, as a means of addressing the persistent issues that have plagued the

SmartTrip® effort.

When viewed in this context, WMATA's argument that ERG should have marshaled

"contemporaneously" a greater level of detail to demonstrate to WMATA likely competitive

harm caused by disclosing sensitive confidential information to its arch-competitor, Cubic, when both were seeking additional work from WMATA, falls flat. Clearly, release of the types of information detailed in ERG's objections "could benefit selectively" Cubic, for the reasons specified in those objections. *See* PARP § 2.0 (Statement of Purpose). *See also McDonnell Douglas* v. *NASA,* 180 F.3d 303, 306-07 (D.C. Cir. 1999) *rehearing en banc denied* (D.C. Cir. Oct. 6, 1999) *dismissed as moot on motion for entry of judgment* 102 F.Supp.2d 21 (D.D.C.), *recon. denied* 109 F.Supp.2d 27 (D.D.C. 2000)(agency erroneously rejected contractor's argument that release of information "would permit commercial customers to bargain down ('ratchet down') its prices more effectively" and "would help its domestic and international competitors to underbid it.)"

As ERG has argued previously, the deference WMATA and Cubic crave as to WMATA's findings concerning competitive harm is not owed by this Court (*see* ERG Opp., at 23-26), because WMATA applied the relevant "substantial competitive harm" standard in an inconsistent, irrational, arbitrary and capricious manner. WMATA withheld certain information on the grounds that disclosure would compromise its own position in confidential settlement negotiations, yet rejected ERG's equivalent argument that ERG would suffer harm to its own negotiating position were its submissions disclosed in response to the PARP request of its competitor. In respect of critical technical information, to which WMATA's proposed disclosure ERG objected, WMATA endeavors to support its decision with the *post hoc* rationalization that disclosure would not harm ERG because it "was readily available in the industry." This is an entirely conclusory assertion of the type of empirical fact that is capable of objective proof. Yet this supposition by WMATA is supported only by the self-serving declaration of a WMATA employee, created for purposes of this litigation, merely stating the proposition, and no other

objectively verifiable evidence. As such, it is entitled to no deference. *Id.* And citations to authorities therein. Accordingly, WMATA's and Cubic's motions must be denied, and ERG is entitled to summary judgment.

    **C.**    ***The Provisions of the Contract Upon Which WMATA Relies Do Not Constitute Actual Legal Authority Compelling ERG to Submit the Information At Issue Here***

    WMATA and Cubic each argue that, because ERG's intention in submitting proposals for changes to its contract tasks and scope of work, and resulting adjustments in its compensation and period of performance, was to obtain the "benefit" of contract modifications, all information contained in those submissions was "required to be submitted." Defendants continue to misapply the legal standard and ignore recent precedent governing the crucial "voluntary" vs. "required to be submitted" inquiry. Their focus on ERG's purpose to seek "benefits" from WMATA is entirely misplaced: the pertinent issue is whether ERG was required, by actual, compulsory legal authority, to submit to WMATA the particular information ERG seeks to protect from disclosure. *Ctr. For Auto Safety* v. *Nat'l Highway & Traffic Safety Admin.,* 244 F.3d 144, 149 (D.C. Cir. 2001) (test is an objective one; existence of actual, legal authority compelling disclosure, rather than party's subjective beliefs and intentions, governs judicial assessment of "voluntary vs. required to be submitted" dichotomy).

    WMATA does not controvert effectively ERG's contention that ERG had several means available to it, other than seeking a resolution through confidential settlement negotiations in the midst of contract performance by submitting the proposals at issue here, to address the difficulties, delays and increased costs caused by the manner in which WMATA administered the contract, including pursuit of a formal claim under the disputes provision of the contract. ERG Opp., at ERG SMF, at ¶¶ 17-18 and Winyard Dec., at ¶ 10. WMATA also effectively

concedes that no statute or regulation compelled ERG to submit the particular information at issue in this case.

Instead, WMATA relies exclusively on its own extrapolations of certain provisions of the contract relating to the contractor's rights triggered by changes ordered by the WMATA contracting officer (GP 2) and to compensation for delays (GP 9). In its opposition brief, seizing on a single snippet from the introduction of ERG's opening summary judgment brief taken entirely out of context, WMATA suggests that ERG agrees that certain provisions of the contract provide a source of actual legal authority. WMATA Opp., at 8. To be clear, ERG does not concede WMATA's point. ERG, in the quoted passage of the introduction to its brief, acknowledged that the contract has provisions that gave it a right to submit a claim *when the contracting officer issued a written change order,* and to seek compensation for delay. ERG Memorandum of Points and Authorities in Support of its Motion for Summary Judgment ("ERG Opening Memo."), at 3, but nothing more than that.

WMATA neglects to articulate to the Court the actual points about these provisions ERG made in the substantive portion of its brief, and in its consolidated opposition to Defendants' cross-motions. Far from "looking to the contract" for legal authority or conceding that the contract provisions are the wellspring of compulsory legal authority, ERG contends as follows:

> Further, WMATA's apparent contention that requests for change orders and delay claims both are required to be made in writing is simply wrong—the requirement for a written submission only applies to delay claims. *See* Exs. 2, 3. Nothing in GP 2 states a requirement for a written submission in regard to contract change orders: "The Contractor *must assert* its right an adjustment under this article within 30 days from the date of the receipt of the written order." Ex. 2 (emphasis added). Second, nothing in GP 2 addresses requests for change orders based on constructive changes or even changes requested at the instance of the Contractor; only changes made by "written order" by the "contracting officer." *Id.* Many of the RFCOs submitted by ERG addressed constructive changes to the contract, which were never ordered by the contracting officer, but instead requested by ERG to address unforeseen circumstances. Therefore, such requests are expressly outside the scope of GP 2 clause, which does not address this circumstance, and cannot be read to impose any mandatory requirement as to contractor-initiated change requests. SMF ¶ 17. All GP 2 does is establish a requirement for a contractor to "assert its right to an adjustment . . . within

30 days" when issued a change order by the contracting officer. Ex. 2. Conspicuously absent from GP 2 are any specific requirements. *Id.* GP 2 does not require that a request include anything in particular, such as pricing information, or a narrative description, or workflows, or technical information, all of which are included in the CNS at issue here. *Id.* The same is true of GP 9. While GP 9 does require that a delay claim be made in writing, all it requires of such a claim is that it include "an amount stated" and no more. Ex. 4.

> The lack of any specific requirement—other than for an amount stated in the case of a delay claim—renders ineffectual WMATA's reliance on GP 2 and GP 9 as "actual legal authority" requiring submission of any and all information submitted by ERG in the CNS. Here, in regard to the CNS, where no specific requirements exist, other than to assert "an amount stated" for delay claims, what specific information to submit and in what form were at the sole discretion of ERG, and therefore voluntary. *Ctr. for Auto Safety* 244 F.3d 144; *Mallinckrodt, Inc. v. West*, 140 F. Supp.2d at 6.

ERG Opening Memo, at 12-13.

Citing General Provisions 2 and 9 of the contract, a self-serving declaration, and no more, WMATA asserts: "Once ERG decided to pursue a request for a change order, equitable adjustment or time extension, the documents it submitted are required by the contract. In addition, the contractor must submit these as a prerequisite to compensation." The contract provisions upon which WMATA relies as the source of a requirement for the specific information ERG submitted – General Provisions 2 and 9 – do not constitute actual, compulsory legal authority compelling ERG to submit the information at issue to WMATA.

First, GP 2 simply does not apply, because the condition precedent it contemplates simply never occurred here. By its terms, GP 2, applies to a written change order issued *by the contracting officer. See* GP 2(a) ("The Contracting Officer may at any time, *by written order*, and with or without notice to the sureties, make changes, within the general scope of this Contract . . . ."). In that instance, GP 2 requires the contractor to assert its right to a contract adjustment within 30 days of receipt of the written order from the contracting officer. GP 2(c). As we have noted, it is undisputed that none of ERG's requests for adjustments or changes now at issue in this case were triggered by the issuance of a change order by WMATA: ERG initiated

the change requests at issue. GP 2 is inapposite, and certainly did not compel ERG to submit the information at issue to WMATA.

General Provision 9 deals with delays caused by the Contracting Officer. It provides for an adjustment in contract compensation to cover the contractor's increased costs of performance (excluding profit). Insofar as submissions required of the contractor seeking compensation for such a delay, the provision calls for the contractor to submit a claim for increased costs "in an amount stated" as soon as practicable after the termination the delay, but not later than the date of final payment under the contract. GP 9. Thus, the specific information called for from the contractor by GP 9 in a delay claim is nothing more than a demand and "an amount stated." Beyond that, it is a timing provision only.

No provision in either GP 2 or GP 9 actually required ERG to submit the type of detailed substantive information ERG in fact submitted. ERG volunteered information far beyond its increased costs of performance, and included ERG's proposals as to work requirements and tasks beyond the scope of the original contract, descriptions, charts and graphs of proposed processes and workflows, breakdowns of pricing and costs, ERG's identification of contract implementation and operational problems and issues to be resolved, and its views on the reasons why the changes it proposed were necessary in order to resolve those administration issues. *See* AR-8 and AR-13.

While at the same time chiding ERG for relying on positions and matters not before WMATA at the time of its decisions, WMATA here attempts to salvage its utter refusal to give the "voluntary vs. required" dichotomy reasoned consideration below by resorting to new legal theories, and interpretations of what the contract requires, articulated for the first time in the self-serving Declaration of Richard Beebe. WMATA Opp., at 8-10. But, for purposes of judicial

review of its decision, the propriety of WMATA's actions must be judged according to the plain language of the contract provisions it cites, and the reasoning it applied at the time it made the decision, without the benefit of *post hoc* interpretations or extrapolations. *See Cortez III Service Corp.* v. *NASA,* 921 F. Supp. 8, 11-13 (D.D.C. 1996) *appeal dismissed voluntarily* (D.C. Cir. July 3, 1996)(NASA's extrapolation from bidding requirement for G&A rates in cost proposal a requirement for G&A rate ceilings impermissible; rate ceilings went beyond what express requirements of cost proposal, and were subject to *Critical Mass* test).

WMATA's citations to legal authorities in its opposition are completely misdirected. As its support for its own (not ERG's) proposition that the contract can supply the source of compulsory legal authority, WMATA cites an unreported decision – *Chemical Waste Management* v. *O'Leary,* 1995 WL 115894 (D.D.C.). That case involved the reverse-FOIA claim of a subcontractor, who sought to protect from disclosure unit prices it supplied to Westinghouse, so that Westinghouse could respond to a DOE Request for Proposal. The Court held that the subcontractor "submitted the pricing data pursuant to a requirement in the RFP. Without the information, Chem Waste's bid would not have conformed to the terms of the RFP and would not have won the plaintiff the subcontract." *Id.* At *4. In any event, the Court held, the data was submitted by Westinghouse, not the subcontractor, with the result that "[p]laintiff had no role in the transfer of this information and, thus, cannot be considered a *volunteer* under any reasonable definition of the term." *Id.* Thus, the Court concluded, DOE properly applied *National Parks,* not *Critical Mass,* to the unit prices at issue.

This case is not remotely analogous to the situation here. The information in *Chemical Waste* was submitted in response to express contract bidding requirements, not in the context of an awarded contract already in performance and an attempt to resolve contract administration

issues present here. Moreover, the RFP expressly required submission of unit prices, without which the subcontractor's bid would not have conformed to the RFP. Quite unlike the *Chemical Waste* RFP's simple, clear and explicit mandate for the prices for the subcontractor's labor, as we have seen, *supra*, the contract provisions upon which WMATA rely do not intrinsically demand the precise nature and extent of information actually supplied by ERG in order to conform to their express requirements. Those provisions must first undergo WMATA's tortured interpretations of their "real" import, including resort to inapposite cases not relied upon by WMATA below, and a gloss based on Mr. Beebe's *post hoc* pronouncements of their meaning, before the information submitted by ERG here can be seen to conform to their imaginary "requirements." Finally, unlike in *Chemical Waste*, where the plaintiff had not even submitted to the agency the information at issue, there is no doubt here that ERG itself transferred to WMATA the information at issue. Accordingly, this case provides no support for WMATA's position.

Similarly unavailing is WMATA's attempt to read into GP 2 – on its face applicable only to claims resulting from a contracting officer's written change order – any *mandatory requirements* that a contractor submit the information ERG submitted to WMATA in the event of a constructive change, on the authority of *Miller Elevator Co.* v. *United States*, 30 Fed. Cl. 662, 678-80 (1994). Unfortunately for WMATA, *Miller* had nothing whatsoever to do with any information-submission requirements on the part of the contractor compelled by contract language similar to GP 2.

Rather, the decision focused on whether the authority of the contracting officer to order written changes under the clause foreclosed a certified "constructive" change claim asserted by the contractor, after the contract was terminated for the convenience of the government, for

additional costs associated with work the contractor claimed was ordered by the government, but outside the scope of the contract. *Id.* at 674, 677-78. In that case, the government invoked the "changes clause" (similar to WMATA's GP-2) defensively, to support its position that "only the contracting officer (and then only by written order) maintained the authority to approve additional work under the terms of the . . . contract." *Id.* at 679. The court ultimately rejected the government's attempt to erect the change clause as an obstacle to the contractor's recovery, analyzing carefully whether, on the facts proven, the contractor was entitled to recover for a "constructive" change, notwithstanding the undisputed fact that the contracting officer never issued a written change under the formal change provision. *Id.* at 696.

Simply put, the decision does not interpret the formal contract changes clause similar to GP 2 as requiring the contractor to submit any particular information to the contracting officer. It certainly offers no authority for WMATA's argument that "once ERG decided to pursue a change order, equitable adjustment, or time extension, the documents it submitted are required by the contract." WMATA Opp., at 9.

In obvious contravention of the clear language of the contract, WMATA attempts to draw from GP 2's language governing the timing of the contractor's assertion of a *right* to an adjustment based on a written order of the contracting officer, a mandatory requirement that such an assertion include both a *justification* for actual changes ordered constructively by the contracting officer, *and* a mandatory requirement, not found in the plain language of the clause, that a contractor submit a request for adjustment containing the particulars found in ERG's submissions based on a constructive change as well. This interpretation is not supported by the plain language of GP 2.

The absence in the WMATA/ERG contract of any language requiring either a

justification for an adjustment under a contractor-requested change order or submission of any

particular information in regard to an adjustment for a constructive change is placed in sharp

focus, when compared with an alternative changes clause included in the Federal Acquisition

Regulation, 48 C.F.R. § 52.243-4, which addresses both matters.

That FAR provision, on which WMATA could have based GP 2, but did not, provides, in

its entirety:

> a) The Contracting Officer may, at any time, without notice to the sureties, if any, by
> written order designated or indicated to be a change order, make changes in the work
> within the general scope of the contract, including changes --
>
>> (1) In the specifications (including drawings and designs);
>> (2) In the method or manner of performance of the work;
>> (3) In the Government-furnished property or services; or
>> (4) Directing acceleration in the performance of the work.
>
> (b) *Any other written or oral order (which, as used in this paragraph (b), includes
> direction, instruction, interpretation, or determination) from the Contracting Officer that
> causes a change shall be treated as a change order under this clause; Provided, that the
> Contractor gives the Contracting Officer written notice stating --*
>
> *(1) The date, circumstances, and source of the order; and*
> *(2) That the Contractor regards the order as a change order.*
>
> (c) Except as provided in this clause, no order, statement, or conduct of the Contracting
> Officer shall be treated as a change under this clause or entitle the Contractor to an
> equitable adjustment.
>
> (d) If any change under this clause causes an increase or decrease in the Contractor's cost
> of, or the time required for, the performance of any part of the work under this contract,
> whether or not changed by any such order, the Contracting Officer shall make an
> equitable adjustment and modify the contract in writing. However, except for an
> adjustment based on defective specifications, no adjustment for any change under
> paragraph (b) of this clause shall be made for any costs incurred more than 20 days
> before the Contractor gives written notice as required. In the case of defective
> specifications for which the Government is responsible, the equitable adjustment shall
> include any increased cost reasonably incurred by the Contractor in attempting to comply
> with the defective specifications.
>
> (e) The Contractor must assert its right to an adjustment under this clause within 30 days
> after (1) receipt of a written change order under paragraph (a) of this clause or (2) the
> furnishing of a written notice under paragraph (b) of this clause, *by submitting to the*

*Contracting Officer a written statement describing the general nature and amount of the proposal*, unless this period is extended by the Government. The statement of proposal for adjustment may be included in the notice under paragraph (b) of this clause.

(f) No proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract.

FAR 52.243-4 (emphases added).

WMATA chose to adopt another changes clause to become GP 2, which represents a paraphrasing of FAR 52.243-1, *Alternate II. See* 48 C.F.R. § 52-243-1 Alt. II. Unlike 52.243-4, that alternate does not provide for adjustments on account of constructive changes, nor does it particularize the information a contractor must submit to assert its right. The alternate changes clause of 52.243-4, which contains the language WMATA apparently wishes GP 2 contained pertaining to equitable adjustments for constructive changes not actually ordered in writing by the contracting officer, demonstrates conclusively by comparison that GP 2 does not support WMATA's position.

Indeed, as regards equitable adjustments, WMATA's footnote concerning GP 2, WMATA Opp., at 9 n.2, reinforces what is obvious from a cursory reading of the provision: the provision is concerned with the *contracting officer's obligations* to make equitable adjustments in price, delivery schedule, or both, and to so modify the contract, in the event the contracting officer orders a change in writing. Nothing in the provision addresses, much less mandates, any obligation on the part of the contractor to submit the particular information ERG submitted. Nor does *Servidone Constr. Corp.* v. *United States*, 931 F. 2d 860 (Fed. Cir. 1991), which merely sets forth the elements the contractor must prove on a certified claim for an equitable adjustment under the Contracts Disputes Act, 41 U.S.C. § 609(a) (1).

The contract dispute case law advanced by WMATA simply fails to support its position that ERG's contract *required* it to submit requests for adjustments based on constructive, rather

than ordered changes. *Miller Elevator* in no way shape or form, explicitly or implicitly, supports

WMATA's notion that a contractor is required to submit a constructive change request in order

to "get paid." It stands for the opposite proposition: that a contractor *need not* submit a change

order request in the event of a constructive change, but can make a formal equitable adjustment

claim under the Contract Disputes Act, in order to be compensated. Nowhere does the case hold

or imply that a contractor must submit a change order request to be paid on a constructive

change. Rather, it finds that a contractor does not need to submit such a request to prevail on a

claim because a contractor's right of recovery on a constructive change is *independent* of any

change order. 30 Fed. Cl. at 678-80.

WMATA completes its misplaced analysis by further ignoring the most squarely on point

reverse FOIA case, the *Judicial Watch v. Department of the Army* case, which holds that

submission to negotiate contract administration are voluntarily submitted. 466 F. Supp.2d 112,

125 (D.D.C. 2006). Instead of concentrating on the holding, WMATA ignores it, and instead

attempts to distinguish the case on its facts, even though its holding clearly applies to contract

administration submissions at issue in this case.

WMATA's position that all the material submitted in regard to contract changes was

required because a contractor must adequately support its requests is once again contradicted by

case law. To conclusively rebut and expose the fundamental flaw in WMATA's position, the

Court need only apply its logic to the reverse FOIA contract bid and proposal case such as

*McDonnell Douglas Corp. v. NASA*, 895 F.Supp. 316, 318 (D.D.C. 1995), on which WMATA

seeks to rely. Contrary to WMATA's position in regard to change order requests, which is that

the entirety of a submission is required because it is all necessary for the contractor "to get paid,"

the bid and proposal cases reject that very argument. *See e.g., Cortez III Service Corp. v. NASA,*

921 F.Supp. 8, 12 (D.D.C. 1996); *Malinckrodt v. West*, 140 F. Supp.2d 1, 6 (D.D.C. 2000);

*Canadian Commercial Corp. v. Department of the Air Force*, 442 F. Supp.2d 15, 29 (D.D.C.

2006), *aff'd Canadian Commercial Corp. v. Department of the Air Force*, 514 F.3d 37 (D.C. Cir.

2008) (all seeking to identify actual legal requirement to compel information at issue).

These cases represent repudiation by this Court of the principle that the totality of a bid or

proposal submission is required because the proposal is required to win a contract benefit from

the Government. Instead, these cases identify what material is required by legal authority—

which requires an exacting comparison of the particular information submitted against the

specific requirements of an actual legal mandate—and further find that only that specific

material submitted under actual legal authority, such as the Federal Acquisition Regulation, is

required. In disregard of these cases, WMATA picks up the same discredited argument in regard

to change order requests—that all material, regardless of actual legal authority—is required

because it is necessary "to get paid." If applied to contract proposal documents, WMATA's

position would require disclosure of all materials submitted to in the proposal because the

proposal required to win the contract. Here, WMATA cannot point to any actual legal authority

because the contract and its contracting regulations simply do not require the particular material

submitted by ERG.

ERG's submissions remaining at issue here were detailed proposals describing tasks and

contract requirements different from and beyond the scope of the original contract ERG believed

were necessary because of the manner in which WMATA elected to administer the contract. In

support of its proposals, ERG volunteered detailed workflows, processes and procedures, and

task descriptions not present in the original contract. Examples include proposed changes in

scope regarding paper products support, data synchronization, pre-bill autoload, CTF

- 22 -

connectivity, and network infrastructure, each of which, by their terms, deal with new

requirements and tasks necessary to resolve operational problems, and modifications to existing

contract requirement language and periods of performance. *See, e.g.*, AR-8 ("Wave 1"

Documents): E2-1-27 (Paper Products Support); E4-1-8 (Data Synchronization); Pre-Bill

Autoload (unnumbered); Network Redundancy legal position and proposal; CTF Connectivity

letter, E8-1-4 (Website Functionality), and AR-13 ("Wave 2" Documents: B-E-1 1-25 (Data

Synchronization); B-E-2 1-17 (Pre-Bill Autoload); B-E-3 1-5 (CTF connectivity); and B-E-4 1-

10 (Network Infrastructure Plan).

Obviously, nothing in GP 2 or 9 imposes on ERG a requirement compelling ERG to

submit the type of comprehensive and detailed proposals reflected in the documents in suit. On

their face, the contract provisions advanced by WMATA as its "actual authority," upon which it

rests its "required submission" argument, fail the threshold *Critical Mass* test.

### D.    *Case Law Governing Application of* **Critical Mass** *Obliged WMATA To "Parse Out" the Information Submitted by ERG*

Finally, WMATA argues that every document submitted must be entirely voluntary or

"required to be submitted." WMATA objects to "parsing-out" documents and claims that the

case of *Malinckrodt, Inc. v. West*, 140 F.Supp.2d 1 (D.D.C. 2000) supports its position. This is

patently absurd and ignores the commonplace redactions that occur in countless FOIA releases,

and, indeed, the ones WMATA itself proposed here. Moreover, *Malinckrodt* and other cases, *see*

*e.g., Cortez III Service Corp. v. NASA*, 921 F. Supp. 8, 12 (D.D.C. 1996), which found that some

elements of a contract proposal were required and ultimately releasable and other elements were

voluntary and ultimately not releasable, obviously require a "a parsing out" – which is simply a

redaction of the nonreleasable information. Apparently, WMATA bases its position on the

misplaced premise that every last word of everything submitted by ERG was "required to be

submitted" "to get paid." But, as demonstrated above, WMATA cannot even make a colorable argument on this point because it fails to point to any "actual legal authority." Therefore, its argument here again falls short.

WMATA fails to point to any actual legal authority to require ERG's submissions. In an effort to create a legal standard to save its initial misreading of the law, WMATA invents the concept that every last word of ERG's submissions was "required to be submitted "to get paid." While this conveniently provides a post-hoc rationalization of WMATA's decisions, it does not rest on any actual legal authority. As ERG's submissions were not submitted under any actual legal authority, but were voluntarily submitted to negotiate contract administration issue, the lower standard of routine public disclosure should be applied. As ERG does not routinely publicly disclose such documents, they must be withheld under FOIA exemption 4.

**WHEREFORE,** for the foregoing reasons, ERG respectfully requests the Court to **DENY** the Motions for Summary Judgment of Defendant WMATA and of Intervenor-Defendant Cubic, and to **GRANT** the Motion for Summary Judgment of ERG.

Respectfully submitted,

**ERG TRANSIT SYSTEMS (USA), INC.**

By its attorneys:    /s/ Benjamin J. Lambiotte
                     Benjamin J. Lambiotte, Esq.
                     D.C. Bar No. 421288
                     blambiotte@gsblaw.com
                     Matthew C. Hoyer, Esq.
                     D.C. Bar. No. 975544
                     Robert A.W. Boraks, Esq.
                     D.C. Bar No.  72132
                     **GARVEY SCHUBERT BARER**
                     1000 Potomac Street, Fifth Floor
                     Washington, D.C. 20007
                     (202) 965-7880

Dated: July 30, 2008

- 24 -